## Oregon's Performance Plan for Mental Health Services for Adults with Serious and Persistent Mental Illness

### A. Recitals:

1.    The terms of this Performance Plan for Adults with Serious and Persistent Mental Illness ("Plan") relate to adults with serious and persistent mental illness ("SPMI") in Oregon. This Plan is intended to better provide adults in Oregon with serious and persistent mental illness with community services that will assist them to live in the most integrated setting appropriate to their needs, achieve positive outcomes, and prevent their unnecessary institutionalization.

2.    Title II of the Americans with Disabilities Act ("ADA") requires that public entities administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 42 U.S.C. §§ 12101 *et seq.*; *Olmstead v. L.C.*, 527 U.S. 581 (1999); 28 C.F.R. § 35.130(d). Further, a "public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

3.    Oregon recognizes and supports the Congressional finding that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency." *See* 42 U.S.C. § 12101(a)(7).

4.    Oregon is committed to compliance with the ADA. The Oregon Health Authority ("OHA") is taking steps to improve the lives of Oregonians with serious and persistent mental illness and to resolve the United States Department of Justice's ("USDOJ's") investigation of the State of Oregon's compliance with the integration mandate of Title II of the ADA and *Olmstead v. L.C.*, 527 U.S. 581 (1999), as they apply to adults with serious and persistent mental illness. This Plan is intended to further that progress.

5.    OHA does not deliver services directly, but does administer federal and state funds used for services described in this Plan.

6.    This Plan is not and shall not be construed as an admission on any issue or as an admission of liability by the State of Oregon. Oregon denies liability. This Plan does not create any third party rights.

7.    The measures in this Plan are goals that OHA aspires to meet, and OHA agrees to make diligent efforts to meet them. OHA has begun implementation of a number of improvements since November 2012, the State has invested substantial funds in that effort, and the State's goal through the use of the performance outcome measures below is to make additional system reforms in the next three years.

8.    If OHA does not meet any particular target or outcome measure at the end of each year, OHA and the Independent Consultant shall meet to determine the underlying reasons why

1

the outcome measure was not achieved, whether adjustments need to be made to that measure, whether the State has developed the infrastructure necessary to improve its performance and reach the outcome measure, whether to provide additional time for accomplishment of the measure, and whether to increase the term of this Plan. Any modification shall be in writing.

## B. General Terms and Definitions

1.  The effective date of this Plan is July 1, 2016.

2.  OHA will advocate to the Oregon Health Policy Board ("Board") and the Oregon Health Plan Quality Metrics Committee established under ORS chapter 413 ("Committee") that the Board and Committee develop additional metrics consistent with the performance outcome measures in this Plan.

3.  OHA shall collect and maintain data and records on each of the provisions of this Plan, in order to document that the requirements of this Plan are being properly implemented, and shall make such records reasonably available to the United States and the Independent Consultant, as set forth in Section F below.

4.  This Plan, including the above recitals, shall not be enforceable in any court proceeding. Noncompliance with any provision of this Plan shall not be actionable in court.

5.  In the event that responsibility for the provision and oversight of mental health services in Oregon is transferred to another state agency, those obligations of this Plan that run to the Oregon Health Authority (OHA) shall run to OHA's successor agency.

6.  The following definitions are to be used in connection with this Plan:

a.  An "**Acute Care Psychiatric Facility**" or "**Acute Care Psychiatric Hospital**" is a hospital that provides 24 hour-a-day psychiatric, multi-disciplinary, inpatient or residential stabilization, care and treatment, for adults ages 18 and older with severe psychiatric disabilities.

b.  "**Assertive Community Treatment**" (ACT) is an evidence-based practice designed to provide comprehensive treatment and support services to individuals with serious and persistent mental illness. ACT is intended to serve individuals who have severe functional impairments and who have not responded to traditional psychiatric outpatient treatment. ACT services are provided by a single multi-disciplinary team, which typically includes a psychiatrist, a nurse, and at least two case managers, and are designed to meet the individual needs of each individual and to help keep the individual in the community and out of a structured service setting, such as residential and/or hospital care. ACT is characterized by (1) low client to staff ratios; (2) providing services in the community rather than in the office; (3) shared caseloads among team members; (4) 24-hour staff availability, (5) direct provision of all services by the team (rather than referring individuals to other agencies); and (6) time-unlimited services.

c.  "**CCO Region**" means the geographical area served by a CCO.

2

d.    "**Competitive Integrated Employment**" means full-time or part time work:

(i)     at minimum wage or higher, at a rate that is not less than the customary rate paid by the employer for the same or similar work performed by other employees who are not individuals with disabilities, and who are similarly situated in similar occupations by the same employer and who have similar training, experience, and skill;

(ii)    with eligibility for the level of benefits provided to other employees;

(iii)   at a location where the employee interacts with other persons who are not individuals with disabilities (not including supervisory personnel or individuals who are providing services to such employee) to the same extent that individuals who are not individuals with disabilities and who are in comparable positions interact with other persons; and

(iv)    as appropriate, presents opportunities for advancement that are similar to those for other employees who are not individuals with disabilities and who have similar positions.

