DAN RAYFIELD
Attorney General
CARLA A. SCOTT #054725
SHEILA H. POTTER #993485
CRAIG M. JOHNSON #080902
Senior Assistant Attorneys General
JILL CONBERE # 193430
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.oregon.gov
        Sheila.Potter@doj.oregon.gov
        Craig.M.Johnson@doj.oregon.gov
        Jill.Conbere@doj.oregon.gov

Attorneys for Defendants Patrick Allen, Sejal Hathi, Dolores Matteucci, and Sara Walker


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | Case No.  3:02-cv-00339-AN (Lead Case) Case No.  3:21-cv-01637-AN (Member Case) Case No.  6:22-CV-01460-AN (Member Case) |
| Plaintiffs, | DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF |
| v. | |
| SEJAL HATHI, in her official capacity as head of the Oregon Health Authority, and SARA WALKER in her official capacity as Interim Superintendent of the Oregon State Hospital, | |
| Defendants. | |
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON, | Case No.  3:21-cv-01637-AN (Member Case) |
| Plaintiffs, | |
| v. | |

Page 1 -   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
            REMEDIAL RELIEF
            CAS/a3m/982260266

SARA WALKER, Interim Superintendent of
the Oregon State Hospital, in her official
capacity, DOLORES MATTEUCCI, in her
individual capacity, SEJAL HATHI, Director
of the Oregon Health Authority, in her official
capacity, and PATRICK ALLEN in his
individual capacity,

            Defendants.


LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH; LEGACY
HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES
OREGON,

            Plaintiffs,

    v.

SEJAL HATHI, in her official capacity as
Director of Oregon Health Authority,

            Defendant.

Case No.  6:22-CV-01460-AN (Member Case)

## I.    INTRODUCTION

The Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) are not

currently in compliance with the seven-day admission requirement under the *Mink*

Injunction.  But neither contempt nor monetary sanctions are warranted.  OHA and OSH are

taking all reasonable steps to comply with the *Mink* Injunction, are not acting in willful

disobedience,[1] and have largely met or are actively engaged in meeting the recommendations

designed to regain compliance from the Court-appointed neutral expert (Dr. Debra Pinals).

Plaintiff Disability Rights Oregon's (DRO) motion for contempt and monetary sanctions

should, therefore, be denied.

---

[1] While willfulness is not an element for a contempt finding, it is relevant to what sanctions
or remedial order may be warranted.  *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1802 (2019)
("[A] party's good faith, even where it does not bar civil contempt, may help to determine an
appropriate sanction.")

Page 2 -    DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
            REMEDIAL RELIEF
            CAS/a3m/982260266

Defendants take no position on Plaintiffs' request for a remedial order that would preclude A&A defendants who are charged with only misdemeanors or being held for probation violations or extradition purposes from being admitted to OSH. With some reservations of rights, Defendants also do not oppose the requested relief asking the federal court to order OHA to hire an independent auditor, overseen and chosen by Dr. Pinals to (1) review how the state spent money dedicated to increasing the supply of behavioral health services in the community; (2) identify what levels of care are still lacking and where; and (3) provide this information in a public report to the court to be completed in 90 days. Defendants ask they be allowed to confer with Dr. Pinals regarding selection of the auditor, and they believe that more than 90 days will be needed to complete the study and report.

Defendants oppose the remaining requested remedial relief as impossible, not warranted, or too vague to enable Defendants to comply and for this Court to enforce.

## II.    FACTS

Defendants have proven and will further prove the facts in their January 23, 2025 Status Report (January 23 Status Report), ECF No. 556, through: (1) the live testimony at the January 24, 2025, status hearing by Dr. Sara Walker, Interim Superintendent of the Oregon State Hospital (OSH), Kristine Kautz, Deputy Director of Administration of the Oregon Health Authority (OHA), and Samantha Byers, Adult Behavioral Health Director for OHA, at the January 24 status hearing; and (2) live testimony at the contempt hearing set for March 12 and 13, 2025, by Dr. Walker, Dr. Sejal Hathi, Director of the Oregon Health Authority (OHA), and Ebony Clark, OHA's Behavioral Health Director.

At the contempt hearing, OHA/OSH will supplement the facts already in the record with the following facts via live testimony. On January 28, 2025, OHA/OSH met with Dr. Pinals to begin going over the status of all her past recommendations, confirm completed actions, modify timelines as appropriate, identify recommendations that had not been fully met and determine next steps for meeting them, and add new actions and benchmarks. As

Page 3 -    DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF
CAS/a3m/982260266

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

will be explained during live testimony at the contempt hearing, OHA/OSH have largely met or are actively engaged in meeting Dr. Pinals' recommendations, with some exceptions which are being addressed with Dr. Pinals and discussed with MPD. Dr. Pinals' recommendations remain the subject of ongoing, focused discussions, and Defendants are committed to meeting her expectations.

