**Thomas Carr**, OSB No. 212598
County Counsel
tom_carr@washingtoncountyor.gov
Office of Washington County Counsel
155 N First Avenue, Suite 340, MS #24
Hillsboro, OR 97124
Phone (503) 846-8747
Fax (503) 846-8636

**Jane Vetto,** OSB No. 914564
Marion County Legal Counsel
jvetto@co.marion.or.us
**Nicholas Pileggi,** OSB No. 194367
npileggi@co.marion.or.us
Assistant Legal Counsel
555 Court St NE
PO Box 14500
Salem OR  97309
503 588-5220

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON PORTLAND

## DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | 3:02-cv-00339-MO (Lead Case) |
| Plaintiffs, | 3:21-cv-01637-MO (Trailing Case) |
| v. | **AMICUS BRIEF REGADING JUDICIAL AUTHORITY FILED BY MARION AND WASHINGTON COUNTIES** |
| PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |
| JARROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON | |
| Plaintiffs, | |

v.

DOLORES MATTEUCI, Superintendent of
the Oregon State Hospital, in her individual
and official capacity, PATRICK ALLEN,
Director of the Oregon Health Authority, in
his individual and official capacity,

Defendants.

## I. INTRODUCTION

Amici Curiae Marion and Washington Counties respectfully submit the following in

response to the Court's Minute Order [ECF 269] entered August 29, 2022. Specifically, Amici

were asked by the Court to address whether this Court had the authority to enter an Order

overriding state law to facilitate compliance with the United States Constitution.  As this Court

noted, although the Supremacy Clause allows this Court to ultimately take such an action,

applicable case law requires that a court take the least intrusive approach possible and to support

that approach with certain findings.  The record in the case shows that because the named parties

provided this Court with insufficient information, the Court could not, and therefore did not, take

the least intrusive approach or make the requisite findings. Accordingly, Marion and Washington

Counties ask that the Court make these findings and limit the remedy in this case to a less-

intrusive alternative that respects state law and follows federal precedent.

## II. LEGAL STANDARD

Although federal courts have broad equitable powers to remedy alleged constitutional

violations, those powers are not unlimited.  When intervening in state government affairs "federal

courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved

between federal equitable power and State administration of its own law.'" *Rizzo v. Goode*, 423

U.S. 362, 378 (1976) (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)).  "The interaction

between the federalism limits on a district court's remedial power, invoked in *Rizzo*, and a district

court's power in general to order prospective relief against state executive officials under the *Ex parte Young* fiction, remains an open and contentious area of the law." *M.S. v. Brown*, 902 F.3d 1076, 1089–90 (9th Cir. 2018). A District Court should limit any remedy to the least intrusive available. *Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir.1982). "[S]uperintending federal injunctive decrees directing state officials are appropriate only when constitutional violations have been shown *and* when the state officials are demonstrably unlikely to implement the required changes without its spur." *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985) (emphasis added). "[I]njunctive restraints that exceed constitutional minima must be narrowly tailored to prevent repetition of proved constitutional violations, and must not intrude unnecessarily on state functions." *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986).

> [A]lthough federal district courts have been allowed—indeed, at times constitutionally required—to intrude in the affairs of state and local governments, such intervention has been conducted with the clear understanding that the autonomy of these governmental entities should be safeguarded to the maximum extent possible. As the Court stated in Jenkins, "one of the most important considerations governing the exercise of [federal] equitable power is a proper respect for the integrity and function of local government institutions."

*Langton v. Johnston*, 928 F.2d 1206, 1221 (1st Cir. 1991) (quoting *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990)).

For a federal court to use its extraordinary equity powers to override existing state law that court must find that less-intrusive alternatives are inadequate to remedy the violation. *See Missouri v. Jenkins,* 495 U.S. 33, 110 S. Ct. 1651, 109 L. Ed. 2d 31 (1990) (before ordering remedy, the district court "was obliged to assure itself that no permissible alternative would have accomplished the required task")*; see also Hook v. Az. Dep't of Corrections,* 107 F.3d 1397, 1402 (9th Cir. 1997) ("the district court may not choose a remedial measure that conflicts with state law unless that measure is necessary to remedy the violation,"); *St. Charles Tower, Inc. v. Kurtz,*

643 F.3d 264, (8th Cir. 2011) ("remedies that override state law must be narrowly tailored so as to infringe state sovereignty as minimally as possible.")

