# IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR WASHINGTON COUNTY

STATE OF OREGON,

Plaintiff,

vs.

SALVADOR MARTINEZ-ROMERO,

Defendant.

No. 19CR82213

**INDICTMENT** - Secret

The above named defendant is accused by the Grand Jury of Washington County by this indictment of the crimes of

| | |
|---|---|
| Count 1: | MURDER IN THE FIRST DEGREE (FSG= U; U Felony; Or. Laws. 2019, Ch. 635, Sec 3) |
| Count 2: | ATTEMPTED MURDER IN THE FIRST DEGREE (FSG= U; A Felony; Or. Laws. 2019, Ch. 635, Sec 3 and ORS 161.405) |
| Count 3: | ASSAULT IN THE FIRST DEGREE (FSG= 10; A Felony; ORS 163.185) |
| Count 4: | ROBBERY IN THE FIRST DEGREE (FSG= 9; A Felony; ORS 164.415) |
| Count 5: | ROBBERY IN THE FIRST DEGREE (FSG= 9; A Felony; ORS 164.415) |
| Count 6: | ROBBERY IN THE FIRST DEGREE (FSG= 9; A Felony; ORS 164.415) |
| Count 7: | ROBBERY IN THE FIRST DEGREE (FSG= 9; A Felony; ORS 164.415) |
| Count 8: | ROBBERY IN THE FIRST DEGREE (FSG= 9; A Felony; ORS 164.415) |
| Count 9: | ATTEMPTED MURDER IN THE FIRST DEGREE (FSG= U; A Felony; Or. Laws. 2019, Ch. 635, Sec 3 and ORS 161.405) |
| Count 10: | ASSAULT IN THE FIRST DEGREE (FSG= 10; A Felony; ORS 163.185) |
| Count 11: | ROBBERY IN THE FIRST DEGREE (FSG= 9; A Felony; ORS 164.415) |
| Count 12: | ATTEMPTED MURDER IN THE FIRST DEGREE (FSG= U; A Felony; Or. Laws. 2019, Ch. 635, Sec 3 and ORS 161.405) |
| Count 13 | ASSAULT IN THE FIRST DEGREE (FSG= 10; A Felony; ORS 163.185) |
| Count 14: | ROBBERY IN THE FIRST DEGREE (FSG= 9; A Felony; ORS 164.415) |

committed as follows:

## COUNT 1

The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and intentionally commit the crime of Robbery in the First Degree and in the course of and in the furtherance of or in immediate flight from the crime that defendant was committing, defendant personally and intentionally caused the death of Janet Risch, a human being who was not a participant in the crime.

## COUNT 2

As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Count 1: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and intentionally attempt to cause the death of Debra Thompson, another human being, defendant having unlawfully and intentionally caused the death of Janet Risch, an additional human being, in the course of the same criminal episode.

COUNT 3
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Count 2: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and intentionally cause serious physical injury to Debra Thompson by means of a knife, a dangerous weapon.

The state further alleges that the above-named victim did not substantially contribute to the commission of the above-described offense by precipitating the attack.


COUNT 4
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Counts 2 and 3: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and knowingly, while in the course of committing theft, with the intent of compelling bank employees to deliver the property of Wells Fargo, use physical force upon Debra Thompson, and use a dangerous weapon, to wit: a knife.


COUNT 5
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Counts 1 through 4: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and knowingly, while in the course of committing theft, with the intent of compelling Angelica Mendez-Varela to deliver the property of Wells Fargo, use physical force upon Debra Thompson, and use a dangerous weapon, to wit: a knife.


COUNT 6
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Counts 1 through 5: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and knowingly, while in the course of committing theft, with the intent of compelling Jonathon Smith to deliver the property of Wells Fargo, use physical force upon Debra Thompson, and use a dangerous weapon, to wit: a knife.


COUNT 7
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Counts 1 through 6: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and knowingly, while in the course of committing theft, with the intent of compelling Nadja Rue to deliver the property of Wells Fargo, use physical force upon Debra Thompson, and use a dangerous weapon, to wit: a knife.


COUNT 8
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Counts 1 through 7: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and knowingly, while in the course of committing theft, with the intent of compelling Chloe Brockie to deliver the property of Wells Fargo, use physical force upon Debra Thompson, and use a dangerous weapon, to wit: a knife.

**COUNT 9**
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1 through 8: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and intentionally attempt to cause the death of Ian Day, another human being, defendant having unlawfully and intentionally caused the death of Janet Risch, an additional human being, in the course of same criminal episode.


**COUNT 10**
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Count 9: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and intentionally cause serious physical injury to Ian Day by means of a knife, a dangerous weapon.

The state further alleges that the above-named victim did not substantially contribute to the commission of the above-described offense by precipitating the attack.


**COUNT 11**
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Counts 9 and 10: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and knowingly, while in the course of committing unauthorized use of a vehicle, with the intent of preventing and overcoming resistance to defendant's taking of property and retention of the property immediately after the taking, use physical force upon Ian Day, and use a dangerous weapon, to wit: a knife.


**COUNT 12**
As a separate act and transaction but as part of crimes that are of the same or similar character and a common scheme and plan as Counts 1 through 11: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and intentionally attempt to cause the death of Martha Bashir, another human being, defendant having unlawfully and intentionally caused the death of Janet Risch, an additional human being, in the course of same criminal episode.


**COUNT 13**
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Count 12: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and intentionally cause serious physical injury to Martha Bashir by means of a knife, a dangerous weapon.

The state further alleges that the above-named victim did not substantially contribute to the commission of the above-described offense by precipitating the attack.

**COUNT 14**
As part of the same act and transaction and part of crimes that are of the same or similar character and a common scheme and plan as Counts 12 and 13: The defendant, on or about December 18, 2019, in Washington County, Oregon, did unlawfully and knowingly, while in the course of committing unauthorized use of a vehicle, with the intent of preventing and overcoming resistance to defendant's taking of property and retention of the property immediately after the taking, use physical force upon Martha Bashir, and use a dangerous weapon, to wit: a knife.

contrary to the statutes and against the peace and dignity of the State of Oregon

It is hereby affirmatively declared for the record, upon appearance of the defendant for arraignment, and before the Court asks how the defendant pleads to the charges, that the State intends that any misdemeanor offenses charged herein each proceed as a misdemeanor.

Dated: December 27, 2019

Witnesses subpoenaed, examined and appeared in person unless otherwise indicated before the Grand Jury for the State of Oregon:

Martha Bashir
Anthony Bastinelli
Chloe Brockie
Madalyn Brown
Ian Day
Angelica Mendez-Varela
Rebecca Millius, MD (by report)
Walter Monk
Colin Munson
Taylor Mursu
Chadwick Opitz
Nadja Rue
George Shafer
Jonathon Smith
Eric Piper (by affidavit)
Tricia Gil (by affidavit)

DA # 386559
BVP 51-193520424
DOB 07/15/ 1999
FPC #: JWAS219773416
☒ Security Amount – **NO BAIL**

A TRUE BILL

_Aidel Ahad Khan_
Foreperson of the Grand Jury

KEVIN BARTON, District Attorney

_John Gerhard_
John Gerhard
Senior Deputy District Attorney
Oregon State Bar # 076025

Grand Jury Proceeding Dates:
December 27, 2019

Skip to Main Content Logout My Account Search Menu Search Criminal, Traffic and Parking Case Records Refine Search  Back

Location : All Locations   Images Help

# REGISTER OF ACTIONS
## CASE NO. 19CR82213

| | | | | |
|---|---|---|---|---|
| **State of Oregon vs Salvador Antonio Martinez-Romero** | | § § § § § § § | Case Type: | **Offense Felony** |
| | | | Date Filed: | **12/19/2019** |
| | | | Location: | **Washington** |
| | | | District Attorney Number: | **386559** |
| | | | Law Enforcement Case Number: | **51-193520424** |

---

### PARTY INFORMATION

| | | | | |
|---|---|---|---|---|
| **Defendant** | **Martinez-Romero, Salvador Antonio** | | Male DOB: 1999 | **Attorneys** **DEBORAH BURDZIK** *Retained* 503 225-9100(W) |
| | | | | Cameron Taylor *Retained* 503 726-7900(W) |
| | | | | ~~DEBORAH BURDZIK~~ *~~Court Appointed~~* ~~503 225-9100(W)~~ |
| | | | | **GREGORY B SCHOLL** *Court Appointed* 503 225-9100(W) |
| **Plaintiff** | **State of Oregon** | | | **JOHN C GERHARD, IV** 503 846-8671(W) |
| | | | | **ALLISON M BROWN** 503 846-8705(W) |
| | | | | **JEFFERY MACLEAN** 503 846-8671(W) |

---

### CHARGE INFORMATION

| Charges: Martinez-Romero, Salvador Antonio | Statute | Level | Date |
|---|---|---|---|
| 1.  Murder in the First Degree | 635s3 | Felony Unclassified | 12/18/2019 |
| 2.  Attempted Murder in the First Degree | 161.405 | Felony Class A | 12/18/2019 |
| 3.  Assault in the First Degree | 163.185 | Felony Class A | 12/18/2019 |
| 4.  Robbery in the First Degree | 164.415 | Felony Class A | 12/18/2019 |
| 5.  Robbery in the First Degree | 164.415 | Felony Class A | 12/18/2019 |
| 6.  Robbery in the First Degree | 164.415 | Felony Class A | 12/18/2019 |
| 7.  Robbery in the First Degree | 164.415 | Felony Class A | 12/18/2019 |
| 8.  Robbery in the First Degree | 164.415 | Felony Class A | 12/18/2019 |
| 9.  Attempted Murder in the First Degree | 161.405 | Felony Class A | 12/18/2019 |
| 10. Assault in the First Degree | 163.185 | Felony Class A | 12/18/2019 |
| 11. Robbery in the First Degree | 164.415 | Felony Class A | 12/18/2019 |
| 12. Attempted Murder in the First Degree | 161.405 | Felony Class A | 12/18/2019 |
| 13. Assault in the First Degree | 163.185 | Felony Class A | 12/18/2019 |
| 14. Robbery in the First Degree | 164.415 | Felony Class A | 12/18/2019 |

---

### EVENTS & ORDERS OF THE COURT

| | |
|---|---|
| | **OTHER EVENTS AND HEARINGS** |
| 12/19/2019 | **Information** *Complainant's* Created: 12/19/2019 11:57 AM |
| 12/19/2019 | **Arraignment**  (3:00 PM) (Judicial Officer Guptill, Rebecca) Result: Held |