e.    "**Discharge Planning**" means a process that begins upon admission to the Oregon State Hospital and that is based on the presumption that with sufficient supports and services, all individuals can live in an integrated community setting. Discharge planning is developed and implemented through a person-centered planning process in which the individual has a primary role and is based on principles of self-determination. Discharge planning teams at OSH include a representative of a community mental health provider from the county where the individual is likely to transition.

f.    "**Evidence-Based**" refers to well-defined practices that are based directly on scientific evidence and that have been demonstrated to be effective through research studies.

g.    "**Fidelity**" means that the ACT provider or supported employment provider is providing services that are faithful to the evidence-based practice model (ACT or Individual Placement and Support) and obtains a satisfactory score from the Oregon ACT Center of Excellence or the Oregon Supported Employment Center of Excellence, as part of their regular reviews.

h.    "**Homeless**" as used in this Plan, means an individual with no fixed address, including individuals in shelters. "Homeless," as used in this Plan, is limited to adult individuals with SPMI who are homeless.

i.    "**Jail Diversion Services**" are community-based services that are designed to keep individuals with behavioral health issues out of the criminal justice system and, instead, supported by other community based services, such as mental health services, substance abuse services, employment services, and housing. Jail diversion services are intended to minimize contact with law enforcement, avoid jail time, and/or reduce jail time. These services are

3

intended to result in the reduction of the number of individuals with mental illness in the criminal justice system or Oregon State Hospital.

j.      **"Mobile Crisis Services"** are mental health services for people in crisis, provided by mental health practitioners who respond to behavioral health crises onsite at the location in the community where the crisis arises and who provide a face-to-face therapeutic response. The goal of mobile crisis services is to help an individual resolve a psychiatric crisis in the most integrated setting possible, and to avoid unnecessary hospitalization, inpatient psychiatric treatment, involuntary commitment, and arrest or incarceration.

k.      **"Peer-Delivered Services"** are community-based services and supports provided by peers, and peer support specialists, to individuals or family members with similar lived experience. These services are intended to support individuals and families to engage individuals in ongoing treatment and to live successfully in the community. OHA may utilize peer-delivered services in providing other mental health services, such as ACT, crisis services, warm handoffs from hospitals, and services at the Oregon State Hospital.

l.      **"Ready to Place/Ready to Transition"** means that, consistent with the scope of the order of commitment, the individual's discharge planning team has determined that a placement in the community is the most integrated setting appropriate for the individual, and that the individual was subject to a discharge planning process consistent with the definition in this Plan.

m.      **"Sequential Intercept Model"** is the model which describes a series of junctures in the criminal justice system where interventions can be made to prevent an individual with mental illness from entering the criminal justice system or from becoming further involved in the system, by instead receiving appropriate community-based mental health interventions, to the benefit of the individual and the community.

n.      **"Supported Employment Services"** are individualized services that assist individuals to obtain and maintain integrated, paid, competitive employment. Supported employment services are provided in a manner that allows individuals to work the maximum number of hours consistent with their preferences, interests and abilities and are individually planned, based on person-centered planning principles and evidence-based practices.

o.      **"Supported Housing"** is permanent housing with tenancy rights and support services that enables people to attain and maintain integrated affordable housing. Support services offered to people living in supported housing are flexible and are available as needed and desired, but are not mandated as a condition of obtaining tenancy. Tenants have a private and secure place to make their home, just like other members of the community, with the same rights and responsibilities. Supported housing enables individuals with disabilities to interact with individuals without disabilities to the fullest extent possible. Supported housing is scattered site housing. To be considered supported housing under this Plan, for buildings with two or three units, no more than one unit may be used to provide supported housing for tenants with SPMI who are referred by OHA or it contractors, and for buildings or complexes with four or more units, no more than 25% of the units in a building or complex may be used to provide supported

4

housing for tenants with SPMI who are referred by OHA or it contractors. Supported housing has no more than two people in a given apartment or house, with a private bedroom for each individual. If two people are living together in an apartment or house, the individuals must be able to select their own roommates. Supported housing does not include housing where providers can reject individuals for placement due to medical needs or substance abuse history.

## C. Funding Limitation

This Plan on performance outcomes is subject to Oregon law. Nothing in this Plan will be construed as permitting any violation of Article XI, Section 7 of the Oregon Constitution or any other law regulating liabilities or monetary obligations of the State of Oregon. The State will make diligent efforts to obtain the funding, appropriations, limitations, allotments, or other expenditure authority necessary to implement the terms of this Plan.

## D. Performance Outcomes

OHA agrees to the following performance outcomes. Unless otherwise specified, the completion date for all provisions is July 1, 2019.

### Assertive Community Treatment ("ACT")

1. OHA will increase the number of individuals with SPMI served by ACT teams. OHA will provide ACT services to everyone who is referred to and eligible for ACT, and will meet the following metrics:

    a. 1,050 individuals will be served by the end of year one (June 30, 2017).

    b. 2,000 individuals will be served by the end of year two (June 30, 2018).

    c. After year two (after June 30, 2018), if 10 individuals in a CCO region have been referred, are eligible and are appropriate for ACT, and are on a waitlist to receive ACT that has lasted for more than 30 days, OHA will take action to reduce the waitlist and serve those individuals by (i) increasing team capacity to a size that is still consistent with fidelity standards, or (ii) by adding additional ACT team(s).

    d. OHA may waive the fidelity requirements regarding the number of individuals served by a team and the proportional reduction in staff for ACT teams in rural areas if the teams are unable to achieve fidelity. OHA shall report on any such waiver to USDOJ.

    e. By July 1, 2016, OHA will develop criteria for admission to ACT consistent with the definition in this Plan and based on national standards and provide them to USDOJ.