### III.    LEGAL STANDARD

This Court has the inherent power to enforce its orders through civil contempt. *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991). "Civil . . . contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 191 (1949). "Civil contempt in this context consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. . . The contempt need not be willful." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (citation and quotations omitted). Additionally, an alleged contemnor may defend against a finding of contempt by demonstrating a present inability to comply. *See United States v. Ayres*, 166 F.3d 991, 994 (9th Cir. 1999) (citations omitted). The burden of showing the inability to comply falls on the alleged contemnor. *N.L.R.B v. Trans Ocean Exp. Packing, Inc*., 473 F.2d 612, 616 (9th Cir. 1973). "Ability to comply is the crucial inquiry, and a court should weigh all the evidence properly before it determines whether or not there is actually a present ability to obey." *United States v. Drollinger*, 80 F.3d 389, 393 (9th Cir. 1996) (citations and quotations omitted).

To assess whether an alleged contemnor has taken every reasonable step to comply with the terms of a court order, the court can consider a history of noncompliance, and a failure to comply despite the pendency of a contempt motion. *Stone v. City and Cty. of San Francisco*, 968 F.2d 850, 856–57 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992); *see also Baker v. Ensign*, No. 11-CV-2060-BAS WVG, 2014 WL 3058323, at *11

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(S.D. Cal. July 3, 2014) (in denying motion for contempt, noting that the alleged contemnor did not have a history of noncompliance with court orders).

Whether to find contempt, and what sanctions to impose, lie with the court's discretion. *Reno Air Racing Ass'n*., 452 F.3d at 1130. "Despite this broad discretion, however, the 'judicial contempt power is a potent weapon' that must be exercised with care." *Hooks v. Int'l Longshore & Warehouse Union, Local 8*, 72 F. Supp. 3d 1168, 1183 (D. Or. 2014) (*citing Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)). Any contempt relief must be reasonably tailored to return the defendants to compliance with the injunction at issue. Where the purpose for contempt sanctions is to make the defendant comply, the court "must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 516 (9th Cir. 1992) (citation and quotations omitted). "[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).

The Ninth Circuit has instructed that, "[g]enerally, the minimum sanction necessary to obtain compliance is to be imposed." *Whittaker Corp*. 953 F.2d at 517; *Stone*, 968 F.2d at 861 (in fashioning contempt remedies, "federal courts should 'exercise the least possible power adequate to the end proposed'") (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)). And where, as here, the remedy is directed toward a state or local governmental entity, the federal court also must give "appropriate consideration . . . to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976).

Page 5 -   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
            REMEDIAL RELIEF
    CAS/a3m/982260266

                            Department of Justice
                            100 SW Market Street
                            Portland, OR 97201
                        (971) 673-1880 / Fax: (971) 673-5000

Federal courts "should always seek to minimize interference with legitimate state activities in tailoring remedies." *Stone*, 968 F.2d at 861.

Finally, any remedy to contempt must be specific enough that it is itself enforceable. *See Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) ("[C]ivil contempt is a severe remedy and principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt.") (citations and quotations omitted).

## IV.    ARGUMENT

**A.    Defendants have taken all reasonable steps within their power to comply with the injunction, are not willfully disobeying it, and have largely met or are actively engaged in meeting Dr. Pinals' recommendations.**

Together, the testimony given at the January 24 status hearing and that which will be given at the contempt hearing will prove that Defendants have taken and are taking all reasonable steps within its control and are substantially meeting Dr. Pinals' recommendations, with some exceptions that are being addressed with Dr. Pinals. Nevertheless, OSH is presently unable to admit all A&A defendants within seven days of the commitment orders. There is no willful disobedience. If Defendants could comply with that bright-line admission timeframe they would.

DRO contends that "Defendants have failed to implement six repeated recommendations made by Dr. Pinals." That contention is not accurate. First, DRO argues that Defendants have not met Dr. Pinals' recommendation that "[e]very effort should be made to examine discharge processes for both GEI and AA patients to expedite timely and safe processes." *Id.* at p. 14. As explained in their January 23 Status Report, live testimony at the January 24 status hearing, and will be further explained via live testimony at the contempt hearing, OHA/OSH have engaged in many efforts to examine the discharge processes for both GEI and A&A patients to expedite timely and safe discharges. And, as

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

explained in the January 23 Status Report, this work is now part of the new Extended Care Management Unit (ECMU).