It is particularly important that a court consider efforts made by the state government to address the alleged constitutional violation. *Trueblood v. Washington State Dep't of Soc. & Health Servs.,* 822 F.3d 1037, 1045–46 (9th Cir. 2016). *Trueblood* is instructive because the court faced a situation similar to the instant case. The plaintiffs in *Trueblood* were a class of pretrial detainees awaiting therapeutic evaluation and treatment. The complaint alleged that delays in competency evaluations violated the state's constitutional obligations to the plaintiffs. *Id*. at 1039-40. The district court ordered the state to conduct competency evaluations within seven days. *Id*. at 1040. While the case was pending, the state legislature addressed the issue by setting a target of seven days with a fourteen-day maximum with a possible seven-day extension for clinical reasons, with the new restrictions phased in over a year. *Id*. at 1040-41. The Ninth Circuit reversed the district court's injunction. *Id*. at 1046. The appellate court directed the district court to consider the legislative solution before imposing a court-ordered judicial solution. *Id.* It is of critical importance for federal courts to look at a state's own policies for guidance in imposing a solution to honor well-established principles of federalism.

A court must make findings that less intrusive steps are inadequate to provide the remedy sought. In *Stone v. City & Cty. of S.F.*, the Ninth Circuit vacated a district court's decision to override state law because if failed to make these findings. 968 F.2d 850, 864 (9th Cir. 1992). In that case, the City and County of San Francisco appealed a contempt order arising from longstanding overcrowding of "Jail No. 1," which allowed state law to be overridden by the local Sheriff in granting early release to inmates. *Id.* at 852.

In *Stone,* the court determined that, "[i]f the district court finds that other alternatives are inadequate, the court could consider authorizing the Sheriff to override certain provisions of state

law to assure compliance." *Id.* However, the Ninth Circuit determined that, due to principles of federalism, the district court "should have waited until the threat of sanctions failed to induce compliance before authorizing the state-law-override provisions." *Id.* at 864. Moreover, in that case the court determined that the district court had failed to make a finding that other alternatives were inadequate. *Id.*

## III.     LEGAL ARGUMENT

### A.     *Trueblood* Requires that this Court Allow an Opportunity for Oregon State Hospital and State Circuit Courts  to Implement Senate Bill 295, now codified at ORS 161.371

In 2021, the Oregon Legislative Assembly passed Senate Bill 295, which, among other things, added ORS 161.371 ORS 161.371 attempted to address overcrowding at the state hospital by imposing mandatory discharge standards and limitations on the time an individual could be committed to the state hospital.  2021 Oregon Laws Ch. 395 (S.B. 295).  S.B. 295 is precisely the type of state action that a court must consider before imposing its own remedy to an alleged violation of constitutional rights.  Indeed, S.B. 295 provides a framework for addressing the issues surrounding the treatment of mentally ill Oregonians that is significantly less intrusive than the measures proposed by this court.

For example, rather than adopting the one-year limit for violent felonies that this Court chose, the legislature imposed a maximum stay period of either three years or the maximum potential sentence if the defendant had been convicted—whichever is shorter.  ORS 161.371(5)(a).  More importantly, the legislature considered the defendant's treatment needs and the potential impact on the community when directing earlier discharge—a set of considerations that this Court did not include in its order.  The legislature directed that the hospital and committing courts assess within sixty days if (1) the defendant is fit to proceed, (2) there is a substantial probability that the defendant will regain fitness to proceed; or (3) there is no

probability that the defendant will regain fitness to proceed. ORS 161.371(a). Before recommending discharge, the hospital is required to consider whether the defendant needs a hospital level of care and whether the acuity of the defendant's symptoms present a risk to public safety if the defendant is discharged. ORS 161.371(2). Finally, state circuit courts are required to consider if there are alternative treatment options, such as community restoration resources, available to the defendant if the defendant is discharged. *Id.* Section 161.371 became effective immediately upon passage on June 23, 2021. 2021 Oregon Laws Ch. 395 § 15.

Implementing S.B. 295 295 and ORS 161.371 required substantial commitments from Oregon's constituent counties. Declaration of Nicholas Ocón ¶ 4. Washington County has responded by expanding available bed space and developing the capacity to provide community restoration support in the jail. It is important, however, to note that the current community mental health crisis extends far beyond individuals detained in the jail or being treated at the state hospital. The counties face a growing need for behavioral health support and services. While implementing S.B. 295, counties need to make sure that services and bed space remain available to others in the community with severe needs. The Court's order forced the counties to redirect this important work to focus instead on the potential release of individuals who present a danger to the community. *Id.* ¶ 5.