Exhibit A -  Amici Request for Judicial Notice - Page 5

| | |
|---|---|
| | Created: 12/19/2019 11:57 AM |
| 12/19/2019 | **Arraignment** (Judicial Officer: Guptill, Rebecca ) |
| | Created: 12/19/2019 2:10 PM |
| 12/19/2019 | **Order** (Judicial Officer: Guptill, Rebecca ) |
| | Signed:  12/19/2019 |
| | Created: 12/19/2019 2:10 PM |
| 12/19/2019 | **Order - Protected** (Judicial Officer: Roberts, Beth L ) |
| | *Seal PC Affidavit* |
| | Signed:  12/19/2019 |
| | Created: 12/19/2019 2:40 PM |
| 12/19/2019 | **Order - Appointing Counsel** (Judicial Officer: Guptill, Rebecca ) |
| | *Attorney:PD* |
| | Signed:  12/19/2019 |
| | Created: 12/20/2019 12:20 PM |
| 12/20/2019 | **Request - Discovery** |
| | Created: 12/20/2019 12:12 PM |
| 12/27/2019 | **Arraignment - Indictment**  (3:00 PM) (Judicial Officer Wipper, Janelle Factora) |
| | Result: Held |
| | Created: 12/19/2019 2:10 PM |
| 12/27/2019 | **Indictment** |
| | Created: 12/27/2019 1:40 PM |
| 12/27/2019 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | Signed:  12/27/2019 |
| | Created: 12/27/2019 3:09 PM |
| 12/27/2019 | **Indictment - Amended** |
| | Created: 12/27/2019 3:10 PM |
| 12/27/2019 | **Motion - Change Judge** |
| | Created: 12/27/2019 4:44 PM |
| 12/27/2019 | **Affidavit** |
| | Created: 12/27/2019 4:44 PM |
| 12/27/2019 | **Motion** |
| | Created: 12/27/2019 4:45 PM |
| 12/27/2019 | **Affidavit** |
| | Created: 12/27/2019 4:45 PM |
| 12/27/2019 | **Warrant - Return of Service** |
| | Created: 12/31/2019 1:40 PM |
| 12/30/2019 | **Notice** |
| | *Of Withdrawal - Motion For Change Of Judge* |
| | Created: 12/30/2019 9:01 AM |
| 12/30/2019 | **Motion** |
| | *FOR CHANGE OF JUDGE* |
| | Created: 12/30/2019 10:13 AM |
| 12/30/2019 | **Affidavit** |
| | Created: 12/30/2019 10:13 AM |
| 01/02/2020 | **Hearing - Status Check**  (8:30 AM) (Judicial Officer Menchaca, Ricardo J.) |
| | *Status for Murder hearing* |
| | Result: Held |
| | Created: 12/27/2019 3:10 PM |
| 01/02/2020 | **Order** (Judicial Officer: Menchaca, Ricardo J. ) |
| | Signed:  01/02/2020 |
| | Created: 01/02/2020 8:33 AM |
| 01/08/2020 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | *moot/notice withdrawing motion to change judge* |
| | Signed:  12/31/2019 |
| | Created: 01/08/2020 4:14 PM |
| 01/08/2020 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | *granted for change of judge (Judge D. Charles Bailey)* |
| | Signed:  12/31/2019 |
| | Created: 01/08/2020 4:16 PM |
| 01/08/2020 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | *Change of Judge Granted. (no judge listed)* |
| | Signed:  12/31/2019 |
| | Created: 01/08/2020 4:18 PM |
| 01/22/2020 | **Certificate - Compliance** |
| | *Notification of Compliance with Crime Victims' Constitutional Rights* |
| | Created: 01/22/2020 8:55 AM |
| 02/10/2020 | **Hearing - Fitness to Proceed**  (8:30 AM) (Judicial Officer Menchaca, Ricardo J.) |
| | *02/06/2020 Reset by Court to 02/10/2020* |
| | Result: Held |
| | Created: 01/02/2020 8:32 AM |
| 02/10/2020 | **Order** (Judicial Officer: Menchaca, Ricardo J. ) |
| | *Motion for fitness to proceed will be e-filed today. The ct commits the def per 161.370 for hospital level care.* |
| | Signed:  02/10/2020 |
| | Created: 02/10/2020 8:41 AM |
| 02/10/2020 | **Motion** |
| | *TO DETERMINE THE DEFENDANT'S FITNESS TO PROCEED* |
| | Created: 02/10/2020 9:21 AM |
| 02/10/2020 | **Exhibit** |
| | Created: 02/10/2020 9:21 AM |
| 02/10/2020 | **Exhibit** |
| | Created: 02/10/2020 9:21 AM |
| 02/10/2020 | **Order - Finding Unfit to Proceed - State Hospital** (Judicial Officer: Menchaca, Ricardo J. ) |
| | *w/Order To Transport* |

Exhibit A -  Amici Request for Judicial Notice - Page 6

| | |
|---|---|
| | Signed: 02/10/2020 |
| | Created: 02/10/2020 4:53 PM |
| 02/12/2020 | **Order** (Judicial Officer: Menchaca, Ricardo J. ) |
| | *making Finding Unfit to Proceed document confidential* |
| | Signed: 02/12/2020 |
| | Created: 02/12/2020 8:16 AM |
| 03/05/2020 | **Order** (Judicial Officer: Menchaca, Ricardo J. ) |
| | *allowing parents to visit defendant at State hospital* |
| | Signed: 03/05/2020 |
| | Created: 03/05/2020 1:22 PM |
| 05/13/2020 | **Report - Psychological Evaluation - State Hospital** |
| | Created: 05/13/2020 11:04 AM |
| 05/18/2020 | **Hearing - Fitness to Proceed** (10:30 AM) (Judicial Officer Menchaca, Ricardo J.) |
| | *Status Check* |
| | *05/19/2020 Reset by Court to 05/18/2020* |
| | Result: Held |
| | Created: 02/10/2020 8:42 AM |
| 05/18/2020 | **Order** (Judicial Officer: Menchaca, Ricardo J. ) |
| | *A/A Hrg* |
| | Signed: 05/18/2020 |
| | Created: 05/18/2020 10:30 AM |
| 06/09/2020 | **Exhibit** |
| | Created: 06/09/2020 11:45 AM |
| 06/10/2020 | **Motion - Protective Order** |
| | Created: 06/10/2020 7:44 AM |
| 06/10/2020 | **Order - Protected** (Judicial Officer: Guptill, Rebecca ) |
| | Signed: 06/10/2020 |
| | Created: 06/10/2020 11:17 AM |
| 08/06/2020 | **Report - Psychological Evaluation - State Hospital** |
| | Created: 08/07/2020 8:32 AM |
| 08/18/2020 | **Hearing - Fitness to Proceed** (1:30 PM) (Judicial Officer Roberts, Beth L) |
| | *Status Check* |
| | Result: Held |
| | Created: 05/18/2020 10:30 AM |
| 08/18/2020 | **Order** (Judicial Officer: Roberts, Beth L ) |
| | Signed: 08/18/2020 |
| | Created: 08/18/2020 1:39 PM |
| 12/31/2020 | **Motion - Protective Order** |
| | Created: 12/31/2020 1:05 PM |
| 12/31/2020 | **Exhibit** |
| | Created: 12/31/2020 1:05 PM |
| 01/04/2021 | **Order - Protected** (Judicial Officer: Menchaca, Ricardo J. ) |
| | Signed: 01/04/2021 |
| | Created: 01/05/2021 9:22 AM |
| 01/25/2021 | **Report - Psychological Evaluation - State Hospital** |
| | *RJM Emergency Q 1.27.21* |
| | Created: 01/25/2021 8:51 AM |
| 02/11/2021 | **Motion - Continuance** |
| | Created: 02/11/2021 2:08 PM |
| 02/11/2021 | **Affidavit** |
| | Created: 02/11/2021 2:08 PM |
| 02/16/2021 | **Order - Continue** (Judicial Officer: Menchaca, Ricardo J. ) |
| | Signed: 02/16/2021 |
| | Created: 02/18/2021 3:11 PM |
| 06/29/2021 | **Motion - Protective Order** |
| | Created: 06/29/2021 2:48 PM |
| 06/29/2021 | **Exhibit** |
| | Created: 06/29/2021 2:48 PM |
| 06/30/2021 | **Order - Protected** (Judicial Officer: Colburn, Chris C ) |
| | *\*GRANTED\** |
| | Signed: 06/30/2021 |
| | Created: 07/01/2021 2:56 PM |
| 07/30/2021 | **Report - Psychological Evaluation - State Hospital** |
| | Created: 07/30/2021 4:23 PM |
| 08/26/2021 | **Hearing - Fitness to Proceed** (8:30 AM) (Judicial Officer Menchaca, Ricardo J.) |
| | *Status* |
| | *02/18/2021 Reset by Court to 08/19/2021* |
| | *08/19/2021 Reset by Court to 08/26/2021* |
| | Result: Held |
| | Created: 08/18/2020 1:46 PM |
| 08/26/2021 | **Order** (Judicial Officer: Menchaca, Ricardo J. ) |
| | Signed: 08/26/2021 |
| | Created: 08/26/2021 8:34 AM |
| 12/27/2021 | **Motion - Protective Order** |
| | Created: 12/27/2021 1:35 PM |
| 12/27/2021 | **Exhibit** |
| | Created: 12/27/2021 1:35 PM |
| 01/05/2022 | **Order - Protected** (Judicial Officer: Menchaca, Ricardo J. ) |
| | Signed: 01/05/2022 |
| | Created: 01/14/2022 2:35 PM |
| 01/24/2022 | **Report - Psychological Evaluation - State Hospital** |
| | Created: 01/25/2022 8:33 AM |

| | |
|---|---|
| 02/17/2022 | **Hearing - Fitness to Proceed** (8:30 AM) (Judicial Officer Menchaca, Ricardo J.) |
| | *Status* |
| | *03/01/2022 Reset by Court to 02/17/2022* |
| | Result: Held |
| | Created: 08/26/2021 8:33 AM |
| 02/17/2022 | **Order** (Judicial Officer: Menchaca, Ricardo J. ) |
| | Signed: 02/17/2022 |
| | Created: 02/17/2022 8:43 AM |
| 06/14/2022 | **Motion - Protective Order** |
| | Created: 06/14/2022 2:49 PM |
| 06/14/2022 | **Exhibit** |
| | Created: 06/14/2022 2:49 PM |
| 06/15/2022 | **Order - Protected** (Judicial Officer: Colburn, Chris C ) |
| | Signed: 06/15/2022 |
| | Created: 06/16/2022 8:53 AM |
| 07/22/2022 | **Report - Psychological Evaluation - State Hospital** |
| | Created: 07/25/2022 8:31 AM |
| 09/15/2022 | **Hearing - Fitness to Proceed** (8:30 AM) (Judicial Officer Menchaca, Ricardo J.) |
| | *Status* |
| | Created: 02/17/2022 8:35 AM |