Disability Rights Oregon v. Allen, 3:02-cv-00339-MO
Declaration of Tom Stenson, Exh. A, Page 5 of 21

      f.      Thereafter, OHA will incorporate those admission criteria into administrative rules.

2.      Individuals who meet the admission criteria for ACT will be admitted to ACT.

3.      OHA will track denials of individuals to ACT teams to determine if denials are based on established admission criteria. OHA shall take corrective action if providers are improperly rejecting individuals for ACT services.

4.      OHA will gather the data listed below regarding individuals with SPMI receiving ACT services. These data points will be collected internally as a part of the quality improvement monitoring of ACT programs to determine the effectiveness of individual programs and the statewide effectiveness of ACT. The information will be used to identify areas for technical assistance and training. OHA will establish regular reporting of these metrics, and these reports will be made available to USDOJ.

      a.      Number of individuals served;

      b.      Percentage of clients who are homeless at any point during a quarter;

      c.      Percentage of clients with safe stable housing for 6 months;

      d.      Percentage of clients using emergency departments during each quarter for a mental health reason;

      e.      Percentage of clients hospitalized in OSH during each quarter;

      f.      Percentage of clients hospitalized in an acute care psychiatric facility during each quarter;

      g.      Percentage of clients in jail at any point during each quarter;

      h.      Percentage of individuals receiving Supported Employment Services during each quarter; and

      i.      Percentage of individuals who are employed in competitive integrated employment, as defined above.

5.      The services measured in paragraphs D.1 to D.4 are for all services billed to Medicaid, regardless of whether the Medicaid claim was accepted, and for services through OHA that are paid for with state general funds used for treatment of the indigent.

*Crisis Services*

6.      OHA will expand its mobile crisis services as follows: by the end of year two (June 30, 2018), mobile crisis services will be expanded so that they are available statewide.

6

7.      OHA will increase the number of individuals served with mobile crisis services, as follows:

      a.      During year one (July 1, 2016 to June 30, 2017), 3,500 people will be served by mobile crisis.

      b.      During year two (July 1, 2017 to June 30, 2018), 3,700 people will be served by mobile crisis.

8.      OHA will track and report the number of individuals receiving a mobile crisis contact.

      a.      By the end of year one (June 30, 2017), OHA will develop a methodology to track dispositions after a mobile crisis contact.

      b.      Six months after the development of the methodology, OHA will begin reporting the number of individuals whose disposition from mobile crisis is admission to Acute Care.

      c.      By the end of year two (June 30, 2018), Oregon will report the number of individuals whose dispositions after contact with mobile crisis result in stabilization in a community setting rather than arrest, presentation to an emergency department, or admission to an acute care psychiatric facility.

9.      By the end of year one (June 30, 2017), for areas that are not rural or the frontier, mobile crisis teams shall respond "from the initial call to face to face" within 1 hour.

10.      For frontier areas, the following outcomes apply.

      a.      By the end of year one (June 30, 2017), a mobile crisis team member shall respond "from the initial call to face to face" within 3 hours.

      b.      During year two (July 1, 2017 to June 30, 2018), OHA shall review its progress against this standard and against best practices to determine if adjustments are needed.

11.      In rural areas, by the end of year one (June 30, 2017), a mobile crisis team member shall respond "from the initial call to face to face" within two hours.

12.      In frontier and rural areas, a person who is trained in crisis management (such as a person from a crisis line or a peer) shall call within 1 hour.

      a.      During year two (July 1, 2017 to June 30, 2018), OHA shall review its progress against this standard and against best practices to determine if adjustments are needed.

13.      OHA will develop and enforce uniform standards for hotline services and County Crisis Lines.

***Supported Housing***

14.    OHA's housing efforts will include an increase in the number of individuals with SPMI in supported housing, as follows:

    a.    In year one (July 1, 2016 to June 30, 2017), at least 835 individuals will live in supported housing.

    b.    In year two (July 1, 2017 to June 30, 2018), at least 1,355 individuals will live in supported housing.

    c.    In year three (July 1, 2018 to June 30, 2019), at least 2,000 individuals will live in supported housing.

OHA recognizes that individuals may decline housing offered to them. However, OHA will make best efforts to match individuals to housing that meets their needs and individual choices.

15.    OHA will collect data regarding the housing stock or inventory that is available for individuals with SPMI. OHA will also continue to track the number of individuals with SPMI receiving supported housing. This information will be used to make a budget request for affordable housing for individuals with SPMI in connection with OHA's 2017- 2019 budget.

***Peer-Delivered Services***

16.    OHA will increase the availability of peer-delivered services, consistent with the definition above, as follows:

    a.    By the end of year one (June 30, 2017), OHA will increase the number of individuals who are receiving peer-delivered services by 20%.

    b.    By the end of year two (June 30, 2018), OHA will increase the number of individuals who are receiving peer-delivered services by an additional 20%.