Second, DRO asserts that OHA has not met Dr. Pinals' recommendation to "engage stakeholders to develop a process for real-time ongoing local in-jail review/consultation of all currently detained defendants in the [A&A] process ordered for restoration, and leverage resources expended on jail diversion programs in the community to conduct these reviews." *See* Dr. Pinals' Second Report at p. 24.  OHA did engage in this work for over a year, until the recommendation was conditionally paused while Defendants were in compliance. Defendants are now re-engaging with this work.

Third, DRO asserts, inaccurately, that OHA has not met Dr. Pinals' recommendation to review existing Community Mental Health Providers (CMHP) and Coordinated Care Organizations (CCO) contracts to determine the scope of existing contractual obligations to serve the A&A and GEI populations.

Regarding the County Financial Assistance Agreements (CFAA) with the CHMPs:

- OHA revised several service elements in the current CFAA (A&A, civil commitment, and residential treatment) to: (1) prioritize forensic and civil commitment populations; (2) clarify mandatory obligations; (3) prioritize placement in non-hospital settings.

- OHA added language recommended by Dr. Pinals.  For CMHPs' placement of A&As in the community, CMHPs are now required to be "primarily guided" by OSH's clinical teams' recommendations.  At OHA's request, Dr. Pinals reviewed this language before it was incorporated into the current CFAA.

- OHA added a new Plan of Resolution (POR) process into the current CFAA.  The POR requires CMHPs to notify OHA when a county determines that it cannot reasonably identify and place a mandatory behavioral health patient (A&A, GEI, and civil) discharging from a state or community hospital to the community within 60 calendar days after the hospital notifies the county that the patient no longer requires HLOC.  The CMHP must provide a plan of resolution to come back into compliance and work closely with OHA management to resolve the case.  This allows OHA to push CMHPs on developing alternative discharge plans, ensure that CMHPs are in fact being "primarily guided" by OSH for A&As and are planning for the least restrictive level of care, and to help the CMHP remove barriers to placement.  This prevents CMHPs from only looking at SRTFs, claiming they have no resources (when they usually still have funds in

Page 7 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF
CAS/a3m/982260266

their contract), or allowing CMHPs to sit on these cases without sending out new referrals or doing other problem-solving.

Regarding the CCO contracts, changes are currently in motion that will address care broadly for CCO members, as well as CCO members who may be experiencing transitions to and from jail, community restoration, and OSH. In addition, over the last 2 years, several contractual and rule actions have either been put in place or are in motion, including:

- Language has been updated in the CCO contracts to point directly to Oregon Administrative Rule (OAR) requirements to ensure compliance and oversight by OHA as it relates to CCO responsibility to coordinate care for all members at the level of intensity and intervention the member requires, including those on AA, GEI and CC orders.

- Revised Care Coordination OARs effective February 1, 2024 (OARs 410-141-3860, 410-141-3865, 410-141-3870):

  - addresses known infrastructure and community partnership gaps. CCOs are now required to enter into agreements and establish connections with community agencies and partners serving their members, including carceral settings and Institutions for Mental Disease, to ensure that they are pro-actively putting in place processes that streamline action for their members.

  - adds a requirement for CCOs to establish risk stratification methodology and processes to stratify all members into risk levels that will aid in prioritization of outreach and engagement to address the most vulnerable while still outreaching and tracking those that are in the lower risk levels to ensure they are not escalating by experiencing Health Related Circumstance Changes (events that members may experience that pose a threat or change to their health status that may require support from their CCO and coordinators).- Currently carceral setting involvement and discharges are on that list of events at OAR 410-141-3865(3)(g)).

  - approves CCO's Risk Stratification models, as of December 31, 2024, via material document submissions and virtual demonstrations to measure each CCO's ability to effectively implement their proposed risk stratification methodology and demonstrate compliance with appropriate risk stratification processes for CCO members at all risk levels, including members of the A&A and GEI Populations.

  - adds a requirement for Care Profile Tracking and appropriate care planning, including for members of Moderate and High-risk class. The GEI, A&A and OSH discharge population of members will fall into the Moderate and high-risk levels of each CCO model and will require appropriate care planning for those members to support them in their transition.

Page 8 -   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF

- New OAR updates were added January 1, 2025, that include a section to address care planning, regardless of member engagement.  This ensures that CCOs are still actively working to address a member's health needs behind the scenes (referrals, educational information, connections and resources made to provide support, continued offers of engagement, etc.).  A&A, GEI and OSH discharging Members will be included in these processes.