Amici do not have access to complete lists of individuals who may be released, but two defendants who almost certainly will be returning to Washington County present examples of the challenges presented by the Court's order that would be mitigated by relying on the legislative approach. *See* Amicus Motion for Judicial Notice, exhibits A & B. On December 27, 2019, a Washington County grand jury indicted Salvador Martinez-Romero on fourteen counts of various violent felonies, including one count of murder in the first degree, three counts of attempted murder in the first degree, three counts of assault in the first degree and seven counts of robbery

in the first degree.  *Id.* ex. A.  According to the docket, on February 10, 2020, Mr. Martinez-Romero was found unfit to proceed and ordered transported to the state hospital.  *Id.* ex. B.  The Court considered the defendant's fitness to proceed at hearings on May 18, 2020, August 18, 2020, August 26, 2021, February 17, 2022, and September 15, 2022.  *Id.*

On February 26, 2021, a Washington County grand jury indicted Toby Epling on one count of murder in the second degree and one count of unlawful use of a weapon.  *Id.* ex. C. According to the docket, on August 20, 2021, the circuit court found Mr. Epling unfit to proceed and ordered him transported to the state hospital.  *Id.* ex D.  The Court considered the defendant's fitness to proceed at hearings on December 16, 2021, June 20, 2022, and August 30, 2022.  *Id.* All the competency hearings after June 23, 2021, were subject to the requirements of Senate Bill 295 and new section ORS 161.371.

Although the details are, of course, confidential and not publicly available, the circuit court presumably found that Mr. Martinez-Romero and Mr. Epling did not meet the criteria for return to the community as established by the legislature.  Under this Court's August 29, 2022 Order, both Mr. Martinez-Romero and Mr. Epling will be discharged to the community, without any consideration of whether discharge is in their best interests, whether they present a public safety risk and whether there are appropriate community restoration services available.  The Court should defer to—or at least consider—the solution adopted by the legislature, which would employ a case-by-case analysis as well as community-based solutions to alleviate the concerns regarding overcrowding, ensure that high risk-individuals remain in custody, and facilitate out-of-custody treatment for lower-risk individuals.  This represents exactly the kind of less-intrusive solution and deferential federalism that a court should employ when addressing potential violations of constitutional rights, and is a better solution  than a blanket release of mentally ill, dangerous individuals into the community without planning, funding, or support structures in

place to address both the public safety needs of individuals within those communities and the

mental health needs of those individuals being released into the community.

**B. Federal law requires the Court to consider whether less intrusive alternatives will be effective prior to overriding existing state law.**

Federal law requires that before a federal court uses its extraordinary equity powers to

override existing state law it must find that other, less intrusive alternatives are inadequate to

remedy the violation. *Missouri v. Jenkins,* 110 S. Ct. 1651, 109 L. Ed. 2d 31 (1990). Here, the

Court did not make those findings on the record. Some potential alternative remedies are

discussed in greater detail in subsections a-e below.[1]

In *Stone,* discussed *supra*, the Ninth Circuit held that district courts must make findings

that less-intrusive alternatives to overriding state law were inadequate. Here, the parties failed to

demonstrate or explain why other alternatives were inadequate, making it impossible for this

Court to make the proper findings. Therefore, this Court should follow the reasoning in *Stone*

and, at a minimum, require the parties to demonstrate that available alternatives are inadequate to

---

[1] The alternatives described below are not exhaustive and merely serve to demonstrate that the parties to this case failed to adequately consider and "flesh-out" or try these potential alternatives for an adequate time to demonstrate to this Court that the extreme action of overriding Oregon statute presented the least intrusive means of bringing OSH into compliance with the underlying *Mink Injunction*. Here, the Court should have made findings that alternatives, such as the ones discussed here, are inadequate. An adequate remedy may apply a combination of the alternatives discussed in this Brief or others.

remedy the violation of the underlying *Mink* Injunction.[2] Some potential alternatives are discussed in greater detail below.[3]

Marion and Washington Counties are not implying that the below alternatives are "silver bullets" that will solve OHA's issues in complying with the underlying Mink Injunction. However, again, a court is required to consider these less intrusive alternatives. To the extent that the parties failed to meaningfully address any potential alternatives to overriding state law, the federalism concerns highlighted in the Court's original opinion [ECF 256] in response to DRO and OHA's proposed Order remain.[4]

### a. OHA Provide More Beds within its Existing Facilities

The contention of the parties has been that "…the state hospital is using almost every bed available to serve the populations subject to the consolidated cases. The hospital currently has