---

### FINANCIAL INFORMATION

| | | | |
|---|---|---|---:|
| | **Defendant** Martinez-Romero, Salvador Antonio | | |
| | Total Financial Assessment | | 6.00 |
| | Total Payments and Credits | | 6.00 |
| | **Balance Due as of 09/11/2022** | | **0.00** |
| | | | |
| 12/27/2019 | Transaction Assessment | | 6.00 |
| 12/27/2019 | Counter Payment | Receipt # 2019-1118439       Brittney Falkners | (6.00) |

## IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR WASHINGTON COUNTY

| | | |
|---|---|---|
| STATE OF OREGON, | | No. 21CR09175 |
| | Plaintiff, | |
| | | **INDICTMENT** - Secret |
| vs. | | |
| TOBY LEE EPLING, | | |
| AKA TOBY LEE NOAH | Defendant. | |

The above-named defendant is accused by the Grand Jury of Washington County by this indictment of the crimes of

Count 1:    MURDER IN THE SECOND DEGREE  (FSG= U; U Felony; ORS 163.115(1)(a))
Count 2:    UNLAWFUL USE OF A WEAPON  (FSG= 6; C Felony; ORS 166.220(1)(a))

committed as follows:

COUNT 1
The defendant, on or about February 21, 2021, in Washington County, Oregon, did unlawfully and intentionally cause the death of Glenda Marie Noah, another human being.

COUNT 2

As part of the same act and transaction as that alleged in Count 1, the defendant, on or about February 21, 2021, in Washington County, Oregon, did possess a dangerous weapon, to wit: a knife, with intent to use said weapon unlawfully against Glenda Marie Noah.

contrary to the statutes and against the peace and dignity of the State of Oregon

It is hereby affirmatively declared for the record, upon appearance of the defendant for arraignment, and before the Court asks how the defendant pleads to the charges, that the State intends that any misdemeanor offenses charged herein each proceed as a misdemeanor.

Dated: 2·26-21

Witnesses subpoenaed, examined and appeared in person unless otherwise indicated before the Grand Jury for the State of Oregon:
Robert Stubbs
Danielle Stockton
Jose Silva-Acantar
Becca Venable

A TRUE BILL

Darlene Emerson
Foreperson of the Grand Jury

KEVIN BARTON, District Attorney

Bracken D. McKey
Chief Deputy District Attorney
Oregon State Bar # 982894

DA # 398275
HBP 51-21564
DOB 09/19/ 1979
FPC #: JWAS221864007
NO BAIL (Murder)

Grand Jury Proceeding Dates:
February 26, 2021

9/11/22, 6:36 AM                    https://publicaccess.courts.oregon.gov/PublicAccessLogin/CaseDetail.aspx?CaseID=32703929

Skip to Main Content Logout My Account Search Menu Search Criminal, Traffic and Parking Case Records Refine     Location : All Locations   Images Help
Search  Back

# REGISTER OF ACTIONS

## CASE NO. 21CR09175

| | | | |
|---|---|---|---|
| **State of Oregon vs Toby Lee Epling** | § § § § § § | Case Type: | **Offense Felony** |
| | | Date Filed: | **02/22/2021** |
| | | Location: | **Washington** |
| | | District Attorney Number: | **398275** |

### PARTY INFORMATION

| | | | |
|---|---|---|---|
| **Defendant** | **Epling, Toby Lee** *Also Known As* **Noah, Toby Lee** 416 SW Oak St Hillsboro, OR 97123 | Male DOB: 1979 | **Attorneys** **SETH I WHITE** *Court Appointed* 503 726-7900(W) |
| **Plaintiff** | **State of Oregon** | | **Washington County Deputy District Attorney** 503-846-8671(W) KATHERINE GLASSON 503 846-8705(W) |

### CHARGE INFORMATION

| Charges: Epling, Toby Lee | Statute | Level | Date |
|---|---|---|---|
| 1.  Murder in the Second Degree | 163.115 | Felony Unclassified | 02/21/2021 |
| 2.  Unlawful Use of a Weapon | 166.220 | Felony Class C | 02/21/2021 |

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

| | |
|---|---|
| 02/24/2021 | **Plea** (Judicial Officer: Lemarr, Kelly) 1. Murder in the Second Degree Not Guilty Created: 02/24/2021 2:27 PM |
| 03/03/2021 | **Plea** (Judicial Officer: Butterfield, Eric E) 2. Unlawful Use of a Weapon Not Guilty Created: 03/03/2021 3:01 PM |

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 02/22/2021 | **Information** *Complainant's* Created: 02/23/2021 8:19 AM |
| 02/22/2021 | **Affidavit - Arrest Warrant** Created: 02/23/2021 8:19 AM |
| 02/22/2021 | **Motion - Protective Order** Created: 02/23/2021 8:19 AM |
| 02/22/2021 | **Exhibit** Created: 02/23/2021 8:19 AM |
| 02/23/2021 | **Warrant - Return of Service** Created: 02/24/2021 10:53 AM |
| 02/24/2021 | **Arraignment**  (3:00 PM) (Judicial Officer Lemarr, Kelly) Result: Held Created: 02/24/2021 8:29 AM |
| 02/24/2021 | **Arraignment** (Judicial Officer: Lemarr, Kelly ) Created: 02/24/2021 2:23 PM |
| 02/24/2021 | **Order** (Judicial Officer: Lemarr, Kelly ) Signed:  02/24/2021 Created: 02/24/2021 2:23 PM |
| 02/24/2021 | **Order - Appointing Counsel** (Judicial Officer: Lemarr, Kelly ) *Attorney: PD* Signed:  02/24/2021 Created: 02/24/2021 2:23 PM |
| 02/24/2021 | **Order - Protected** (Judicial Officer: Lemarr, Kelly ) Signed:  02/24/2021 Created: 03/01/2021 4:04 PM |
| 02/25/2021 | **Request - Discovery** *Defendant's Discovery Demand and Notice of Assertion of Rights* Created: 02/25/2021 9:05 AM |

Exhibit B -  Amici Request for Judicial Notice - Page 3

| | |
|---|---|
| 02/26/2021 | **Indictment** |
| | Created: 02/26/2021 1:06 PM |
| 03/02/2021 | *CANCELED* **Arraignment** (1:30 PM) (Judicial Officer Butterfield, Eric E) |
| | *Other* |
| | *w/19CR48759* |
| | Created: 03/02/2021 1:18 PM |
| 03/03/2021 | **Arraignment - Indictment** (3:00 PM) (Judicial Officer Butterfield, Eric E) |
| | *03/03/2021 Reset by Court to 03/03/2021* |
| | Result: Held |
| | Created: 02/24/2021 2:27 PM |
| 03/03/2021 | **Arraignment** (Judicial Officer: Butterfield, Eric E ) |
| | Created: 03/03/2021 3:00 PM |
| 03/03/2021 | **Order** (Judicial Officer: Butterfield, Eric E ) |
| | Signed: 03/03/2021 |
| | Created: 03/03/2021 3:00 PM |
| 03/04/2021 | **Appearance** (9:00 AM) (Judicial Officer Roberts, Beth L) |
| | Result: Held |
| | Created: 02/24/2021 2:27 PM |
| 03/04/2021 | **Order** (Judicial Officer: Roberts, Beth L ) |
| | Signed: 03/04/2021 |
| | Created: 03/04/2021 9:16 AM |
| 03/05/2021 | **Motion** |
| | *For Change of Judge* |
| | Created: 03/05/2021 2:10 PM |
| 03/05/2021 | **Affidavit** |
| | *in support of motion for change of judge* |
| | Created: 03/05/2021 2:11 PM |
| 03/05/2021 | **Motion - Change Judge** |
| | Created: 03/05/2021 3:04 PM |
| 03/05/2021 | **Affidavit** |
| | Created: 03/05/2021 3:04 PM |
| 03/09/2021 | **Hearing - Status Check** (8:30 AM) (Judicial Officer Wipper, Janelle Factora) |
| | Result: Held |
| | Created: 03/04/2021 9:20 AM |
| 03/09/2021 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | *State to prepare order.* |
| | Signed: 03/09/2021 |
| | Created: 03/09/2021 9:26 AM |
| 03/09/2021 | **Order - Changing Judge** (Judicial Officer: Menchaca, Ricardo J. ) |
| | Signed: 03/09/2021 |
| | Created: 03/12/2021 1:52 PM |
| 06/07/2021 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | *FROM FIRST APPEARANCE WITH APPOINTED COLINSEL AND SCHEDULING ORDER* |
| | Signed: 06/07/2021 |
| | Created: 06/30/2021 9:13 AM |
| 06/08/2021 | **Hearing - Status Check** (8:30 AM) (Judicial Officer Wipper, Janelle Factora) |
| | Result: Held |
| | Created: 03/10/2021 7:57 AM |
| 06/08/2021 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | Signed: 06/08/2021 |
| | Created: 06/08/2021 8:36 AM |
| 08/11/2021 | **Exhibit** |
| | Created: 08/11/2021 8:45 AM |
| 08/11/2021 | **Notice** |
| | *OF DEFENDANT'S LACK OF FITNESS TO PROCEED BY REASON OF INCAPACITY* |
| | Created: 08/11/2021 9:24 AM |
| 08/11/2021 | **Affidavit** |
| | Created: 08/11/2021 9:24 AM |
| 08/20/2021 | **Hearing - Fitness to Proceed** (8:30 AM) (Judicial Officer Wipper, Janelle Factora) |
| | *on Defense Aid and Assist Motion* |
| | Result: Held |
| | Created: 08/13/2021 9:19 AM |
| 08/20/2021 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | Signed: 08/20/2021 |
| | Created: 08/20/2021 8:50 AM |
| 08/20/2021 | **Order - Finding Unfit to Proceed - State Hospital** (Judicial Officer: Wipper, Janelle Factora ) |
| | Signed: 08/20/2021 |
| | Created: 08/20/2021 3:32 PM |
| 08/21/2021 | **Reported - OSP 181A.290** |
| | Created: 08/21/2021 6:02 AM |
| 11/09/2021 | **Motion** |
| | *Reset Fitness to Proceed Hearing* |
| | Created: 11/09/2021 10:33 AM |
| 11/09/2021 | **Declaration** |
| | Created: 11/09/2021 10:33 AM |
| 11/16/2021 | **Order** (Judicial Officer: Wipper, Janelle Factora ) |
| | *Reset Fitness to Proceed *GRANTED** |
| | Signed: 11/16/2021 |
| | Created: 11/17/2021 2:16 PM |
| 12/02/2021 | *CANCELED* **Hearing** (9:00 AM) (Judicial Officer Wipper, Janelle Factora) |
| | *Stipulated by Parties* |
| | *Omnibus* |
| | Created: 06/07/2021 4:42 PM |