17.    OHA measures the number of peer-delivered services by using Medicaid billing data. In Oregon, many individuals receive peer-delivered services which are billed under another Medicaid billing code, and which are not captured in this methodology. Accordingly, OHA believes that this methodology significantly undercounts the number of persons actually receiving peer-delivered services in Oregon. Nevertheless, OHA agrees to use this methodology in order to track increases in peer-delivered services and meet the metrics set by this provision. OHA will continue to explore better and more accurate ways to count peer-delivered services. If a more accurate method is identified, OHA may agree to modify the methodology to track the provision of peer-delivered services.

18.    The services measured in paragraphs D.16 and D.17 are for all services billed to Medicaid, regardless of whether the Medicaid claim was accepted, and for services through OHA that are paid for with state general funds used for treatment of the indigent.

8

*Oregon State Hospital*

19.    Paragraphs D.20 to D.26 below apply only to civilly-committed adult individuals at Oregon State Hospital ("OSH"), except to the extent specifically noted in D.26 below.

20.    Discharge from OSH will occur as soon as an individual is ready to return to the community, as follows:

    a.    By the end of year one (June 30, 2017), 75% of individuals who are Ready to Place/Ready to Transition will be discharged within 30 calendar days of placement on that list

    b.    By the end of year two (June 30, 2018), 85% of individuals who are Ready to Place/Ready to Transition will be discharged within 25 calendar days of placement on that list

    c.    By the end of year three (June 30, 2019), 90% of individuals who are Ready to Place/Ready to Transition will be discharged within 20 calendar days of placement on that list.

    d.    If the last calendar day for a discharge within a timeframe found in subparagraphs (a) through (c) above falls on a weekend or holiday, that timeframe shall be extended to the next business day.

    e.    OSH will track and report on discharges that are extended to and occur on the business day following a weekend day or holiday under subparagraph (d) above.

    f.    OHA agrees that discharges from OSH of members of a Coordinated Care Organization ("CCO") should be consistent with the Oregon Administrative Rules. OHA will work with CCOs to help them meet their obligations regarding the discharge of their members from OSH, consistent with the Oregon Administrative Rules.

21.    The preferred discharge is one where an individual is discharged from OSH within 72 hours of the determination that the individual is Ready to Place/Ready to Transition.

22.    OHA will enter into performance-based contracts to help it pursue paragraphs D.20 and D.21. These contracts may be with Community Mental Health Programs ("CMHPs"), CCOs, or with other entities, as appropriate.

23.    OSH will discharge individuals with linkages to appropriate services, as follows:

9

    a.      Everyone discharged from OSH who is appropriate for ACT shall receive ACT or an evidence-based alternative.[1]

         i.    OHA shall document efforts to provide ACT to individuals who initially refuse ACT services, and shall document all efforts to accommodate their concerns.

         ii.    OHA shall offer alternative evidence-based intensive services for individuals discharged from OSH who refuse ACT services.

    b.      Everyone discharged from OSH who is determined not to meet the level of care for ACT shall be discharged with services appropriate to meet their needs.

24.      At the end of year one (June 30, 2017), OSH will discharge 90% of individuals within 120 days of admission.[2]

    a.      As of the effective date of this Plan and continuing thereafter, if an individual is at OSH for more than 90 days, the OHA Director or her designee shall perform a clinical review of the individual's status to determine whether a continued stay at OSH is necessary.

    b.      When a review is performed under subparagraph (a) above or (d) below, the justification for the individual's stay shall be clearly documented.

    c.      If the OHA Director or her designee determines that there is an appropriate clinical justification for the individual to remain at OSH, the Director or her designee shall approve the extension of the individual's stay for up to 45 additional days.

    d.      If an extension has been approved, the OHA Director or her designee shall conduct a follow-up clinical review of the individual's status every additional 45 days.

    e.      If the OHA Director or her designee determines that there is not an appropriate clinical justification for the individual to remain at OSH, the Director of OSH shall work to expeditiously identify and move the individual to an appropriate clinical placement.

    f.      OHA will review best practices on this issue annually.

---

[1] Services will be offered to everyone, but this involves an issue of individual choice. OHA shall make diligent efforts to inform each individual leaving OSH who is eligible for ACT about ACT services, in order to understand and address the individual's concerns about ACT and to tailor ACT services to the individual. OHA will provide data to USDOJ about individuals by quarter, who were offered ACT services and refused.

[2] As of July 2015, the average length of stay at OSH for civilly committed individuals was 7.3 months.

25.    Every individual discharged from Oregon State Hospital shall be discharged to a community placement in the most integrated setting appropriate for the individual. Discharge shall be to housing consistent with the individual's treatment goals, clinical needs, and the individual's informed choice. The individual's geographic preferences and housing preferences (e.g., living alone or with roommates) shall be reasonably accommodated, in light of cost, availability, and the other factors stated above. Cost shall not be used as a justification for denying housing. Discharges shall not be to a secure residential treatment facility unless clinically necessary. No one shall be discharged to a secure residential treatment facility without the express approval of the Director of OHA or her designee.