- The CCO Contract now outlines requirements for reporting of Care Coordination policy and procedures.  Newly revised Evaluation Criteria for the Care Coordination Policy and Procedure ensures that CCOs are documenting their processes and procedures for coordinating care, including required time parameters for response to member experienced events that will include discharge or transitions from carceral settings or Institutions for Mental Disease.

- The CCO Contract outlines requirements for the CCOs to report on Care Coordination Activities through a bi-annual report data submission.  New reporting requirements capture data on how members are being stratified initially and how that risk level changes throughout their enrollment to ensure CCOs are appropriately outreaching and care planning.  This will include reporting of members experiencing transitions or discharge from Carceral settings or Institutions for Mental Disease.

- OHA has begun developing a plan for additional oversight of Risk Stratification processes and Care Coordination activities via bi-annual targeted case samples that will provide insight on CCO practices at a member level when coordinating care.  This will include the A&A, GEI and OSH discharge population among other targeted groups known to have care gaps.

- In alignment with new federal requirements (the 2023 Federal Consolidated Appropriations Act) and Oregon's participation in the 1115 Waiver Carceral Reentry Demonstration program, people experiencing incarceration will no longer lose their Medicaid coverage (it will be suspended) when they enter a carceral facility for stays less than a year.  While OSH patients are not covered (negotiations with the Centers for Medicare and Medicaid Services (CMS) were attempted and denied), Reentry Health Care benefits will apply and impact those incarcerated in participating carceral facilities, including those who are designated as A&A and GEI.  This includes, for example, CMHPs able to leverage Medicaid services for A&A patients while they are in local custody, which could support overall continuum of care Pre- and Post-OSH stays.

  o Accordingly, appropriate updates to the 2026 CCO Contract are actively being reviewed now, for effective date of January 1, 2026; these updates will reflect continued coverage for incarcerated people for stays under 90 days, or re-activated coverage for those in prison/longer jail stays in their final 90 days pre-release. The contract changes address CCO accountability to coordinate care with OHA Fee-For-Service, which will provide direct services under benefits.

  o This newly required collaboration between CCOs and Fee-For-Service during a member's incarceration will support transitions of care to community-based services prior to release, reducing the risk of overdose and recidivism at release.

Page 9 -   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
            REMEDIAL RELIEF
CAS/a3m/982260266

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

o Responsibilities of CCOs under new contract changes will include coordination with Fee-For-Service of a Health Risk Assessment and Reentry Care Plan, which will assess level of care needed for those on A&A/GEI orders. Changes will also include CCO accountability for 30-day post-release monitoring/follow up of Reentry Care Plan & service delivery.

o In addition, OHA has several actions in motion to support the shift for continued coverage for incarcerated people on the operations and policy side. This includes new and revised Oregon Administrative Rules (OARs) and design changes to our Medicaid Management Information Systems and the Oregon Eligibility system that will be implemented by January 1, 2026.

Fourth, DRO argues that Defendants have not met Dr. Pinals' recommendations to expand substance use disorder (SUD) treatments. Relevant to this recommendation, OSH has had medication for Opioid Use Disorder (Suboxone) in place for a while and has recently started using an injectable version (Sublocade), which helps prevent relapse and provides some protection for some time after discharge from OSH. In October 2024, OSH relaunched the Certified Alcohol and Drug Counselor training academy to train new staff to provide SUD treatment. OHA has also submitted policy option packages seeking at least $55 million to fund additional capacity building and increases in various services, including expansion of the Community Navigator Program and additional SUD services.

Fifth, DRO argues that Defendants have not established the community restoration timelines recommended by Dr. Pinals. DRO ignores, however, that Dr. Pinals' reports have always recognized that legislation is needed to impose time limits on community restoration. As explained in Defendant's January 23 Status Report, such legislation is now moving forward in the legislative process with the full support of Defendants and Governor Kotek.

Sixth, DRO points to a quote from Dr. Pinals' Fifth Report restating her recommendation that OHA revisit legislation that did not pass in the 2023 Legislative Session to limit community restoration. Again, that legislation is now underway in the 2025 Legislative Session.

Page 10 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF

In sum, circumstances outside Defendants' control currently prevent compliance with the *Mink* Injunction—namely, sharp, often unpredictable increases in A&A commitment orders, state-court judges prohibiting discharge of those on the A&A Ready to Place (RTP) List without a locked community placement when a lower level of care is appropriate and available, and lack of available community placements despite significant increases in funding over time.[2]  Since 2019, Defendants have been and continue to address those barriers, revamping their efforts regularly after analyzing data.  *See* January 23 Status Report at pp. 12-14.