---

[2] It should also be noted that Paragraph 2 of the Order [ECF 271] provided to this Court restricts access to OSH from civilly committed patients from being admitted to OSH unless they meet expedited criteria or are admitted under the "extremely dangerous" prong of ORS 426.701, which clearly contravenes state law. ORS 426.010. However, OSH's practice in the recent past any person under ORS 426 Civil Commitment who does not meet expedited criteria. Declaration of Nicholas Ocón ¶ 7.The practical implication of this portion of the Order does nothing to bring OSH closer to compliance with the requirements of the underlying *Mink* Injunction. Therefore, this portion of the order infringes on state law without providing a remedy, making it more intrusive than necessary. The only underlying justification that the counties can see is, perhaps, a tacit acknowledgment that barring civilly committed patients from OSH is a violation of their constitutional rights and an effort to bar future U.S.C. § 1983 actions brought by civilly committed patients against defendants while the Order [ECF 271] is in effect.

[3] In the present case, less intrusive alternatives exist but were not adequately considered on the record by the parties or the Court. The factual support relied upon for the Court's order is the two reports issued by Dr. Debra Pinals. Declaration of Emily R. Cooper [ECF 262] Exhibits. A & B. The parties did not provide this Court with detailed projections or data that demonstrate that the more limited alternatives are inadequate.

[4] In DRO's Supplemental Memorandum [ECF 260], they contend that "[i]t is difficult to understand how federalism and comity concerns could be violated by the federal court granting state officials [OHA] authority to do
something which they do not oppose doing…" This argument ignores the other impacted state and local government actors, namely, the Oregon courts, district attorneys and counties.

neither the physical space nor the necessary staffing to add more beds. Even if the legislature decided to appropriate money to expand capacity at the state hospital, which it almost certainly will not, new construction would take years to implement." [ECF No. 265 at 8]. DRO's claim that additional construction would be required to expand capacity at the state hospital appears to be contradicted by data released by OHA:



Amicus Motion for Judicial Notice, ex. C.

The chart above purports to show, among other things, the total population of persons at the state hospital. The chart shows that OSH housed approximately 850 patients in 2005 and consistently supported nearly 800 patients on average through 2009. By 2018 that number had dropped to around 600 patients. This is despite opening the Junction City campus. The creation of this new facility, somewhat confusingly, seems to have had no impact on the number of persons the state hospital has been treating. Amicus Motion for Judicial Notice, ex. C.

Although OHA and OSH have been rather opaque about the reasons for this reduction in capacity over the previous decade, it is clear that physical capacity to house additional patients

currently in county jails without adequate mental health services appears to exist.[5] Furthermore, even if, for the purposes of argument, the Court accepts OHA's contention that there is no more physical space to house patients at the OHA, alternative solutions exist. OHA controls a significant number [CAN WE GET AN EXACT FIGURE] of Secure Residential Treatment Facilities (SRTFs). OHA has not provided an explanation for why those facilities are inadequate or cannot be converted to the type of treatment facility necessary to house patients. .[6] Moreover, Dr. Pinals' Reports[7] also fails to engage with the alternatives of increasing OSH capacity or for increasing capacity at the OHA-controlled SRTFs and does not engage with potential timelines for either of those capactiy-boosting solutions.[8]

Instead of considering solutions to find the physical space necessary to treat these individuals, including facilities already controlled by OHA, this Court . Here, the Court was asked to take an extraordinary first step of overriding state law. Returning to the reasoning in *Stone*, in which the court in that case attempted several different actions to return Jail No. 1 to compliance with overcrowding issues. In that case, the court attempted several less intrusive attempts to resolve the overcrowding issues. Ultimately, the court vacated and remanded based on the district court failing to find that less intrusive alternatives were inadequate. In the instant case, there is even less of a factual record of attempts to find a less intrusive solution; OHA has failed

---

[5] To the extent that OSH relies upon claims of difficulty in finding staffing, those challenges are present in the community as well. *See* Decl. Ryan Matthews ¶ 5.

[6] Alternatively, why the division of currently operating facilities would lead to a constitutionally impermissible overcrowding issue.

[7] The court-appointed expert, Dr. Debra Pinals has issued three reports, the first on January 30, 2022, the second on June 5, 2022 and the third on September 15, 2022. The first two reports are in the record as attachments to the Declaration of Emily R. Cooper [ECF 262] Exs. A & B (referred to respectively as "Dr. Pinals' January Report & Dr. Pinals' June Report"). The third report has not yet been made part of the record. A copy is attached as exhibit D to the Amicus Request for Judicial Notice ("Dr. Pinals' September Report").