Exhibit B - Amici Request for Judicial Notice - Page 4

| | |
|---|---|
| 12/03/2021 | **Report - Psychological Evaluation - State Hospital**<br>Created: 12/03/2021 3:55 PM |
| 12/16/2021 | **Hearing - Fitness to Proceed** (8:30 AM) (Judicial Officer Wipper, Janelle Factora)<br>*Status*<br>*11/18/2021 Reset by Court to 12/16/2021*<br>Result: Held<br>Created: 08/20/2021 8:50 AM |
| 12/16/2021 | **Order** (Judicial Officer: Wipper, Janelle Factora )<br>Signed: 12/16/2021<br>Created: 12/16/2021 8:47 AM |
| 03/01/2022 | **Report - Psychological Evaluation - State Hospital**<br>Created: 03/02/2022 8:06 AM |
| 04/01/2022 | *CANCELED* **Appearance - Orientation** (8:00 AM) (Judicial Officer Wipper, Janelle Factora)<br>*Other*<br>Created: 03/10/2021 11:08 AM |
| 04/26/2022 | *CANCELED* **Trial - Twelve Person Jury** (9:00 AM) (Judicial Officer Wipper, Janelle Factora)<br>*Other*<br>*Opening Statements 5.3.22*<br>Created: 03/10/2021 11:09 AM |
| 06/22/2022 | **Hearing - Fitness to Proceed** (8:30 AM) (Judicial Officer Wipper, Janelle Factora)<br>Result: Held<br>Created: 12/16/2021 8:54 AM |
| 06/22/2022 | **Order** (Judicial Officer: Wipper, Janelle Factora )<br>Signed: 06/22/2022<br>Created: 06/22/2022 8:41 AM |
| 08/25/2022 | **Report - Psychological Evaluation - State Hospital**<br>Created: 08/25/2022 3:44 PM |
| 08/30/2022 | **Hearing - Fitness to Proceed** (8:30 AM) (Judicial Officer Wipper, Janelle Factora)<br>*Status*<br>Result: Held<br>Created: 06/22/2022 8:41 AM |
| 08/30/2022 | **Order** (Judicial Officer: Wipper, Janelle Factora )<br>Signed: 08/30/2022<br>Created: 08/30/2022 8:51 AM |
| 02/15/2023 | **Hearing - Fitness to Proceed** (1:00 PM) (Judicial Officer Wipper, Janelle Factora)<br>Created: 08/30/2022 8:50 AM |

Oregon Health Authority

Oregon State Hospital

# OSH Update

Presented to

House Behavioral Health Committee

September 22, 2022

Patrick Allen, OHA Director

Dolly Matteucci, OSH Superintendent





Exhibit C - Amici Request for Judicial Notice - Page 1

# Oregon State Hospital Capacity

## OSH Average Daily Population by Month and Legal Status Type since 2000

Total

A&A

PSRB

Civil

Exhibit C - Amici Request for Judicial Notice - Page 2




# Aid and Assist orders

**Aid & Assist Admissions / Orders per Month by Year since 2012**
**(with high, low, and average per month)**

| Year | High | Average | Low |
|------|------|---------|-----|
| 2012 | 42 | 30.5 | 16 |
| 2013 | 42 | 35.7 | 30 |
| 2014 | 47 | 38.4 | 33 |
| 2015 | 63 | 45.3 | 31 |
| 2016 | 69 | 51.9 | 33 |
| 2017 | 63 | 50.8 | 37 |
| 2018 | 69 | 60.8 | 49 |
| 2019 | 74 | 56.9 | 43 |
| 2020 | 68 | 55.2 | 42 |
| 2021 | 100 | 71.9 | 58 |
| 2022 Jan - Aug | 83 | 74.0 | 62 |

  

Exhibit C - Amici Request for Judicial Notice - Page 3

 

# OR-OSHA Violations and Response
## September 7, 2022

- **Three violations related to workplace violence and injuries**
  - Documentation
  - Thorough investigation
  - Response

- **Three hazard letters**
  - Documentation
  - Committee function

Exhibit C - Amici Request for Judicial Notice - Page 4







# Litigation Against OHA/OSH re: Admissions/Discharges

- May 2002 - Federal injunction (Mink order) issued requiring OSH to admit every aid and assist patient within 7 days of circuit court order

- April 2019 to present - 74 contempt actions brought against OSH from various Oregon counties

- May 2020 - Mink order modified to permit OSH to slow down admissions to implement Covid restrictions

- Nov. 2021 - Bowman (Guilty Except for Insanity) case consolidated with Mink case

- Dec. 2021- Covid modification to Mink order lifted

- Sept. 2022 - Judge Mosman issues order in Mink case requiring OSH to discharge aid and assist patients within specific time-frames

Exhibit C - Amici Request for Judicial Notice - Page 5







# Dr. Pinals Timeline

- December 21, 2021 – Federal Court Judge Michael Mosman appointed Dr. Debra Pinals as a neutral expert
- January 30, 2022 – Dr. Pinals submitted first report (short term recommendations)
- June 5, 2022 – Dr. Pinals submitted second report (longer term recommendations)
- September 15, 2022 – Dr. Pinals submitted third report (update of changes since second report)





Exhibit C - Amici Request for Judicial Notice - Page 6




# Dr. Pinals' Recommendations, June Report- Actions Taken

- The data dashboard was expanded to report admissions and discharges in aggregate and by county enabling timely information sharing

- OSH modified the expedited admission processes to emphasize consultative availability upon request regardless of referral source

- The Hospital Level of Care Assessment conducted and filed with court and parties on Day 10 of stay versus previous 30-day timeline





Exhibit C - Amici Request for Judicial Notice - Page 7




# Dr. Pinals' Recommendations, June Report- Actions Taken

- OSH has identified staff to assist patients with intellectual and developmental disabilities service applications for improved care coordination

- Managers of OSH Forensic Evaluation Services (FES) collaborating with Dr. Pinals regarding standardized elements for Aid and Assist progress reports.

- Forensic Certification Program (FCP) Coordinator convening a Rules Advisory Committee (RAC) to implement Administrative Rule changes.

  

Exhibit C - Amici Request for Judicial Notice - Page 8



# 2021-2022 Legislative investments

**Community Mental Health Programs (CMHPs)**

- **$15M increase in Aid and Assist dedicated funding** (*flexibility encouraged if program design needs to be changed/refined*)
- **$100M** in housing and treatment infrastructure
- Doubling of mobile crisis funding ($15m obligated/spent to date)
- By County Innovations (*e.g. Washington Co's New Narrative program bridge services from hospital and jail*)

**M110 Behavioral Health Resource Networks**

- Contracts have been executed state-wide, implementation will vary by county/region
- **All M110 BHRN monies obligated or spent ($302m)**

**Other legislative investments**

- **$130M in housing and treatment infrastructure**
  - o Current RFGA for Supportive Housing and Residential expansion
- Improving Peoples Access to Community-based Treatment (**IMPACTS**) program – grants awarded to counties

**Medicaid funded services** (*upon Medicaid enrollment/activation*)

- Assertive Community Treatment (ACT)
- Intensive Care Coordination

  

Exhibit C - Amici Request for Judicial Notice - Page 9

 

# Admission Wait Times – Through August 2022

**Average Wait Time Prior to Admission - <span style="color:red">Aid & Assist</span>**



Exhibit C -Amici Request for Judicial Notice - Page 10



# Intent of Federal Court Order

- Designed to reduce time to admission for people waiting for hospital care while in jail by
  - Prioritizing forensic admissions until the hospital reaches compliance with Mink/Bowman
  - Limits length of restoration in alignment with national data and clinical averages for restoration timelines.

- Mediate State court litigation

Exhibit C - Amici Request for Judicial Notice - Page 11







# What Does Federal Court Order Do?

**OSH admissions framework:**

- GEI and A&A patients to be admitted per place on waitlist, unless expedited admissions criteria met.

- Precludes admissions of civilly committed patients, unless expedited admissions criteria met.

- Allows admissions of PSRB GEI revocations and persons pursuant to ORS 426.701 (extremely dangerous persons).