26.    If OHA utilizes interim, short-term, community-based housing for exceptional cases where individuals are ready to discharge from more restrictive settings and for whom permanent housing is not yet available, the following limitations shall apply:

    a.    OHA may make available interim, short-term, community-based housing for individuals who are ready to discharge from OSH or from secure residential treatment facilities ("SRTFs") and for whom permanent housing is not yet available. OHA may also utilize such housing for individuals who are ready to discharge from acute care psychiatric facilities in accordance with paragraph D.33. Interim housing shall have no more than 5 individuals per unit. An individual's stay in interim housing shall not last more than two months.

    b.    Individuals in interim housing shall be moved to long-term integrated housing within two months. Individuals in interim housing shall receive all services specified in their discharge plan.

    c.    OHA shall report to USDOJ on all individuals who are placed in interim housing and the steps OHA is taking to place them in long-term integrated housing.

    d.    OHA will phase out any interim housing or convert it to long-term integrated housing consistent with this Plan by July 1, 2019.

    e.    OHA shall have no more than 20 interim housing slots.

***Acute Psychiatric Care***

27.    All individuals with a serious and persistent mental illness who are discharged from Acute Care Psychiatric Facilities (not including OSH) will have documentation of linkages to timely, appropriate behavioral and primary health care in the community prior to discharge.

28.    OHA shall continue with its process to enroll all or substantially all indigent individuals with SPMI not yet enrolled in Medicaid prior to discharge from acute care psychiatric facilities or emergency departments, consistent with state law.

29.    All individuals discharged from an acute care psychiatric facility will be presented a "warm handoff" to a community case manager, peer bridger, or other community provider prior to discharge. OHA shall require acute care psychiatric facilities to report to OHA all individuals who refused a warm handoff on a quarterly basis, and OHA shall report this information to USDOJ, beginning with data for the second quarter of year one (October 1, 2016 to December 31, 2016). OHA shall provide this as aggregate data by acute care psychiatric facility. A warm handoff is the process of transferring a client from one provider to another, prior to discharge, which includes face-to-face meeting(s) with the client, and which coordinates the transfer of responsibility for the client's ongoing care and continuing treatment and services. A warm handoff shall either (a) include a face-to-face meeting with the community provider and the client, and if possible, hospital staff, or (b) provide a transitional team to support the client, serve as a bridge between the hospital and the community provider, and ensure that the client connects with the community provider. For warm handoffs under subparagraph (b), the transitional team shall meet face to face with the client, and if possible, with hospital staff, prior to discharge. Face-to-face in person meetings are preferable for warm handoffs. However, a face-to-face meeting may be accomplished through technological solutions that provide two-way video-like communication on a secure line ("telehealth"), when either distance is a barrier to an in person meeting or individualized clinical criteria support the use of telehealth.

a.    By the end of year one (June 30, 2017), 60% of individuals discharged from an acute care psychiatric facility will receive a warm handoff to a community case manager, peer bridger, or other community provider.

b.    By the end of year two (June 30, 2018), 75% of individuals discharged from an acute care psychiatric facility will receive a warm handoff to a community case manager, peer bridger, or other community provider.

c.    By the end of year three (June 30, 2019), 85% of individuals discharged from an acute care psychiatric facility will receive a warm handoff to a community case manager, peer bridger, or other community provider.

30.    OHA will continue to require that individuals receive a follow up visit with a community mental health provider within 7 days of discharge, and OHA will report this data.

31.    OHA will reduce recidivism to acute care psychiatric facilities, and OHA will take the following steps.

a.    OHA will monitor and report the 30 and 180 day rates of readmission, by acute care psychiatric facility.

b.    OHA will provide a management plan for contacting and offering services to individuals with two or more readmissions to an acute care psychiatric hospital in a six month period designed to assist the individuals to avoid unnecessary readmission in acute care hospitalization.

32.    OHA will identify individuals with SPMI who are homeless and who have had two or more readmissions to an acute care psychiatric hospital in a six month period. OHA or

12

another system participant will connect these individuals to a housing agency or mental health agency with access to housing, in order to work to ensure that those individuals are linked to housing in an integrated setting, consistent with the individual's treatment goals, clinical needs, and the individual's informed choice.

33.    If necessary, OHA may make use of the interim housing described in paragraph D.26 for the individuals described in paragraph D.32 above.  If interim housing is utilized for this purpose, paragraph D.26.b does not apply.

34.    OHA will work with acute care psychiatric facilities, CCOs, and CMHPs to seek to ensure that individuals with SPMI who are discharged from acute care psychiatric facilities are discharged to housing that meets the individual's immediate need for housing.  OHA will establish requirements for acute care psychiatric hospitals to assess the housing needs of individuals with SPMI.  OHA shall require that, for all individuals with SPMI who are CCO members, the acute care psychiatric facilities shall consult with the individual's CCO in developing the assessment.  The assessment will be documented in a plan for integrated housing that is part of the individual's discharge plan, and will be based on the individual's treatment goals, clinical needs, and the individual's informed choice.  The hospital will notify the individual's community provider regarding the plan for housing in order for the provider to facilitate the implementation of the plan for housing.

35.    OHA will measure the average length of stay of individuals with SPMI in acute care psychiatric facilities, by hospital. OHA will also report the number of individuals with SPMI in each facility whose length of stay exceeds 20 days.

36.    The services measured in paragraphs D.27 to D.35 are for all services billed to Medicaid, regardless of whether the Medicaid claim was accepted, and for services that are paid for with state general funds used for treatment of the indigent.