**B.    DRO's argument that Defendants did not work to build capacity to address "predictable" increases in A&A commitment orders fails.**

DRO argues that the number of A&A commitment orders "has steadily risen over the past decade at a fairly predictable rate" and that Defendants failed to build capacity for restoration services in the community to meet that demand.  ECF No. 540 at p. 20.  Notably, DRO does not argue that Defendants failed to provide an adequate array of hospital level of care (HLOC) or secure residential treatment facility (SRTF) beds, which would be the most direct way to ensure an immediate ability to meet any predictable demand to comply with the *Mink* Injunction. *See id.* DRO's arguments fail.

First, the increase in commitment orders has not been at a steady, predictable rate. There have been different periods with significant (and unexpected) jumps.

---

[2] DRO's attempt to use the now-expired Oregon Performance Plan (OPP) as a standard by which this Court should measure Defendants' efforts fails as well.  OHA, with cooperation of the U.S. Department of Justice Civil Rights Division and an independent consultant, developed the OPP to improve and monitor mental health services for adults with serious and persistent mental illness to assist them in living in the most integrated setting appropriate to their needs and to prevent unnecessary institutionalization.  The OPP was not directed at the A&A and GEI populations.  The OPP was in effect between July 1, 2016, and June 30, 2019.  Moreover, the OPP states it "shall not be enforceable in any court proceeding. Noncompliance with any provision of this Plan shall not be actionable in court."

Page 11 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF

These are the average orders per month and percent change year over year.

| Year | Orders per Month | Percent Change |
|------|------------------|----------------|
| 2012 | 30.5 | |
| 2013 | 35.7 | 16.9% |
| 2014 | 38.4 | 7.7% |
| 2015 | 45.3 | 17.8% |
| 2016 | 51.9 | 14.7% |
| 2017 | 50.8 | -2.1% |
| 2018 | 60.8 | 19.5% |
| 2019 | 56.8 | -6.6% |
| 2020 | 54.4 | -4.1% |
| 2021 | 72.0 | 32.3% |
| 2022 | 79.3 | 10.1% |
| 2023 | 94.9 | 19.8% |
| 2024 | 97.4 | 2.6% |

This graph depicts the percentage change in orders per month from previous years:



To summarize:

- Orders were increasing at a fairly steady rate of about +15% each year between 2013 and 2016.

- But then there was nothing steady or standard about the rate at which orders were coming in between 2017 and 2020 (three of the four years actually saw decreases in new orders)

Page 12 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
        REMEDIAL RELIEF
        CAS/a3m/982260266

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- The spike in 2021, from 54 per month in 2020 to 72 per month, was the single biggest increase, year over year.

- Then, in 2022, the rate slowed to less than what occurred in 2012-2016.

- Then it jumped up again in 2023 (second highest year over year increase), almost immediately after the federal order was signed and the inpatient restoration limits were implemented.

- Then the rate slowed down again in 2024.

If the increases had been steady over this 13-year period, there would have been a flat, steady 10.2% increase year over year. The fact that some years saw as little as a 2.6% increase while some saw as much as a 32.3% increase demonstrates there has not been anything steady or predictable about the rate at which A&A commitment orders have issued.

Second, DRO's contention that Defendants failed to act reasonably to fund community restoration services and placements is belied by the significant increases in funding for capacity building in the community. As described in Defendants' January 23 Status Report and will be further testified to at the hearing on DRO's motion, funding increased for services and placements for the forensic populations in the community (via the CFAAs, grants, RFA responses, direct contracts, and other state funding sources) from over $44.4 million in the 2021-23 biennium to nearly $60 million in the 2023-25 biennium. In addition, Defendants are currently spending $9.4 million to build and fund more SRTFs and RTFs (money has been dedicated and shovels are in the ground) and nearly $1 million for flexible housing funds. And they are seeking in the current legislative session significantly more funding for further capacity throughout the community.

## C.    Most of the remedies DRO seeks are not warranted.

DRO asks this Court to: (1) impose unspecified daily sanctions against Defendants for each person waiting over seven days for transport to OSH, with a recommendation that the sanction amount double at fourteen days; and order the State to (2) limit misdemeanor and status offender referrals to OSH until compliance is achieved; (3) transfer or discharge all A&A patients on the RTP List within 30 days; (4) discharge all Psychiatric Security

CAS/a3m/982260266

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Review Board (PSRB) patients on the RTP List within 60 days; (5) hire a "cadre" of evaluators to re-evaluate patients in community restoration; and (6) commission an "external study by an outside group approved and [led] by Dr. Pinals" to review OSH admissions data, develop a statewide process to centralize oversight of the forensic mental health system, project system capacity to provide the demanded services, and "make any other findings as recommended by Dr. Pinals.