[8] Other than DRO and OHA's general contention that, to simplify somewhat, it would be too hard, cost too much and take too long. *See* [ECF 260 at 8].

to implement *any* meaningful change to practices since falling out of compliance and *no* less intrusive resolutions have been attempted or adequately considered by the parties prior to the unopposed order to implement the Neutral Expert's Recommendations, contravening state law.[9]

What is clear to counties providing community restoration and other mental health services is that there is currently no physical capacity to provide appropriate housing for individuals in need of treatment in the community, especially those that require a hospital level of care or an SRTF. Decl. Ryan Matthews ¶ 7. Although the State has indicated that funds are being released into the community to provide that capacity, these facilities have not yet been created. *Id.* at ¶ 8. Indeed, this is precisely the situation that OHA claims as a justification for this Court's order; OHA claims that there are insufficient treatment beds, and that the construction of those beds would take significant time. Counties face the exact same calculus of time and resources,

### b. OHA Can Contract with Private Providers for More Beds

The parties also fail to provide timelines or costs for contracting with private providers, such as Telecare or Cascadia, or indeed, that they had even contacted private providers to determine the timeline, cost or terms required to construct a secure facility that could serve the needs of the aid and assist or GEI populations. The parties failed to provide this Court with the information necessary to decide that this alternative is inadequate.

### c. Allow Recovery of Wait Times from the Covid Admissions Pause

The key issue before this Court is the state hospital's inability to comply with the *Mink* injunction's seven-day limitation. The determining factor should be the existing waiting period. Plaintiffs' Unopposed Motion for Order to Implement Neutral Expert's Recommendations [ECF

---

[9] The single major change undertaken had an adverse impact on the OSH waitlists, as OHA requested pauses to admission during the Covid-19 Pandemic. [ECF 262 Exhibit B at 9]. An assessment of whether these pauses are continuing to have residual impacts on the OSH waitlist has not been made by the Dr. Pinals or parties to the case.

252] represents that the current waiting period "nearly 40 days." *Id*. at 13. The Court relied upon this representation. *See* Order and Opinion dated August 16, 2022 [ECF 256] at 2. There is some question about the validity of this number. Dr. Pinals' June Report includes the following data on wait times, which suggests much shorter wait times as of May 1, 2022:

**Table 1. Individuals awaiting admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | |
|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* |
| Total Number of individuals | 46 | 93* | 67 |
| Average days waiting | 15.8 days | 22.5 days | 16.2 days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days |
| 2. Regarding individuals found GEI and ordered to OSH | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* |
| Total number of individuals | 15 | 4 | 3 |
| Average days waiting | 45.6 days | 23 days | 18 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days |

*The marked increase in numbers awaiting admission is most likely a residual of the pauses in admissions due to COVID-19

Dr. Pinals' June Report at 9. Dr. Pinals' January Report, included the following explanation for an earlier version of Table 1: "Table 1 directly delineates data regarding compliance with the Mink/Bowman orders and settlement agreements, respectively." Moreover, it is important to note that wait times increased because the state hospital paused admissions. Once admissions resumed the wait times dropped. This is not to say that a 16-day wait period is acceptable, but it does not present the same level of crisis as a 40-day wait period. The Court should consider that the wait time for individuals pending admission has generally decreased following the admissions pause.

### d. Suspend the 30-Day Hold

Dr. Pinals' June Report identifies a practice at the state hospital whereby patients under forensic commitment remain at the hospital for 30 additional days after a finding of "able," "med never," "not able" or "never able," to allow for challenges to the finding. *Id.* at 22. Suspension of this practice of holding onto these persons for an additional 30 days could help accelerate discharge of persons at OSH. Critically, Dr. Pinals does not demonstrate what potential impact

this could have on population levels at OSH and, in turn, those waiting to be admitted at local jails. Therefore, the parties did not explain to this Court why this limited alternative was inadequate.

### e. OSH Provide Services in Jails

One other potential alternative to help alleviate the burden on OSH's admittance process would be to consider having OSH staff providing some limited services to persons waiting in local jails to be transported to OSH. Oftentimes, a person under an ORS 161.370 order has not yet been prescribed with appropriate medication, such as injectables, and is less stable than they might be with proper treatment and medication. Decl. Ryan Matthews ¶ 6. An assessment with a prescriber and medication administration monitored by OSH in Jails could help stabilize committed persons prior to their entry into OSH. Presumably, this stabilization could help reduce the length of stay for patients receiving restoration services. In Dr. Pinals' September Report, she states that "[m]any patients in jail will take medications voluntarily or will be substance use free and have a chance for their cognitive function to improve.[10] Dr. Pinals' September Report at 14. Based on this logic, having OSH provide prescriber services for defendants under an ORS 161.370 order while awaiting transport could help limit the duration of the defendant's stay at OSH, or eliminate the need for transport if defendants were reevaluated by OSH or other qualified evaluator following stabilization at county jail.