**Limits restoration timelines at OSH:**

- Limits length of restoration (LOR) for A&A patients charged with **misdemeanors to 90 days.**

- Limits LOR for A&A charged with **non-M11 felonies** to **six months.**

- Limits LOR for A&A charged with **M11 felonies** to **one-year.**

Exhibit C -Amici Request for Judicial Notice - Page 12







# Will Impact Counties Differently

- Rates of Aid and Assist orders vary widely among counties
- Mix of misdemeanor and felony charges vary among county Aid and Assist admissions
- Counties vary in resource development to support people with complex behavioral health conditions

Exhibit C -Amici Request for Judicial Notice - Page 13







# No change for approx. 70% of aid and assist patient discharges

- **Discharges occur as usual for:**
  - People found able or not able to aid and assist
  - People found to no longer need hospital level of care
  - People with their charges dismissed

  - Approx. 67 patients discharged / month
  - 74.1% of patients charged with non-violent felonies discharged before reaching 180 days

Exhibit C -Amici Request for Judicial Notice - Page 14







# Cohort 1: Patients newly admitted to OSH on or after 9/1/22

- OSH will apply the new Federal Court Order restoration time limits:
  - People charged with misdemeanor: up to 90 days
  - People charged with non-M11 felony: up to 6 months
  - People charged with M11 felony: up to 1 year
- Notices will be sent to the courts 30 days prior to the date the restoration time limit is reached

Exhibit C -Amici Request for Judicial Notice - Page 15






# Cohort 2: Patients at OSH at the time of the Federal Court order

- **OSH will stagger discharges over the next several months for patients who meet new Federal Order criteria using the following sequencing:**
  - Misdemeanors on 9b/RTP list
  - Non-M11 felonies on 9b/RTP list
  - Misdemeanors not on 9b/RTP list
  - Non-M11 felonies not on 9b/RTP list
  - M11 felonies not on 9b/RTP list

- **Notices will be sent to the courts 30 days prior to discharge**
- **Approx. 120 patients will be discharged through this process**

Exhibit C - Amici Request for Judicial Notice - Page 16







# OHA Discharge Coordination

- OSH Social Work services – Engage with community partners such as CMHPs, CCOs and Medicaid, throughout patient's stay to best prepare for discharge

- Benefit Coordination – Creating a regional Social Security expert liaison to expedite access to benefits. Medicaid eligible will have benefits from discharge for 3 months to help planning. Pilot project with CCOs on aid and assist notification

- OSH Admission and discharge services – Coordinating admissions with county jails and acute care hospitals. Coordinating discharges with courts, attorneys, jails and CMHPs in each county





Exhibit C -Amici Request for Judicial Notice - Page 17




# OSH Resource Needs

- OSH must accomplish the restoration of persons committed to the hospital in less time

- Approximate increase in both patient discharges and admissions estimated at 27 persons per month, from 10/22 to 9/23

- Staffing must increase to treat patients at the same level of care in the abbreviated timeframes



Exhibit C - Amici Request for Judicial Notice - Page 18



# Thank you.

Exhibit C - Amici Request for Judicial Notice - Page 19







Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Third Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** 9/15/22
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report**

On 12/21/21, the Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as a Neutral Expert in granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman's order stipulates further that OHA enter into a contract with the Neutral Expert and provide any needed information to her.  The Court ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)."  The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH."

After considerable work with the parties I submitted my First Report (dated 1/30/22) and then my Second Report (dated 6/5/22) to the Court. My Second Report contained several long-term recommendations.  Subsequent to submitting that report, the Court ordered my ongoing appointment accompanied by periodic update reports. With Judge Mosman's authorization for a brief extension of the initially ordered deadline, this report represents my Third Report as the appointed Neutral Expert in this matter.

**Background and Summary of the Two Consolidated Cases**

As reviewed in my prior reports, the following background is provided for context in this matter. In 2002, Oregon Advocacy Center, now known as Disability Rights Oregon (DRO) filed a civil rights lawsuit against the state of Oregon alleging that the state was failing to timely admit individuals found incompetent to stand trial (Unable to Aid and Assist) who were ordered to Oregon State Hospital (OSH) for competence to stand trial restoration. The ruling out of the Ninth Circuit (*OAC v. Mink*) found on behalf of plaintiffs that the state was out of compliance and must admit these individuals within seven

(7) days. In June 2019, after the state had fallen out of compliance, the Court compelled the state to get in compliance with *Mink* within 90 days. Although the state met its burden at the time, compliance with became challenging once again with the pandemic creating other barriers. The state filed a motion requesting greater latitude in admitting individuals found Unable to Aid and Assist to mitigate the spread of COVID-19. That motion was granted, and DRO appealed to the Ninth Circuit Court of Appeals. The Ninth Circuit issued an order vacating the modification but also sought review by the District Court Judge. In December 2021, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations.

In November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after the Honorable Nan Waller had ordered them to OSH for treatment, without unreasonable delay. The plaintiffs remained, however at the Multnomah County Detention Center for months (plaintiff Bowman for nearly eight months, and plaintiff Douglas-Simpson for nearly six months) after the commitment order was issued. Plaintiffs alleged a violation of their substantive due process rights and filed a motion for a Temporary Restraining Order asking for plaintiffs to be transported to OSH within seven days of the order. The defendants argued that a lack of space at OSH, in part related to the need to timely admit individuals in the Aid and Assist process, contributed to the delays in admitting the patients. The Court granted the plaintiffs' motion for a Temporary Restraining Order, noting that "The *Mink* injunction does not address the relative priority of aid-and-assist patients and GEI patients…" noting that "any prioritization stems from Defendant's failure to provide the funds, staff, and facilities necessary to satisfy the *constitutional rights* of both groups. When satisfying constitutional guarantees, Defendants cannot rob Peter to pay Paul." In that opinion, The Honorable Marco A. Hernandez, United States District Court Judge, did agree with the defendants that a consolidation of the *Mink* and *Bowman* cases may make sense. As noted above, after the decision about the Temporary Restraining Order regarding the two specific plaintiffs, and at the time of the appointment of the Neutral Expert, the P entered an interim agreement that no individuals found GEI would wait longer than four months for admission to OSH.

**Qualifications to Perform this Consultation**

My qualifications to render opinions as the Neutral Expert were described in my first report. In summary of that experience, I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level administrative leadership, management, policy development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions.

**Sources**

To help inform the recommendations contained in this report, I reviewed numerous documents, and exchanged email correspondence with the parties and others. I requested and received data from the state, and reviewed occasional news coverage on this matter, which are not specifically delineated below as sources of information. It is acknowledged that the volume of material reviewed may mean that some more substantive items may have been inadvertently omitted from the list below. Apart from

2

those caveats, to understand the scope of my activities, background documents I have reviewed for this matter include:

1. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
2. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
3. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
4. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
5. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
6. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
7. January 30, 2022, Neutral Expert First Report; and
8. June 5, 2022, Neutral Expert Second Report.

In addition, documents I have reviewed in the interim between this report and my prior report include (but are not necessarily limited to):

1. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
2. Weekly data from OSH with metrics related to admissions and discharges, currently including net bed capacity, current census at OSH, OSH Discharge Ready list, and OSH 0.370 Admissions List;
3. OSH Forensic Admissions and Discharge Bi-Weekly Report, August 15-28, 2022 and August 29-Sept 11, 2022;
4. OSH Forensic Admission and Discharge monthly data dashboards June to August 2022;
5. Mink & Bowman Monthly Progress Reports from OHA from July 6, August 3, and September 2, 2022;
6. Handouts from the 6/17/22 A&A Workgroup meeting including:
   a. Minutes from 5/20/22;
   b. OSH Ready to Place Discharge Data 6/3/22;
   c. Aid and Assist Demographic Data 6/8/22; and
   d. Copy of OSH Current Census by County LS 2022-05-31;
7. Materials from the Behavioral Health (BH) Mandated Population Funding Workgroup Meetings hosted by Ms. Annaliese Dolph, Policy Advisor to House Speaker:
   a. Meeting #3: Aid and Assist Cost Models (meeting on 6/10/22):
      i. Pinals recommendations 6.5.22; and
      ii. Copy of Mandated Caseload Calculator June 2022;
   b. Meeting #4: PSRB Services and Cost Models (meeting on 6/24/22):
      i. MHS 30 PSRB (GT#) Draft 210921; and
      ii. CMHP Services for Forensic and CC Clients;
   c. Meeting #5 Models for Civil Commitment (meeting on 7/8/22):
      i. Minutes from 6/24/22 meeting;
      ii. Commitment Process May 2012;

3

        iii.   MHS 01 System Management (GT#) Draft 210903;

        iv.   OJD Newsletter with Civil Commitment data; and

        v.   DRO civil commitment guide with flowchart;

   d.   Meeting #6 Civil Commitment Cost Models (meeting on 7/22/22):

        i.   Oregon Civil Commitment Roles and Responsibilities 5/26/22;

        ii.   Commitment Swim Lanes 7/21/22;

        iii.   Civil Commitment Dashboard Summary 2021;

        iv.   WG Agenda and Summary from 7/22/22;

        v.   Oregon Civil Commitment Process Simple Flowchart;

   e.   Meeting #7 Mandated Caseload and Funding Alternatives (meeting on 8/5/22):

        i.   Draft recommendations (due by 9/12/22);

8. Materials for a Behavioral Health Transformation Meeting hosted by legislative leaders, sent by Anna Braun, Senior Advisor to the Senate President on 8/17/22, including:

   a.   T.A.B. Principles 2022 08.17;

   b.   988/Mobile Crisis Workgroup Update 8.17.22;

   c.   Mandated Population Update 8.17.22;

   d.   NAMI 988 Workgroup Summary Slide;

   e.   Tackling Administrative Burden Subgroup 8.17.22 BHT Presentation;

   f.   CCBHC August 17 presentation.

9. Expedited admissions protocols for forensic patients;

10. A&A Admissions to OSH by Highest Charge Classification as of 6/27/22;

11. Notice to Partners 6/27/22, along with attachments including: Final updated Expedited Consultation for Patients Under Forensic Commitment Revised June 2022;

12. Plaintiffs Outreach & Training Plan, draft reviewed 6/30/22;

13. Oregon Council for Behavioral Health (OCBH) Letter to Steve Allen and MH Res Rate Standardization dated 8/8/19;

14. 2022.6 Summarized feedback from OCBH providers, June 2022;

15. MH Residential letter to Steve Allen and Team dated 10/8/19;

16. MH Res Trans Timeline v2 from the Oregon Residential Provider Association (ORPA) from July 2013 to March 2017;

17. ORPA one pager v2;

18. SB 295 guide and common violations, sent by Ms. Carla Scott to Judge Nan Waller on 7/26/22;

19. Document from 7/28/22 summarizing AA funding distribution based on statewide RFA proposals;

20. A&A Discharged After More than 1 year at OSH, 8/25/22;

21. OSH data request for 8.29.2022 federal hearing, 8/25/22;

22. HB 2308 FAQs;

23. Expedited Admission Protocol for Civil Admissions;

24. Community Restoration Program Survey results, received 8/15/22;

25. Forensic Mental Health Evaluators and Evaluation Rules, Division 90, beginning at 309-090-0000;

26. Letter to stakeholders from Dolly Matteucci and Steve Allen, dated 8/30/22 alerting the community to the ruling made verbally on 8/29/22 by Judge Mosman; and

27. Behavioral Health Partner Meeting 9/6/22 PowerPoint presentation.

4

I observed two Court hearings that took place related a motion filed by plaintiffs to uphold my prior recommendations. These took place on 8/16/22 and 8/29/22. Documents reviewed related to those hearings include:

1. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Unopposed Order to Implement Neutral Expert's Recommendations, filed by plaintiffs;
2. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), Plaintiff's Supplemental Memorandum in Support of Unopposed Motion for Order to Implement Neutral Expert's Recommendations, dated 8/26/22;
3. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), Declaration of Emily Cooper in Support of Plaintiffs' Supplemental Memorandum, dated 8/25/22;
4. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), Defendants' Supplemental Brief Regarding Plaintiffs' Motion for Order to Implement Neutral Expert's Recommendations, dated 8/26/22;
5. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), Declaration of Carla Scott, executed 8/25/22; and
6. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), Declaration of Derek Wehr, executed 8/25/22.