### *Emergency Departments*

37.    OHA will work with hospitals to collect data regarding individuals with SPMI who present to emergency departments for mental health reasons. This data will be analyzed to identify issues related to individuals staying in the emergency department for over 23 hours. OHA will identify reasons for individuals remaining in emergency departments beyond 23 hours and will provide proposals for solutions to address this issue. This analysis will be presented to the Legislature during the next legislative session. This analysis will be provided to the USDOJ. OHA will initiate additional community-based strategies to address this issue, beginning in the fall of 2016.

38.    The data in the analysis described in paragraph D.37 will also be used to assess the needs of individuals with SPMI who leave the emergency department and strategies for linking them to services.  OHA will initiate strategies to increase the number of individuals with SPMI who are connected to services at the time that they leave emergency departments and will collect data to measure the effectiveness of these strategies.

Disability Rights Oregon v. Allen, 3:02-cv-00339-MO
Declaration of Tom Stenson, Exh. A, Page 13 of 21

39.    As provided in paragraph D.28, OHA shall continue its process to enroll all or substantially all indigent individuals with SPMI not yet enrolled in Medicaid prior to discharge from emergency departments.

40.    OHA will reduce recidivism to emergency departments for psychiatric purposes, by taking the following steps:

    a.    OHA will track emergency department readmissions of individuals with SPMI by hospital. Emergency departments include the use of psychiatric emergency services, such as the proposed Unity Center in Portland.  OHA will monitor the number of individuals with SPMI with two or more readmissions to an emergency department for psychiatric reasons in a six month period, and will continue to work with CCOs and CMHPs to better address the needs of these individuals in less institutional settings.

    b.    OHA shall enter into collaborative efforts with CCOs and CMHPs to develop and implement plans to (a) address the needs of individuals with SPMI with two or more readmissions to an emergency department for psychiatric reasons in a six-month period, and (b) meet their needs in less institutional settings where appropriate.  OHA will seek contract amendments to CCO contracts in 2018 that will require that acute care psychiatric hospitals develop and implement plans to address the needs of these individuals and address their needs in less institutional settings.

41.    OHA will reduce the rate of visits to general emergency departments by individuals with SPMI for mental health reasons, as follows[3]:

    a.    By the end of year one (June 30, 2017), there will be a 10% reduction from the baseline.

    b.    By the end of year two (June 30, 2018), there will be a 20% reduction from the baseline.

    c.    By the end of year three (June 30, 2019), OHA will have a quality improvement process to track whether emergency room visits are decreasing.

42.    OHA agrees to meet with the Independent Consultant to discuss the use of emergency departments by individuals with SPMI who present to emergency departments for mental health reasons, but an additional performance outcome on this issue will not be added to this Plan or otherwise added as a performance outcome.

43.    OHA is working with hospitals to determine a strategy for collecting data regarding individuals with SPMI who are in emergency departments for longer than 23 hours. OHA will begin reporting this information in July 2017, and will provide data by quarter

---

[3] General emergency departments do not include psychiatric emergency services, such as the proposed Unity Center in Portland.

Disability Rights Oregon v. Allen, 3:02-cv-00339-MO
Declaration of Tom Stenson, Exh. A, Page 14 of 21

thereafter. OHA will report this information by region.   OHA will pursue efforts to encourage reporting on a hospital-by-hospital basis.

     44.    The services measured in paragraphs D.37 to D.43 are for all services billed to Medicaid, regardless of whether the Medicaid claim was accepted, and for services that are paid for with state general funds used for treatment of the indigent.

### Supported Employment

     45.    OHA will report the following:

        a.    The number of individuals with SPMI who receive supported employment services who are employed in competitive integrated employment, as defined above.

        b.    The number of individuals with SPMI who no longer receive supported employment services and are employed in competitive integrated employment without currently receiving supportive services from a supported employment specialist (but who may rely upon natural and other supports).

     46.    OHA will regularly monitor the foregoing data for the purpose of improving Supported Employment services.

     47.    The services measured in paragraphs D.45 and D.46 are for all services billed to Medicaid, regardless of whether the Medicaid claim was accepted, and for services through OHA that are paid for with state general funds used for treatment of the indigent.

     48.    Receipt of supported employment services does not guarantee a job or work for a specific number of hours.

### Secure Residential Treatment Facilities

     49.    Civilly committed individuals in secure residential treatment facilities ("SRTFs") whose clinical needs no longer necessitate placement in a secure facility shall be moved expeditiously to a community placement in the most integrated setting appropriate for that individual.

        a.    These moves shall be consistent with the housing provisions in paragraph D.50.

        b.    OHA will seek to reduce the length of stay of civilly committed individuals in secure residential treatment facilities, as follows:

            i.    By the end of year one (June 30, 2017), there will be a 10% reduction from the baseline.

15

ii.    By the end of year two (June 30, 2018), there will be a 20% reduction from the baseline.

c.    OHA will regularly report on the number of civilly committed individuals in SRTFs, their lengths of stay, and the number of individuals who are discharged. Starting at the beginning of year two of this Plan (July 1, 2017), OHA will collect data identifying the type of, and the placement to which they are discharged.

50.    Civilly committed individuals who are discharged from secure residential treatment facilities shall be moved to a community placement in the most integrated setting appropriate for that individual. Discharge shall be to housing consistent with the individual's treatment goals, clinical needs, and the individual's informed choice. The individual's geographic preferences and housing preferences (e.g., living alone or with roommates) shall be reasonably accommodated in light of cost, availability, and the other factors stated above. Cost shall not be used as a justification for denying housing.