Defendants are working diligently to return to compliance, including following Dr. Pinals' recommendations. In any event, these requested remedies are overbroad, seek to inappropriately and unnecessarily insert the federal court into ongoing state court proceedings, and are not designed to achieve compliance with the injunction any sooner that OSH is already on track to achieve.

### 1.    Monetary Sanctions

Sanctions comprised of monetary fines are not warranted because Defendants are not willfully choosing to not comply. Rather, they are unable to comply. Coercive fines will not alter that reality, as illustrated by the numerous monetary sanctions that state courts have issued against OHA/OSH for not admitting A&A defendants within seven days in response to state-court show cause orders. Monetary sanctions will only hinder compliance.

In support of their request for substantial, increasing monetary sanctions against defendants, DRO points to two wholly inapposite cases. First, DRO relies on *Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F.Supp.2d 594 (S.D.N.Y. 2008), *aff'd* 351 Fed.Appx. 467 (2nd Cir. 2009), an out-of-district case in which substantial, continually doubling sanctions were upheld. However, the difference between that case and the instant action is clear in the reasons that the *Telenor* court determined such a sanction structure was appropriate: the parties against whom the sanctions were assessed were shareholders in a "multi-billion dollar enterprise" with "enormous financial resources" that had "shown a willingness to incur significant expense—including foregoing hundreds of millions in potential dividends and

CAS/a3m/982260266

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

prepayment of a $200 million loan—in order to avoid their legal obligations." *See* 587 F.Supp.2d at 621. By contrast, Defendants here are state agencies with limited operating budgets who have spent substantial amounts of money attempting to *comply* with their legal obligations and are working continually to increase funding for community capacity.

Similarly, the second case on which DRO relies to support the reasonability of its sanctions request, *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623 (9th Cir. 2016), is far afield from the facts before this Court. *See* ECF No. 40 at 24. In *Shell Offshore*, environmental activists violated a preliminary injunction establishing safety zones around Shell's contracted vessels by suspending themselves from a bridge to prevent one such vessel from leaving harbor. 815 F.3d at 627. The reviewing court dismissed as moot a challenge to a preliminary injunction, sanctions for violating which included a progressively increasing schedule of fines, beginning at $2,500 per hour on the first day and increasing to a maximum of $10,000 per hour on the fourth day and beyond, for as long as the activists remained suspended from the bridge. *Id.* at 627, 630-31.

The *Shell Offshore* case does not stand for the proposition that DRO asserts. Although DRO contends that the *Shell Offshore* court "approv[ed] sanctions structured as progressively increasing to compel compliance," the court did not make any determinations about the appropriateness of the sanctions. Instead, the court only addressed that sanction in so far as to conclude that the sanction at issue was a coercive civil contempt sanction rather than a criminal contempt sanction, as part of the court's overall analysis that the case before it was moot because the preliminary injunction on appeal had expired. 815 F.3d at 630-31.

Finally, although DRO is correct that financial constraints cannot justify noncompliance with the injunction, those constraints are not immaterial in the consideration of what type of sanctions may be appropriate. The Supreme Court has made clear that, in imposing a coercive sanction, a court must consider both "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested

Page 15 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
        REMEDIAL RELIEF
CAS/a3m/982260266

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

sanction in bringing about the result desired." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947).  And the Second Circuit case on which Plaintiff relies for an example of "substantial and increasing" monetary sanctions explains that district's requirement that courts consider "the contemnor's financial resources and the consequent seriousness of the burden on him" in imposing such sanctions. *See Telenor Mobile Commc'ns*, 587 F.Supp.2d at 621. Here, all the remedies requested by both Plaintiffs require funding to some degree to implement, and requesting substantial monetary fines is not in line with the parties' shared goal of Defendants returning to compliance as quickly as possible.