### f. Length of Stay Determination Based on Treatment Needs

Although Dr. Pinals's reports frequently reference the number of patients currently under the hospital's care that currently do not need a hospital level of care, according to OSH,[11] the plan

---

[10] Although Dr. Pinals does not provide citation for the basis of this determination. *See* Dr. Pinals' September Report at 14.
[11] Under Oregon law, the ultimate determination is left to the trial court under ORS 161.370.

proposed makes no exceptions for those defendants that will be released that still require a hospital level of care. *See* [ECF 269]. Moreover, it is unclear from Dr. Pinals' reports what impact having such a limited exception would have on the remedying the violation of the underlying *Mink* Injunction. Therefore, the Court should have been presented with the details on the impact of this remedy.[12] Allowing such exceptions would more closely mirror the intent of Oregon's current statutory scheme and would be a less intrusive alternative to blanket remedy proposed by the parties of hard cutoff dates.

### g. Shorten Evaluation Timelines for HLOC Review at OSH

Another potential alternative to implementing the program proposed by Dr. Pinals' in her June and September Reports is to shorten the time for a determination for a "hospital level of care" ("HLOC"). Dr. Pinals' September Report at 14. A pilot program was initiated where an initial determination of level of care necessary for defendants was made within 10 days of hospitalization. The provisional data suggests that most of these determinations made at 10 days were in keeping with redetermination of the level of care required at 30 days. Based on this, a policy could be implemented at OSH where an HLOC determination is made within 10 days of admission for all patients and the recommendation would be referred to the trial court for a determination of whether community restoration would be appropriate. Here, this limited alternative would leave the determination of release from OSH in the hands of Oregon's state courts, potentially significantly shorten the stay of ORS 161.370 patients at OSH, and show greater deference to state law in line with the restraining principle of federalism.[13]

---

[12] Moreover, the Court could consider an exception relating to patients requiring an SRTF level of care when no such beds are available in the community.

[13] OHA provides reports indicating whether, in their clinical opinion, requires a lower level of care. However, Dr. Pinals' Reports do not provide the relevant factual data of whether courts are holding these hearings and making the determination that a hospital level of care is still required despite the recommendation of OSH. This data would be relevant to this alternative. Moreover,

## IV.     CONCLUSION

Because the information provided to this Court was inadequate to consider other alternatives that follow extant state law or are otherwise less intrusive remedies, the Court was unable to make the necessary findings to contravene state law based on federalism principles. For the foregoing reasons, Marion and Washington Counties ask that the Court limit the remedy in this case to a less intrusive alternative, which takes into consideration the positions of the other state and local government stakeholders. To that end, amici respectfully request that the Court delete paragraphs 2 and 3 of the Court's September 1, 2022 Order [ECF 271].  The counties respectfully request that amici be included in the discussions required by paragraph one of the Order.  Oregon has made significant steps towards addressing the overcrowding problem that this Court seeks to fix, including passing a law that directly impacts and affects the length of stay at OSH.  That law was the result of careful consideration and input from all stakeholders in this matter, including local and county governments.

///

///

///

---

without having provided this critical information it is difficult to determine whether a more limited order in this case requiring state courts to hold a hearing, say by way of example within 3 days of recommendation, to make the determination whether a hospital level of care is still required for the person under restoration at OSH. Without knowing more, it is unclear whether a limited alternative like this could significantly impact the population levels at OSH or work in conjunction with other proposed alternatives.

Amici ask this Court to follow the guidance of the legislation passed by the Oregon Legislative Assembly and engage in the process of considering and evaluating less intrusive remedies that this Court has so far eschewed to ensure the best result for everyone.

DATED: September 28, 2022.

_s/Thomas Carr_
Thomas Carr, OSB No. 212598
Washington County Counsel
tom_carr@co.washington.or.us
Attorney for Amicus Washington County

_s/Jane Vetto_
Jane E. Vetto, OSB No. 914564
Marion County Counsel
jvetto@co.marion.or.us
Attorney for Amicus Marion County