This hearings resulted in the following orders by Judge Mosman:

- *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22; and
- Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22.

To inform my work I also spoke with and heard numerous individuals, attended meetings and continued to incorporate broad perspectives. To briefly summarize my work for this three-month period, I will not include a list of all individuals at each meeting. As in my prior reports, however, I would like to gratefully acknowledge the robust participation of the stakeholders with whom I have had the privilege of connecting.

Regular/semi-regular meetings during this interim period from my prior report including the following meetings and discussions:

1. Periodic meetings with Judge Mosman;
2. Periodic meetings with OHA staff Mr. Cody Gabel for coordination of my activities and with staff from OSH including Mr. Scott Hillier and Mr. Derek Wehr regarding data requests;
3. Weekly or bi-weekly meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together.  In addition, I met with staff from these agencies at various points in this interval period.
   a. From OHA, OSH, the weekly/bi-weekly leadership meetings have largely included:
      i. Steve Allen, Director of Behavioral Health, OHA

   ii. Dawn Jagger, Chief of Staff, OHA
   iii. Dolores Matteucci, OSH Superintendent-CEO
  b. From Oregon Department of Justice (DOJ):
   i. Carla Scott, DOJ Special Litigation Unit Counsel
   ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
  c. From Disability Rights Oregon (DRO), Emily Cooper, Legal Director
  d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
 4. Huddles with OHA, OSH, DRO, and OJD leadership. OJD leadership with whom I met included:
  a. State Court Administrator Nancy Cozine
  b. Judge Nan Waller, Multnomah County
  c. Debra Maryanov, Senior Assistant General Counsel

I spent time attending several meetings primarily to focus on the plan to implement the recommendations made in my Second Report and to track progress toward compliance. Examples of these included meeting with or attending the following:

1. OHA leaders of the Intensive Services Unit regarding the recent RFA to support individuals in the community with Aid and Assist needs regarding the issuance of the recent RFA, on 6/8/22;
2. Aid & Assist workgroup meeting on 6/17/22;
3. OSH and OHA representatives regarding discharge planning processes on 6/24/22;
4. Ms. Heather Jefferis, Executive Director of OCBH, on 7/11/22;
5. OHA representatives regarding community navigator strategic planning, on 7/13/22;
6. OHA representatives regarding jail review process on 7/20/22;
7. AOCMHP meeting on 7/28/22 at the invitation of Ms. Cherryl Ramirez;
8. OHA representatives regarding juvenile forensic services in Oregon on 8/1/22;
9. OSH representatives regarding Forensic Evaluation Services (FES) on 8/3/22, 9/13/22 and 9/14/22;
10. OHA representatives with DRO's Emily Cooper to discuss community-based restoration services on 8/10/22;
11. OSH representatives to discuss hospital level of care considerations on 8/25/22;
12. OHA, OSH, DRO, and MPD to discuss Town Hall Preparation for 9/6/22;
13. Legislative workgroup meetings on the Forensic and Civil Committed Populations;
14. OHA Town Hall facilitated by Pat Allen, Director, OHA, to discuss Judge Mosman's Order of 9/1/22.

In addition to the above, I attended two court hearings in Judge Mosman's court through a videolink, one on 8/16/22 and one on 8/29/22.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs

6

DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities Since the Second Neutral Expert Report**

Following the issuance of my Second Report, I met with the state and the plaintiffs regularly to discuss progress and the implementation of my recommendations. The state has continued to also produce a monthly progress report to me in this matter. The work since my last report also included monitoring of progress toward the benchmarks set forth in my Second Report. To help inform my work and consultation with the parties and to help with the implementation of the recommendations, I requested and reviewed data regularly. The first section of this report therefore presents some of the data utilized in order provide the Court with some of the information that I have considered.

**Data Summaries**

*Background Data*: Data received has painted a concerning picture since my Second Report. As seen in **Figure 1** and **Table 1,** there are slight improvements in time to admission based on peak numbers in the aftermath of the pause in admissions related to COVID-19 (the "COVID Pause"), but trends show the upper range of days waiting for admission are increased, and average days waiting for AA patients are increased from the May 2022 figures. Wait times for discharge for individuals determined not to need hospital level of care have not improved significantly and indeed appear to have plateaued and worsened for patients found GEI. The census at OSH remains nearly at capacity without major shifts from prior reports (See **Table 2** and **Table 3**). Vacancies reflected allow for emergency bed need planning (generally one bed held open on each unit to allow for safety and planning for unexpected issues) and thus are not true vacancies. These numbers on the one hand indicate that the state is maximizing its resource for state hospital usage, but on the other hand must be understood in the context of staffing shortages, concerns raised by CMS, and new findings related to occupational safety hazards pertaining to violence toward staff. Also, the numbers of individuals determined by the hospital to not need hospital level of care continue to outnumber those awaiting admission (see **Figure 1** and **Table 4**).

Regarding the demand for admissions, A&A orders continue to remain high (see **Table 5** and **Figure 2**), with some lighter months but overall orders per month are at a higher base rate than historic numbers

7

and continue to climb. Thus, it is a recognition of hospital and community efforts that steady efforts at admission have helped the rate of days waiting to discharge remain somewhat stable (see **Figure 1**), even though to achieve *Mink* compliance and *Olmstead* requirements this trend continues to need addressing.

In my Second Report in June 2022, I recommended that the state monitor progress toward compliance utilizing benchmark goals. The goals were as follows:

- By August 1, 2022 – Average wait time to admission 22 days or fewer
- By October 1, 2022 – Average wait time to admission 17 days or fewer
- By January 1, 2023 – Average wait time to admission 11 days or fewer
- By February 14, 2023 – Average wait time to admission 7 days or fewer

Since that report was issued, data was becoming clear that with the rate of orders coming in, and the timing for discharges, the goals toward compliance would not be met for the foreseeable future. Further data analytics were requested and produced to delineate projections going forward, assuming constants of the rate of admissions and discharges (see **Figure 3**). In the discussions with the parties, there was consensus that addressing all the recommendations would help the state achieve compliance over years, but for compliance to be achieved timely, a more drastic intervention would be needed. Plaintiffs therefore filed a motion in federal court with Judge Mosman, and the state determined that it would not oppose this motion. The projected outcomes toward *Mink* compliance with and without the new restoration time limits shows the more expeditious potential for compliance with the new order (see **Figure 4)**. At a Town Hall meeting on 9/6/22 the anticipated increase volume of discharges from baseline projected under the Court's 9/1/22 new order was explained and shared with stakeholders (see **Figure 5**). This delineated that OSH would be discharging close to an average of 20-30 more patients each month compared to its prior average of 67 patients per month.

**Figure 1. Data Dashboard Charts Reflecting Progress in Mink/Bowman as of August 31, 2022**

**Table 1. Individuals awaiting admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | | |
|---|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* |
| Total Number of individuals | 46 | 93* | 67 | 70 |
| Average days waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days |
| 2. Regarding individuals found GEI and ordered to OSH | | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* |
| Total number of individuals | 15 | 4 | 3 | 4 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Table 2: OSH Bed Capacities as of 9/1/22**

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 474 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **561** |
| Junction City HLOC | 76 | 73 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | 151 | 145 |
| **OSH Total** | **743** | **706** |

**Table 3**. OSH Census as of 9/1/22

| Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|
| 410 | 275 | 14 | 1 | 700 |

**Table 4. Individuals determined to be clinically appropriate for discharge as of 9/6/22**

| Legal Status | Total on "ready to discharge list" | Numbers and level of care needed |
|---|---|---|
| **Aid & Assist** | 71 | LOCUS 1(0), 2(0), 3(6), 4(18), 5(45), 6(2) |
| **GEI/PSRB** | 34 | Level of care not determined until discharge |
| **Civil** | 8 | Level of care not determined until discharge |

9

**Table 5. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| December 2021 | 76 | 8 (5 standard/ 3 revocations) |
| January 2022 | 76 | 7 (4 standard/ 3 revocations) |
| February 2022 | 56 | 5 (2 standard/ 3 revocations) |
| March 2022 | 85 | 4 (3 standard/ 1 revocation) |
| April 2022 | 80 | 7 (4 standard/ 3 revocations) |
| May 2022 | 77 | 7 (4 standard / 3 revocations) |
| June 2022 | 75 | 6 (4 standard / 2 revocations) |
| July 2022 | 65 | 5 (3 standard/ 2 revocations) |
| August 2022 | 74 | 7 (4 standard / 3 revocations) |

**Figure 2. Aid & Assist Admissions/Orders Trends through August 2022**



**Figure 3. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 9/9/22**



10

**Figure 4**. From the Declaration of Derek Wehr in anticipation of 8/29/22 hearing



After the 109 Aid & Assist patients at OSH who are already over the proposed restoration limits have been discharged by the end of February 2023 (indicated by the double line between Feb-23 and Mar-23 in the data table above), and with the limits in place for new admissions, the anticipated average lengths of stay are estimated to generate roughly 83 discharges per month. From this point forward, OSH should be able to maintain compliance with Mink/Bowman as long as new orders don't exceed 83 per month.

**Figure 5: Monthly Discharges by Group Presented at Town Hall on 9/6/22**

- **Cohort 1:** Patients newly admitted to OSH on or after 9/1/22 (date of Federal Court order).

- **Cohort 2:** Patients at OSH at the time of the Federal Court order.



*Length of Stay and Aid and Assist Outcome Data in Light of the 9/1/22 Federal Court Order*: In order to put the new court order for shorter duration of restoration in context, I have included the same figure that was in my Second Report that shows the average length of stay at OSH with the statutory duration of restoration of up to three years (see **Figure 6**), with the majority of individuals discharged prior to 180 days. As one can see from 10 years' worth of data, the shorter duration of restoration should only impact outlier cases.