### *Criminal Justice Diversion*

51.    The intent of the following provisions is to reduce the contacts between individuals with SPMI and law enforcement due to mental health reasons. OHA hopes to reduce arrests, jail admissions, lengths of stay in jail, and recidivism for individuals with SPMI who are involved with law enforcement due to a mental health reason.

52.    OHA will work to decrease the number of individuals with serious and persistent mental illness who are arrested or admitted to jail based on a mental health reason, by engaging in the following strategies:

a.    OHA will continue to report the number of individuals with SPMI receiving jail diversion services and the number of reported diversions. OHA will require, under new contracts with entities providing jail diversion services, that contract providers report the number of diversions pre- and post-arrest. OHA will include this requirement in all RFPs for any new jail diversion programs.

b.    By July 2016, OHA will begin to work collaboratively with the Oregon Sheriffs' Association and the Association of Community Mental Health Programs to determine strategies to collect data on individuals with SPMI entering jails.

c.    By July 2016, OHA will contract with The GAINS Center to consult on the expansion of the use of the Sequential Intercept Model by local jurisdictions across the State, and will encourage local jurisdictions to adopt and implement interventions in accordance with this model. New funding for jail diversion services will require the county to adopt the Sequential Intercept Model.

16

d.  As of July 2016, OHA will track arrests of individuals with SPMI who are enrolled in services and will provide data by quarter thereafter.

e.  OHA will provide USDOJ with data quarterly from the jail diversion programs it funds, subject to paragraph F.6 below.

f.  OHA shall continue to collect data regarding individuals with SPMI enrolled in mental health services who are arrested, the county where these individuals encountered law enforcement, existing jail diversion services, the impacts of those services, and obstacles to the success of those services. OHA will provide the results of any mapping and any additional relevant data to USDOJ and will allocate existing funding as necessary to support additional or enhanced jail diversion programs based on the results. OHA-funded jail diversion grants shall prioritize pre-charge diversion activities.

53.  OHA shall work with local jurisdictions to develop strategies to share information with jails regarding the mental health diagnosis, status, medication regimen, and services of individuals with SPMI who are incarcerated.

## E.  Quality and Performance Improvement

1.  OHA will continue to develop and implement a quality and performance improvement system specific to the performance outcomes described in Section D of this Plan. The quality and performance improvement system will seek to ensure compliance with these outcome measures and will seek to ensure that the community-based services for individuals with SPMI described in this Plan are offered in accordance with the requirements of the Plan.

OHA will seek to ensure that the mental health and other services and supports for individuals with SPMI addressed in the performance outcomes in Section D of this Plan and funded by the State are of good quality and are sufficient to provide reasonable opportunities to help individuals achieve increased independence and greater integration into the community, and avoid negative outcomes, including harm, hospitalization, contacts with law enforcement, and institutionalization. The quality improvement measures described in this Plan do not, however, establish a level of benefits or standard of care.[4]

The quality and performance improvement system will monitor the following performance outcomes in this Plan:

o  Assertive Community Treatment Services (paragraphs D.1 to D.5)
o  Crisis Services (paragraphs D.6 to D.13)
o  Supported Housing (paragraphs D.14 to D.15)
o  Peer-Delivered Services (paragraphs D.16 to D.18)
o  Oregon State Hospital (paragraphs D.19 to D.26)

---

[4] *See* Olmstead, 527 U.S. at 603 n. 14

17

o   Acute Psychiatric Care (paragraphs D.27 to D.36)
o   Emergency Departments (paragraphs D.37 to D.44)
o   Supported Employment (paragraphs D.45 to D.48)
o   Secure Residential Treatment Facilities (paragraphs D.49 to D.50)
o   Criminal Justice Diversion  (paragraphs D.51 to D.53)

2.     OHA will maintain a system for accountability for the performance outcomes specified in Section D of this Plan, by including the following elements of OHA's USDOJ Project governance structure:

a.     USDOJ Agreement Stakeholder Advisory Team: composed of a cross section of diverse stakeholders, including a minimum of 20% individuals with lived experience, to review and comment on the progress towards and performance of the outcomes specified in Section D and provide advice to OHA regarding the strategies being employed.

b.     Olmstead Plan Stakeholder Team: composed of membership from the Addictions and Mental Health Planning and Advisory Council's Housing and Olmstead Subcommittee, USDOJ Agreement Stakeholder Advisory Team, OSH Community Reintegration Committee and Oregon Consumer Advisory Council (OCAC) to review and comment on the progress towards and performance of the outcomes specified in Section D and provide advice to OHA regarding the strategies being employed.

3. Additionally, OHA will:

a.     Provide minutes of meetings, formal correspondence and reports, if any, that may issue from the above groups to USDOJ and the Independent Consultant.

b.     OHA may modify the process described in paragraph E.2 above in consultation with the Independent Consultant.