### 2.    Limiting Misdemeanor and Status Offender Referrals to OSH

Defendants take no position on the request for a federal remedial order that would prohibit those charged with only misdemeanor offenses, probation violations, or extradition charges from being admitted to OSH, and defer to the judgment of the Court.  Unlike most of Plaintiffs' other requests, this would have a measurable and relatively rapid effect on the admission of A&A patients.  OSH projects that if those restrictions were imposed by this Court, it would be able to admit A&A defendants to OSH within seven days of the commitment order within 4-6 months of this Court's remedial order.  That said, the Court should be aware that the nature of the charges does not necessarily account for the acuity of a criminal defendant's mental health symptoms.  If the Court were to enter the order sought by Plaintiffs, there could be limited resources available for A&A defendants who were denied admission to OSH because of the misdemeanor nature of their charges.  Whether it is an appropriate measure, in light of all considerations, is a determination for this Court to make; given that it would move OSH toward compliance, and is within this Court's power, Defendants are not in a position to oppose it.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

3. **Transferring of Discharging all A&A Patients on the RTP List Within 30 Days**

Defendants oppose DRO's request that this Court order the transfer or discharge of *all* A&A patients on OSH's Ready to Place (RTP) List within 30 days because that could result in inappropriate or unsafe placements. With no provision for situations in which an appropriate placement may not be available within 30 days, the order DRO is requesting could require Defendants to transfer or discharge patients into environments that are not supportive to their behavioral health needs.

4. **Discharging GEI Patients**

DRO asks this Court to order Defendants to discharge GEI patients on the GEI "Ready to Place" list within 60 days. DRO misunderstands the GEI discharge processes. Those processes are explained in Defendants' January 23 Status Report. Testimony at the contempt hearing will explain why this requested relief is neither feasible nor appropriate.

5. **Hiring a "Cadre" of Evaluators to Re-Evaluate the Backlogged Patients in Community Restoration**

Defendants refer to their response to MPD's similar request in Part IV.D.4 below.

6. **Commissioning an Extensive External Study**

Defendants refer to their response to a similar request in MPD's motion in Part D.6 below. To the extent DRO is seeking a study broader than what MPD requests, Defendants oppose DRO's request as vague and overbroad.

D. **Some of the remedies MPD requests may be warranted and will help achieve compliance while others are not because they are either impossible or too vague or broad for remedial purposes.**

1. **Limiting Admission to OSH for Restoration to Only Those Criminal Defendants with an Active Trial-Level Felony Charge**

Defendants take no position on MPD's request for an order restricting persons who have been charged only with misdemeanors or probation violations, as well as those being held for extradition purposes, from admission to OSH. Defendants incorporate its full response in Part IV.C.2 above to DRO's similar request.

Page 17 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF

2.    **Giving OSH Authority to Discharge Patients Who No Longer Need HLOC Directly to Community Placement**

As explained in the January 23 Status Report, and as will further be explained via live testimony at the contempt hearing, OSH and OHA are already performing work, including the ECMU project, focused on removing the barriers to placing A&A patients.  MPD's request for an order that Defendants "use all reasonable efforts to facilitate and expedite discharges of patients no longer needing [HLOC]," is too vague to give Defendants notice of what additional actions would be required of them and for this Court to enforce

Additionally, MPD's request would require discharge over contrary state-court orders, which will cause outrage and backlash from state-court judges.  Moreover, a federal court order overriding state-court orders must be narrowly tailored and the least restrictive means available to achieve compliance.  *See Stone v. City and Cty. of San Francisco*, 968 F.2d 850, 864-65 (9th Cir. 1992) (stating that district court went too far in allowing Sheriff to override state law without making findings that alternatives to state-law-override provisions were inadequate before imposing such measures and that if state-law is overridden, "the district court should tailor the grant of such authority as narrowly as possible so as to minimize the intrusion upon the state's affairs").  MPD's requested remedy, discharge of all A&A patients on the RTP List for whom appropriate placements have been identified, regardless of any state-court orders, would intrude into state law.  Moreover, such a federal order would be too vague for Defendants to prove compliance and for this Court to enforce.

3.    **Reducing Delays at Every Step of GEI Discharge Process By 20 Percent**

This requested relief does not take into account that the PSRB has legal authority over conditional release and discharge decisions for the GEI population.  CMHP and private providers control multiple steps of the GEI discharge process such as scheduling and conducting patient evaluations, making and communicating admission decisions, and engaging in discharge planning.  There are limits on OHA/OSH's ability to reduce delays at every step of the GEI discharge process and meet a specific benchmark.

Page 18 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF

In any event, this requested relief is not needed at this time. OHA recently expanded ECMU team to focus on discharging GEI patients from OSH who have been found appropriate for conditional release by the PSRB. These individuals are waiting to be admitted to a PSRB-approved facility where they have been accepted by the provider and are waiting for an open bed. ECMU is reviewing these cases to facilitate that placement earlier or to find an alternative open bed that would be approved by the PSRB. ECMU has also reached to PSRB providers to determine if there are existing residents ready to step down to less restrictive settings to open up beds for those currently on the waitlist. In addition, OHA recently adopted an administrative rule that requires residential treatment providers to prioritize admission of GEI and A&A patients discharging from the state hospital over other behavioral health populations. ECMU is monitoring providers' compliance with this rule and referring potential non-compliance to OHA Licensing for investigation.