**Figure 6. Distribution of Aid & Assist Length of Stay for OSH Over 10 Years**



In considering the recommendation for the motion raised by the plaintiffs, additional data was requested from OSH Forensic Evaluation Services to understand overall outcomes of criminal cases under the Aid and Assist process. Several data points are relevant that were considered by the parties and are included here. First, only 214 individuals committed to OSH for restoration across 10 years of data spent more than one year in restoration services at OSH from 2012 to April 2022 (see **Table 6**). Of those, only 35.5% (76 people over ten years) were ultimately found able (See **Table 7**). Of all the 214 people across ten years, only 63 people were ultimately prosecuted, with most other cases dismissed, and of the 214 people 46 were convicted (See **Table 8**). From one point of view, these prosecutions may represent the achievement of important government interests in the pursuit of justice. But from other perspectives, including the Constitutional rights of many more individuals waiting to be served at OSH and those who have a better chance of restoration if timely admitted, as well as from the point of view of resources for the state, utilizing OSH bed days for over one year for the purpose of moving people toward prosecution by providing restoration services, the yield is very low. And currently with the *Mink* compliance in play, this low yield is important to consider.

**Table 6. Aid & Assist Discharged After Spending More Than 1 Year at OSH (from 2012 through April 2022)**

| Year | Count | Percent |
|------|-------|---------|
| 2012 | 9 | 4.2% |
| 2013 | 6 | 2.8% |
| 2014 | 12 | 5.6% |
| 2015 | 15 | 7.0% |
| 2016 | 17 | 7.9% |
| 2017 | 20 | 9.3% |
| 2018 | 18 | 8.4% |
| 2019 | 18 | 8.4% |
| 2020 | 35 | 16.4% |
| 2021 | 46 | 21.5% |
| 2022 (Jan-Apr) | 18 | 8.4% |
| **Total** | **214** | |

**Table 7. FES Opinion on Individuals in the Aid & Assist Process Discharged After Spending More Than 1 Year at OSH (from 2012 through April 2022)**

| FES Opinion | Count | Percent |
|-------------|-------|---------|
| Never Able / Med Never | 106 | 49.5% |
| Able | 76 | 35.5% |
| Timed Out | 11 | 5.1% |
| Not Able | 8 | 3.7% |
| Case Dismissed | 8 | 3.7% |
| Order Rescinded | 3 | 1.4% |
| Patient Passed Away | 1 | 0.5% |
| No Opinion | 1 | 0.5% |
| **Total** | **214** | |

**Table 8. Court Outcome for Individuals in the Aid & Assist Process Discharged After Spending More Than 1 Year at OSH (from 2012 through April 2022)**

| Prosecuted / Dismissed | Count | Percent |
|------------------------|-------|---------|
| Dismissed | 140 | 65.4% |
| Prosecuted | 63 | 29.4% |
| *Convicted* | *46* | *21.5%* |
| *GEI* | *13* | *6.1%* |
| *Dismissed* | *3* | *1.4%* |
| *Deferred* | *1* | *0.5%* |
| Pending | 10 | 4.7% |
| Unknown (muni court) | 1 | 0.5% |
| **Total** | **214** | |

13

Another area that ties to a recommendation made in my June 2022 Second Report was in item I.B.3. *Clinical reviews of utilization of OSH beds*, where I recommended that OSH engage in a process in which by July 1, 2022, OSH should develop plans for prioritization of a) early referrals for evaluations of persons in Aid and Assist process at OSH to re-examine their competence to stand trial; and b) earlier reviews for Hospital Level of Care (HLOC) determinations for AA patients at OSH, with implementation of both these plans as expeditiously as possible. Prior to that recommendation the hospital had been doing a pilot of earlier HLOC reviews by day 10 of hospitalization. I asked for data to examine the findings from that earlier work. This data shows that a substantial percentage (approximately 30%) of patients at OSH are likely not in need of a hospital level of care by day 10, with most of these confirmed with the same finding at day 30 in their admission (See **Table 9**). Many patients in jail will take medications voluntarily or will be substance use free and have a chance for their cognitive function to improve. These findings reflect that many individuals could be served in the community, with the preservation of the OSH resource for those who need it.

**Table 9: Provisional Findings for Patients at OSH on 8/26/22 and determination of Hospital Level of Care Needs for Data Collected from 10/14/21 to 8/25/22.**

| Number of Reviews | Number (%) provisionally found not to require a HLOC at 10 days at OSH | Number (%) confirmed at 30 days at OSH found not to require HLOC | Number (%) for whom time had not yet elapsed for a re-determination at 30 days at OSH regarding meeting HLOC |
|---|---|---|---|
| 159 | 49 (30.81%) | 20 (40%) | 25 (51%) |

**Updates Since my June 2022 Second Report**

*Consultation Related to Efforts to Implement Recommendations:*

Following the submission of my Second Report to the Court, I consulted to the state on several matters. One addressed my recommendation I.B.7.a., which involved a recommendation to modify the expedited admission processes to emphasize consultative availability upon request regardless of referral source. As recommended, this was completed within the timeline and a notice to parties went out regarding the new protocol on 6/27/22 with the change effective 6/30/22.

In addition, in my Second report recommendation I.B.4 called for multidisciplinary training related to AA and misdemeanants, with a plan for this developed by 7/1/22 by plaintiffs working in partnership with others including the state and OJD and in consultation with the State. On 6/30/22 I received a draft plan for this training and have since provided feedback. The training is set for 10/3/22 and DRO has been working with the state to help deliver training.

Toward mid-July there were some concerns that the hospital might need to pause admissions and there were concerns that staff would rapidly be leaving as incentive pays were due to end. This led to several urgent meetings and a plan to try to address the needs without pausing admissions but to continue to emphasize alternative pathways when feasible. In subsequent meetings the state indicated that the

leadership had been able to continue many of the incentive payments at least in part, and that efforts were ongoing to work with the legislature to support ongoing staffing needs at OSH.

As the first benchmark was approaching, my meetings with the parties included discussions about strategies to help better align the system to achieve compliance and to that end, the plaintiffs determined that they would file a motion requesting Judge Mosman to consider federal court authority to address the numerous burdens of contempt (including the risk of local courts holding state leaders in jail) as well as timelines for restoration services at OSH (see below for further details).

By mid-August 2022 the state had drafted legislative concepts regarding recommendations from my Second Report, which I had an opportunity to review. The main proposals pertain to the risk/incentive sharing by other entities for wait times to OSH as well as a proposal to uphold restoration timelines for community and hospital-based competence to stand trial restoration.

On 8/15/22, in accordance with recommendation task I.B.14 in my June 2022 report, I received information about outpatient competency restoration programs. The work related to community restoration services was augmented in part through the RFA that was released to the communities.

I worked with Ms. Scott Hillier and Mr. Derek Wehr to help develop a data set that could be reviewed every two weeks in accordance with my recommendation to increase information flow (Recommendation I.A.1). By the end of August I received and reviewed a new data report consistent with that work that shows admissions and discharges in aggregate and by county as a way to track movement more timely to augment the monthly dashboard report. This is an appreciated addition.

*Overview of the actions related to the unopposed motion by plaintiffs*:

As noted, when the first benchmark had passed with projections showing the difficulties the state would have in meeting the targets I set forth in my June 2022 report, the plaintiffs discussed with me and the state and then filed a motion (unopposed by the state), requesting that Judge Mosman order the state to follow my recommendations in two broad areas. One included addressing contempt orders that were overly burdening the state and distracting from the systemic fixes needed, and the other pertaining to restoration timeframes. Ultimately, there were two hearings resulting in two court orders, one on 8/16/22 enjoining state courts where contempt proceedings had been utilized to solve case-by-case admissions delays. The second order, issued on 9/1/22, covered the prioritization of admissions to those meeting expedited clinical criteria and those involving *Mink* timelines and also ordered OSH to shorten the maximum duration of restoration allowable at OSH consistent with the recommendations set forth in my Second Report. The timelines allow for up to 90 days of restorative services at OSH for individuals charged with misdemeanors, up to 180 days of restorative services at OSH for individuals whose most serious charge equated to specific felonies, and up to one year for particular serious violent offense. These timeframes are consistent with clinical experience and other state examples and are explained in my June 2022 Second Report. As an additional matter, Judge Mosman indicated his intention to ask Judge Stacie Beckerman to help in this case and the parties did not object to this.

Since the issuance of the order, the state and the plaintiffs have been working collaboratively to examine strategies for implementation. As such, OHA and OSH have developed a plan for two main cohorts, those admitted after the issuance of the 9/1/22 order, and those who were admitted before that date whose time for restoration would exceed the limits issued under the new order. With the

duration of restoration shortened, the rates of projected discharges will increase as individuals will have their capacity to stand trial reviewed in light of new time standards. The state has worked with me to identify two cohorts and how to develop plans for them, with one cohort being those admitted after 9/1/22 and one being those in the hospital prior to 9/1/22 who will require a more staggered discharge approach. For the latter population the state has identified, and I have agreed in consultation meetings with the plan to focus on discharging those on the ready to place list first, followed by a staggered discharge of those who reach the end of their restoration time periods and balancing the severity of the charges with the burdens to the community system. I plan to continue to confer with the state and the plaintiffs as these implementation plans unfold to offer suggestions for any course corrections as needed.

In addition, the workload of OSH treatment staff and FES continues to be increasing, as timeframes for evaluations and discharges are expected to be sooner and potentially more frequent, with increased admissions to OSH. As such I have met with OSH administrative leadership who continue to advocate for increased staffing and attractive recruitment and retention options. I have also met with FES leadership to learn more about their service demand and help problem solve. We have also discussed how forensic opinions recommendations will be shaped in accordance with the new time standards and what this will mean for clinical determinations of Able and Never Able (for example, I have recommended that the staff be trained to refer to individuals as Never Able if through the shorter inpatient restoration they have not been restored when it would be clinically unlikely that further community restoration would be effective). We have discussed the need for shorter evaluative progress reports as well. Many processes will remain in place as they were at the three-year end of jurisdiction mark under prior timelines, but going forward there will be similar work completed at the new timelines with 30-day notices issued to the courts. The hospital is working on messaging and helping address staff and patient questions and the leadership has been consulting with me about this regularly.

*Meetings with Various Stakeholders:*

I met on 7/28/22 with leadership from AOCMHP to provide an overview of my Second Report. There were also discussions about proposals for the RFA that had been reviewed preliminarily by the state. It was encouraging to hear about the many actions the CMHPs are taking to serve the population of people in A&A processes, and helpful to hear their challenges. In addition, I attended the A&A Workgroup in June that continues to discuss recommendations in my prior report and other priorities.