4.     OHA will maintain a quality improvement system for behavioral health services that incorporates the following elements:

a.     Data collection and analysis: OHA shall collect and utilize consistent, reliable data regarding services for individuals with SPMI receiving publicly funded behavioral health services in order to:

(i). Identify trends, patterns, strengths, successes, and problems at the individual, service-delivery, and systemic levels, including, but not limited to, quality of services, service gaps, accessibility of services, and the success and obstacles to serving individuals with SPMI;

(ii). Develop preventative, corrective, and improvement measures to address identified problems and build on successes; and

18

(iii) Track the efficacy of preventative, corrective, and improvement measures and revise these measures as appropriate.

b.    OHA will issue regulations or enter into performance-based contracts with CMHPs and other providers, either directly or through its CCOs, that specifically describe expectations with regard to the outcomes in Section D and the services and supports to be provided to individuals with SPMI consistent with the provisions of this Plan.

c.    Supported Employment and Assertive Community Treatment Providers shall continue to be reviewed annually for fidelity to a specific set of standards that demonstrate that the program is following an evidence-based model. Providers may not bill Medicaid or use General Funds unless they are subject to this annual fidelity review. These reviews will include interviews with participants in the program and their families when appropriate. Regardless of a provider's overall fidelity score, if a fidelity review identifies particular areas of weakness, OHA or the Oregon Supported Employment Center for Excellence or the Oregon Center of Excellence for Assertive Community Treatment shall provide technical assistance or other support to the provider, in order to help the provider remedy that deficiency. OHA or the relevant Center for Excellence shall review the provider's implementation of any corrective measures, shall evaluate whether the provider's performance in those areas improves, and shall take further action as necessary to assist the provider in remedying the deficiency.

d.    If a CMHP or CCO is acting in a way that OHA believes will frustrate substantial performance of this Plan, OHA will develop a corrective action plan, with timelines for implementation, oversight and monitoring by OHA.

5.    To further system transparency, OHA will post on its website semiannual reports regarding its quality improvement efforts under this Section E. OHA will also post reports regarding its performance of mental health outcomes found in other quality improvement initiatives that OHA has already initiated. These are (1) the Special Terms and Conditions of the July 11, 2015 Medicaid Demonstration, (2) metrics established by the Oregon Metrics and Scoring Committee, and (3) external quality reviews of behavioral health services by coordinated care organizations.

6.    The activities in this Section E will be used by OHA to direct and measure the implementation of the provisions in Section D. OHA's performance shall be measured by whether it substantially complies with those performance outcomes and the other obligations specified in Section D, and with whether OHA establishes or maintains the quality improvement measures required by this Section E. Section E and the activities that are described in it shall not be used to establish additional performance metrics for which OHA or the State would be responsible.

7.    Any review of OHA's performance of this Section E shall be limited to the extent it serves individuals with SPMI.

Disability Rights Oregon v. Allen, 3:02-cv-00339-MO
Declaration of Tom Stenson, Exh. A, Page 19 of 21

**F. Compliance and Reporting.**

1.    OHA will contract with Pamela S. Hyde, who shall serve as the Independent Consultant to assess OHA's performance under this Plan.   The Consultant's role in assessing OHA's performance shall be limited to assessing whether OHA is meeting the provisions of this Plan. The Consultant's engagement shall terminate three years from the execution of this Plan (July 1, 2019), unless otherwise agreed in a writing signed by the parties.

2.    At OHA's specific written request, the Independent Consultant will be available to assist OHA in implementing the provisions of the Plan, including providing training and technical assistance.  Such assistance may include recommendations to facilitate implementation, including quality and performance improvement processes, and identifying any obstacles to implementation and strategies to address such obstacles.

3.    Every six months, the Independent Consultant shall assess compliance as provided in paragraph F.1 and shall issue semi-annual reports of those assessments.  The Independent Consultant shall provide the report in draft to OHA and USDOJ, and OHA and USDOJ shall have 30 days to comment on the draft report.  Any report or statement by the Consultant is intended to aid in the resolution of this matter.  OHA shall make these reports public.

4.    OHA agrees to facilitate the Independent Consultant's access to documents, staff, and other information necessary to assess OHA's implementation of the Plan.  OHA shall also make a designated contact person available to respond to requests by the Independent Consultant. Contacts with other staff persons shall be facilitated through this person.

5.    If Ms. Hyde is unable to continue to serve as the Independent Consultant during an agreed-upon term of the engagement, or OHA and USDOJ mutually agree to replace Ms. Hyde, OHA and USDOJ agree to jointly select a replacement Independent Consultant.  If OHA and USDOJ are unable to agree on a replacement, OHA and USDOJ shall submit three proposed candidates each to the Chief Judge of U.S. District Court for the District of Oregon and ask the Court to appoint a replacement.  The Independent Consultant shall have experience administering a state mental health system.

//
//

Disability Rights Oregon v. Allen, 3:02-cv-00339-MO
Declaration of Tom Stenson, Exh. A, Page 20 of 21

6.      OHA shall provide the data required under this Plan to USDOJ and the Independent
Consultant.  All data shall be provided quarterly.  Additionally, OHA shall provide a semi-
annual report about the data.  To the extent that quarterly information from third parties, such as
from jail diversion providers, is not currently available, OHA shall seek contract amendments in
any contract entered into after July 1, 2016 that will require that data reporting be done on a
quarterly basis.

STATE OF OREGON, by and through
the Oregon Health Authority

By: _Lynne Saxton_

Lynne Saxton, Director

21