These initiatives allow for case-by-case discharge plans into safe and PSRB-approved facilities and consistent with existing state law. The PSRB's is charged with serving public safety in addition to providing appropriate clinical placements for GEIs. The recent initiatives allow that goal to be achieved in addition to increasing GEI discharges from OSH.

4.    **Hiring "Enough" Certified Forensic Evaluators to Eliminate the Current Backlog and Keep Up with Future Demand**

As described in Defendants' January 23 Status Report, OSH has hired three additional full-time forensic evaluators, who will be onboarded in the coming months, and with those new evaluators expects to have managed the waitlist for community evaluations by June 2025. MPD's request that OSH be ordered to hire or contract "enough" evaluators to complete that task and keep up with new evaluation needs is not only premature, before the three new evaluators OSH's has already hired have begun their work, but also too vague a standard to apply in hiring decisions or by which to assess Defendants' compliance.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Further, although Defendants agree that reducing the number of people waiting for community restoration evaluations is important and is taking steps to reduce that number, there are neither statutory timelines for completing such evaluations nor community timelines established by the permanent injunction in this case.  Moreover, clearing the waiting list for evaluations is also not a guaranteed solution to the problem of compliance. MPD describes the backlog as a potential "bottleneck in the system" identified by amici "that may be contributing to delays in moving people through the community restoration system, which in turn impacts the ability of OSH to discharge people on the RTP List[.]"  The possible effect of hiring an unspecified number of additional evaluators is too attenuated to serve as a remedy here, especially before seeing the effect of the three new evaluators OSH is onboarding.

### 5.    Defendants do not have the practical ability to limit community restoration timelines.

MPD asks this Court to order "Defendants to take all reasonable steps to impose limitations on community restoration consistent with Dr. Pinals' recommendations."  But such an order would be too vague to enforce and impossible as a practical matter for Defendants to implement.  A&A defendants receive community restoration services through a variety of avenues that are generally *indirectly* funded by OHA via contracts and grants in addition to a variety of other sources such as Medicaid.  In other words, funding for the A&A population in the community is not tied to any individual A&A defendant, and so it cannot be tracked and cut off based on the nature of their charges or their time in community restoration.  In this funding system, Defendants simply do not have the power or ability to unilaterally impose limits on community restoration by cutting off funding.

The appropriate and most effective way to impose time limits for A&A defendants in community restoration is through the legislation that is being submitted during the 2025 session.  That legislation aligns with Dr. Pinals' recommendations.

Page 20 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND REMEDIAL RELIEF

### 6.    Hiring an Independent Auditor

Defendants do not disagree that an audit of money dedicated to and spent on community behavioral health services would be useful for the parties and this Court. Accordingly, Defendants do not generally oppose the requested relief asking this Court to order OHA to hire an independent auditor, overseen and chosen by Dr. Pinals to (1) review how the state spent money dedicated to increasing the supply of behavioral health services in the community; (2) identify what levels of care are still lacking and where; and (3) provide this information in a public report to the court to be completed in 90 days. Defendants ask, however, that they be allowed to confer with Dr. Pinals on her selection. Moreover, Defendants believe that more than 90 days will be needed to complete the study and report and suggest that the order not be so limited in time.

## V.    CONCLUSION

Neither a finding of contempt nor monetary sanctions are warranted. Defendants take no position regarding whether this Court should enter a remedial order that would preclude admission to OSH of A&A defendants who are charged with only misdemeanors, probation violations, or are being held for extradition purposes. And Defendants do not oppose, in concept, a federal court order for a study to assess what levels of care are lacking and where. Defendants oppose the remaining requested remedial relief as impossible, not warranted, or too vague to enable Defendants to comply and this Court to enforce.

DATED January  31 , 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General


    s/ Carla A. Scott
CARLA A. SCOTT #054725
CRAIG M. JOHNSON #080902
SHEILA H. POTTER #993485

Page 21 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
        REMEDIAL RELIEF
    CAS/a3m/982260266

Senior Assistant Attorneys General
JILL CONBERE # 193430
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.oregon.gov
Sheila.Potter@doj.oregon.gov
Craig.M.Johnson@doj.oregon.gov
Jill.Conbere@doj.oregon.gov
Of Attorneys for Defendants

Page 22 -  DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS FOR CONTEMPT AND
          REMEDIAL RELIEF
CAS/a3m/982260266