*Meetings with OJD Leadership*:

I have met with the parties and OJD on several occasions since my June report. These meetings have been incredibly valuable to learn about the work of OJD in assigning pretrial assistance officers to new jurisdictions, data efforts for AA processes, and to learn of some of the successes and challenges of the jail review meetings. OJD has indicated they continue to work on recommendations as part of the GAINS center efforts to examine various systemic forensic evaluator models, and I look forward to seeing their report on this. In addition, I appreciated the ability to hear the perspectives of the judiciary related to the June 2022 report as well as the recent orders by Judge Mosman.

*Meetings with the BH Mandated Population Funding Meetings:*

I attended in whole or in part several meetings chaired by Ms. Annaliese Dolph, in which numerous stakeholders came together to develop recommendations related to funding of services for mandated populations, including those in AA processes, those found GEI and those civilly committed to care. Themes that emerged included some of the complexity of developing funding models that allowed for the flexibility of serving complex populations, concerns about liability of managing individuals that are thought to pose specific risks, and mechanisms to formulate case rates to keep providers of services whole. There had also been discussion about adequate funding for prevention as well as funding for possible mandated caseload sizes. It is my understanding that these recommendations will be forwarded to legislators for consideration. There is a legislative hearing scheduled also later in September where information will be presented related to *Mink/Bowman*.

**Information from Progress Reports to the Neutral Expert**

I continue to receive, pursuant to the Court's order, monthly progress reports from the state, and during this interim period I received reports for July, August and September. The progress reports at this point largely relate to how the state is working to achieve the recommendations set forth in my two prior reports. Since I have been consulting regularly, the information on the progress reports was not new information to me, but it does provide a snapshot for review. The following elements were excerpted as new items from those reports:

- Completion of recommendation to re-establish prior policy and discharge .370 defendants back to the committing county upon a forensic evaluation of "able." This was completed on 6/30/22.
- Review with neutral expert of recent RFA to address the needs of the AA population, distribution of the funding still in progress
- Notice of modification to expedited admission process sent on 6/27/22 with update process taking effect 6/30/22
- Ongoing monitoring of benchmarks
- Regular meetings of the parties continue
- Review of early referral processes for evaluations marked as completed 6/22/22 (but still is ongoing)
- Plans in place by plaintiffs to work in partnership with OJD and other stakeholders as well as OHA to collaborate on outreach and education for defense, prosecution and judiciary for education related to AA processes, diversion and community restoration (training planned for 10/3/22)
- Restoration timeframe changes legislative bill proposals drafted;
- Meeting held 8/18/22 with 20 stakeholders to discuss discharge assessment practices, further follow up required.
- Policy option packages submitted for additional staff (recommendation I.A.2) awaiting legislative session approval.
- Research has begun on other states manuals for outpatient competency restoration
- ODDS, HSD, and OSH met to review Mink/Bowman, with OSH creating a process to check I/DD service history. OSH has identified new resource coordinators to complete I/DD service applications, and OSH and ODDS will schedule a training on service eligibility. A barrier for this is scheduling and workload.
- OHA conducted an inventory of the current status of community restoration programs on 8/10/22

- OHA will need to determine whether CCBHC expansion allowable by CMS should occur under the federal demonstration or through a state plan amendment, so information is being gathered about the pros and cons of these options
- Work related to PSRB reporting timeframes and funding expansion is reported as ongoing with no barriers identified
- OHA proposed a provider rate increase to stabilize existing behavioral health providers and encourage them to expand capacity. Public comment period ended on 9/7/22 so this now moves to final approval by CMS.

Barriers were identified in many of the updates related to "in progress" or "not started." For example, for the recommendation of reviewing with the Medicaid team work on the 1115 waiver, the progress report indicated OHA was waiting for final federal approval after which there would need to be CCO contract modifications. Regarding recommendation I.B.1 from my June 2022 report, asking for OHA to convene key partners to review standardized assessment processes for more consistent and transparent placement decisions, the work was identified as in progress, and there remained several identified tools that still required finalization. For the recommendation to expand SUD treatment for people on AA restoration orders, barriers reported include low staffing reported as a 34% vacancy rate at OSH psychology, need for clinicians trained in substance use treatment, lack of position authority to expand services, COVID risks requiring unit-based treatment and the current focus at OSH on CMS responses.

**Recommendations and Comments**

As I have noted in my prior reports, the parties have worked tirelessly to meet and coordinate and to review potential strategies to help the state achieve compliance. In continuing to review the systemic issues involved in *Mink/Bowman*, it is my opinion, with agreement of the parties, that as a total package the prior recommendations hold the most realistic potential for long-term and sustainable achievement of *Mink* compliance. Yet there is much work to do related to those recommendations, as each one requires an administrative and staff effort at a time when staffing shortages remain a constant challenge. The data projections support that the recent court orders hold further promise for a more expedited remedy that will help the state achieve the seven-day *Mink* admission parameters. Judge Mosman's 9/1/22 order requires the state to focus attention on its immediate implementation, and the parties have been working in earnest with numerous meetings and activities related to the implementation of the order. In conferring with me there have been many conversations that show conscientious attention to its impact on OSH and on community systems and efforts to mitigate any potential negative consequences. As such given the work needed to date, the state has indicated they may confer with me regarding shifting some of the timelines for achievement of the other recommendations set forth in my prior reports. I look forward to these conversations.

For this update to the court, I do not have new substantively different recommendations to make as my earlier recommendations are being implemented. However, I offer the following considerations:

1. The parties should continue in their strong work collaboratively leveraging their collective wisdom to help the state move toward compliance. They should continue regular meetings in consultation with the Neutral Expert to accomplish the numerous tasks set forth in the

18

recommendations of my prior reports. This work may consider goal timelines set forth in my June 2022 recommendations to determine if they need to be shifted.

2. There should be ongoing monitoring of the impact of Judge Mosman's order to help keep the court informed and to allow for any new recommendations to emerge should there need to be further refinements or course corrections in implementation strategy.

3. The work of the parties related to reviewing data has been particularly helpful and informative. As such, additional data needs should continue to be prioritized to help inform the work ahead.

4. Staffing should be prioritized across the system. For example, I have had preliminary discussions of the need for data examining forensic evaluator staffing and work demand. According to FES leadership, there have apparently been no staffing allocation increases since approximately 2018 for state forensic examiners, despite the growing demands for their work. Similarly, treatment staffing needs at OSH and in community settings will continue to need to be prioritized and augmented to help achieve the goals of the state to comply with my earlier recommendations.

5. In order to implement Judge Mosman's 9/1/22 order, it will also be important for the forensic evaluators to opine about defendant ability to aid and assist and determine when a "never able" finding is needed in accordance with the new timelines. I will continue to confer with FES about that. In addition, in order to mitigate against further systemic delays, it will be important for the evaluators to continue to conduct their thorough A&A evaluations but develop a method for brief reports of defendant "progress" following initial findings. The parties should continue to discuss this in meetings with OJD and court personnel so that they are aware that they will likely be seeing shorter progress reports going forward.

6. The training spearheaded by plaintiffs and in collaboration with others scheduled for 10/3/22 will be helpful in providing information to court personnel, defense attorneys, and prosecutors about AA process and options for diversion and community restoration services.

7. I am encouraged to hear from state leadership that a public-facing website will soon be launched to help share information regarding *Mink/Bowman* more widely. The data dashboard should be made available on this website so progress can be tracked.

8. As noted in my prior report, it continues to be important for the state to respond to any inquiries related to funding expenditures, fiscal accountability, and requests for data to help the legislature take actions to assist the State in achieving *Mink/Bowman* compliance, including the enactment of the prior recommendations that require the legislature's support.

It should be noted that there have been many excellent questions raised about Judge Mosman's orders. Many of them have to do with issues of homelessness, availability of ACT teams and other supports for individuals in the community. In hearing these questions from stakeholders, it appears even more clear that the Oregon system, like others across the United States, has come to rely on Aid and Assist

19

processes as a means to access general supports and care for people with serious mental illness, intellectual and developmental disorders, substance use disorders and other conditions in need, rather than entirely for its intended purpose, which is to restore defendants in order to be criminally prosecuted at all. In looking at the Aid and Assist process for both community-based and OSH inpatient services, it appears that for many individuals resources for restoration are tied up without much taxpayer or societal gain when the state's chance of restoration or even successful prosecution beyond a certain timeframe is low.

Notwithstanding the above, it is commendable to see the legislative workgroup make efforts to better financially support the providers and community mental health system that is working diligently to serve the population of individuals with complex behavioral health and justice needs. This may help get upstream to the competency system problems. The systemic reform for the competency system in particular that is needed will be, in my opinion, statutory change and funding strategies that largely align with Judge Mosman's order and my June 2022 recommendations. This includes supporting the proposed bill packages that the state is offering. Without legislatively limited timeframes for community restoration programs (as well as more sustained legislative limits to restoration duration at OSH) there will be the ongoing potential to keep defendants in restorative services indefinitely, with rising costs and diminishing gain, increased confusion, and potential limitations for many individuals in pre-trial community limbo who then likely will have more difficulty accessing care in civil treatment pathways because of the "forensic" overlay of the population. In addition, funding strategies to ensure GEI patients timely access to evaluations and pathways out of the hospital are critical. Staffing allocations are also critical at OSH and in the community. These are just some of the examples that have been discussed with the parties and are important for legislative consideration. Although there are undoubtedly many different priorities to consider, I would encourage ongoing discussions about how to achieve as many common pathways as possible in strategies related to helping the state achieve compliance in the *Mink/Bowman* matter.

I would like to acknowledge the many individuals whose perspectives and input have been invaluable in shaping my contributions to the Oregon system, and whose work is laudable even under circumstances that require extra effort with strained resources. I would like to commend the parties again especially for their firm commitment to help the many individuals inappropriately waiting for placements in jails and OSH when they need more timely access to the less restrictive services they deserve. I greatly appreciate the help of the leadership and staff at OHA, OSH, DRO, MPD, OJD, and the PSRB in my work. I also acknowledge with gratitude Mr. Cody Gabel who again assisted me in coordinating meetings and tracking information I requested, and to the OSH team, including Mr. Scott Hillier and Mr. Derek Wehr for their data support used to inform these recommendations.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*