Keith M. Garza, OSB No. 940773
Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon 97268
Phone: (503) 344-4766
Facsimile: (503) 344-4767
E-mail: keithgarza@comcast.net

Attorney for Judge *Amici* Audrey
Broyles, Matthew Donohue, Jonathan
Hill, Kathleen Proctor, and Nan Waller

IN THE UNITED STATES DISTRICT COUT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, <br><br> Plaintiffs, <br> v. <br><br> PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, <br><br> Defendants. | Case No. 3:02-cv-00339-MO (Lead Case) <br> Case No. 3:21-cv-01637-MO (Member Case) <br><br> BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER |

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR 97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

JAROD BOWMAN and JOSHAWN           )     Case No. 3:21-cv-01637-MO (Member Case)
DOUGLAS-SIMPSON,                    )
                                   )
          Plaintiffs,              )
     v.                            )
                                   )
DOLORES MATTEUCII, Superintendent  )
of the Oregon State Hospital, in her official )
capacity, and PATRICK ALLEN, Director )
of the Oregon Health Authority, in his )
individual and official capacity,  )
                                   )
          Defendants.              )

## TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………..…4

II.     QUESTION PRESENTED AND COURT'S ANSWER……………………………..5

III.    JUDGE *AMICI'S* SUMMARY RESPONSE…………………………………………7

IV.     BRIEF FACTUAL CONSIDERATIONS…………………………………….....10

V.      ARGUMENT……………………………………………………………...12

        A.  The Question Properly Considered…………………………………………12

        B.  The Appropriate Analytical Framework…………………………………………15

        C.  Application………………………………………………………………….21

            1.  *The September 1 Order Is Not Demonstrably Necessary or
                Narrowly Drawn and Will Adversely Affect Public Safety,
                the Oregon Criminal Justice System, and Others*…………………………..22

            2.  *Principles of Federalism Dictate that the Parties Should not be
                Permitted to Preempt Ongoing Legislative and Community
                Discussions with a Federal Fait Accompli*………………………………....27

VI.     CONCLUSION…………………………………………..…………………………..29

Page 2 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE,
JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Atwood v. Shinn*, 36 F.4th 901 (9th Cir. 2022)……………………………………….........…20

*Benjamin v. Jacobson*, 935 F. Supp. 332 (S.D.N.Y. 1996)……..……………………...........…18

*Bowman v. Matteucci*, No. 3:21-cv-01637-HZ, 2021 WL 5316440
(D. Or. Nov. 14, 2021)..10, 14, 17………………………………………………………10, 14, 17

*Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910, 179 L. Ed 2d 969 (2011)……………….......18, 20

*Ex Parte Young*, 209 U.S. 123 (1908)……………………………………………………....16

*Clark v. Coye*, 60 F.3d 600 (9th Cir. 1995)……………………………………………………17

*Finney v. Arkansas Bd. of Correction*, 505 F.2d 194 (8th Cir. 1974)……………………………15

*Hoffer v. Secretary, Florida Dept. of Corrections*, 973 F.3d 1263 (11th Cir. 2020)……………15

*Hook v. Arizona Dept. of Corrections*, 107 F.3d 1397 (9th Cir. 1997)…………………………..17

*Keith v. Volpe*, 118 F.3d 1386 (9th Cir. 1997)……………………………………………………17

*Oregon Advocacy Center v. Allen*, No. 20-35540, 2021 WL 3615536
(9th Cir. Aug.16, 2021)…………………………………………………………………11, 12

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 2003 WL 751319
(9th Cir. 2003)…………………………………….........................................................11, 14, 17

*Porretti v. Dzurenda*, 11 F.4th 1037 (9th Cir. 2021)…………………………………….…………20

*Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992)……………....…7, 8, 16

*United States v. Donnelly*, 41 F.4th 1102 (9th Cir. 2022)…………………………………………..14

*Valdivia v. Schwarzenegger*, 599 F.3d 984 (9th Cir. 2010)……………………………………17

*Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977)……………………………………………14

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

**Constitutional Provisions**

Article VI, clause 2, of the United States Constitution…………………………………………………7

Fourteenth Amendment to the United States Constitution………………………………………18

**Statutes and Laws**

18 U.S.C. § 3626………………………………………………………………………………………18

18 U.S.C. § 3626(a)(1)-(3)…………………………………………………………………………19

Or Laws 1999, ch 931, § 2………………………………………………………………………11

ORS 137.124……………………………………………………………………………………..14

ORS 161.370………………………………………………………………………….…...…11-12

ORS 161.370(3) (1999)……………………………………………………………………………11

ORS 161.317(1)…………………………………………………………………………………25

Prison Litigation Reform Act of 1995……………………………………………………..18-19

## I.       INTRODUCTION

Circuit Court Judges Audrey Broyles (Marion County), Matthew Donohue (Benton County), Judge Jonathan Hill (Tillamook County), Kathleen Proctor (Washington County), and Nan Waller (Multnomah County) ("Judge *Amici*") respectfully submit the following brief addressing the legal question this Court identified during the hearing in these consolidated cases on August 29, 2022 (Dkt. 272) and for which the Court has indicated a willingness to entertain additional argument and analysis.

As set out more fully below, with the exception of the separate injunction against state court contempt actions (which these same judges seek to challenge independently as limited

Page 4 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

intervenors (Dkt. 274)), the correct answer to the Court's legal question is reflected in the reasoning in its August 16, 2022, Opinion and Order (Dkt. 256) as opposed to the results of the September 1, 2022, Order to Implement Neutral Recommendations (Dkt. 271). In short, because (1) this Court, sitting in equity, may override a valid state law only if that law violates federal law or is essential to remedy a constitutional violation (otherwise, the Court must reconcile its injunctive powers with state law), and (2) the record in these cases demonstrates that neither predicate was established (certainly not the first), the Court acted outside its equitable authority when it modified the *Mink* injunction to severely restrict admissions to, and expedite discharges from, the Oregon State Hospital ("OSH"). Moreover, even if it had been necessary to override Oregon law in these circumstances, the September 1 order nevertheless failed to satisfy multiple equitable prerequisites, including providing only narrowly tailored relief. Moving forward, a new order that, at least for the time being, adopts only the first and fourth paragraphs of plaintiffs' August 30, 2022, Proposed Amended Order (Dkt. 270) would be an appropriate exercise of this Court's equitable powers based upon the record as it presently exists.

## II.    QUESTION PRESENTED AND COURT'S ANSWER

At the hearing on August 29, the Court described the "abstract doctrinal [legal] question" (Dkt. 272 at 10:4) before it as follows:

> "if one assumes just for purposes of argument that a federal court has in front of it a defendant for whom obeying state law causes federal constitutional violations, then can – is it within the power of the federal court in that situation to order noncompliance with the state law, in derogation of that state law."

(*Id*. at 7:11-16.)

Page 5 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

Regarding the assumption, the Court went further and concluded:

> "And my tentative view -- again, I'm willing to hear from amicus on this -- is that the answer to that is yes, that diligent work, really remarkable efforts by all the parties involved to sort through this complex hydraulic system of inputs and outputs has for at least present **purposes identified certain state laws that affect both input and output at OSH as the causal factors for current noncompliance with the U.S. Constitution**."

(*Id*. at 8:22-9:4 (emphasis added).)

The Court also contrasted the legal issue it had identified with other factual or prudential considerations—such as whether "this is a mistake and that there's more I need to understand about how this affects other people and parties and . . . see whether your potential parade of horribles also pans out or not" (*id*. at 10:20-25), which will be the subject of additional briefing in January (Dkt. 269). In other words, the Court's query now is whether "a federal court even ha[s] the power to do what I'm about to do here[?]" (Dkt. 272 at 10:2-4.)

Although the Court did not issue a written opinion addressing the question, it did provide an answer at the hearing—an answer that, while not provisional, was one the Court was "willing to entertain reopening upon further briefing" (Dkt. 272 at 14:23-25):

> "I think the answer to that question is yes. And boiled down, that actually ends up being relatively straightforward. You end up with a choice. Does a federal court allow obedience to state law and disobedience to the U.S. Constitution or allow obedience to the U.S. Constitution and possible disobedience to state law? And this supremacy clause answers that question as to what ought to happen. So I think to sort of the philosophical question here, the answer is yes."

(*Id*. at 7:22-8:5.)

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR 97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

III.    JUDGE *AMICI'S* SUMMARY RESPONSE

At the level of abstraction the Court has asked the question, Judge *Amici* cannot disagree: the answer is straightforward; Article VI, clause 2, of the U.S. Constitution must control.  As the Ninth Circuit in *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992), observed:  "in a line of cases . . . the Supreme Court has stated that otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme."  *Id*. at 862.[1]

Importantly, however, *Stone* did not end its inquiry by restating that well-settled proposition.  Instead, the panel went on to conclude that "the district court went too far under the[ ] circumstances in allowing the Sheriff to override state laws and state court sentences," *id*. at 864, by, among other things, authorizing the Sheriff to release jail inmates who had served 50% of their sentences in an effort to mitigate jail overcrowding and bring the city back into compliance with a long-extant consent decree.  Why?  Considerations of "federalism," "comity and institutional competence," and the "body of doctrine" that guides the federal judiciary in the exercise of its equitable jurisdiction.  *Id*. at 860.

---

[1]    The Court's question and *Stone's* answer essentially announce a truism with respect to the many examples, both historical and contemporary, of state statutes enacted in derogation of federal law, especially constitutional rights.  Nevertheless, the general principle *Stone* restated also encompasses the same type of state policy pronouncements at issue here—"otherwise valid state laws"—laws that defendants presently are now not only allowed but being compelled to ignore.

Page 7 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

Nor did *this* Court end its inquiry in the August 16 Opinion and Order after citing *Stone* at the outset of its legal analysis, and after having noted that a federal court's equity powers are "'extraordinary.'" (Dkt. 256 at 3.) Instead, after further examination and analysis, the Court, as with the judges in *Stone*, concluded that

> ". . . [t]here is a key distinction to be made between protecting Defendants' ability to work towards solutions to the admittance crisis-what the 2002 injunction was put in place to actualize-and blatantly authorizing noncompliance with specific provisions of state law they no longer wish, for good reason, to comply with. Protecting respects the executive and its role in implementing policy positions; authorizing noncompliance tramples on the role of the state legislature to write laws, a job of which I am neither capable nor for which I was appointed. . . ."

> ". . . . Paragraphs two and three provided for specific solutions . . . that require Defendants to directly disregard state law requirements. This I cannot order for the reasons I have stated, although I encourage Defendants to work with the Oregon Executive Branch, as well as the Legislative and Judiciary, to implement these changes as soon as possible and by whatever means are determined to be most expeditious and effective."

(Dkt. 256 at 5.)

As elected state officials in Oregon's third branch, those sentiments resonate with Judge *Amici*, particularly the Court's final comments about inter-branch cooperation. That alignment is unsurprising because, as noted at page four of their motion for leave to appear, Dr. Pinals acknowledged in her first report "the deep commitment" this state's judiciary has to strengthening Oregon's "behavioral health and justice systems" and lauded the fact that judges and court administrators alike have been "very interested in Aid & Assist issues for some time."

Indeed, like the county *amici*—who have noted the "multiple workgroups at the legislature working to attempt to find additional legislative remedies to the OSH's woes" (Dkt.

Page 8 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

266 at 5), OJD has been a part of many intra- and extra-branch collaborative efforts aimed at making these systems work not only constitutionally but well.  (*See*, *e.g.*, Dkt. 262-2 at 19 ("The leadership at OJD is to be commended for . . . working to help resolve the waitlist issues in partnership with the parties.").)  Judge *Amici* join with Washington and Clackamas counties— now that more of the voices not previously brought before the Court by the parties are seeking to assert themselves—to urge the Court to direct its equitable efforts toward fostering a collaborative and hopefully long-term solution.[2]

As much as Judge *Amici* agree with most of the legal tenets in and results of the August 16 Opinion and Order, they are concerned about the contrary position—really a 180-degree shift—the Court took a few weeks later in its September 1 order.  Nevertheless, they also acknowledge the challenging position in which this Court has been put and that many of the exceedingly difficult and complex issues before it—which Judge *Amici* refuse to call

---

[2]    Relatedly, Judge *Amici* are troubled by what appears to be a growing lack of adversity between the parties.  For example, there was the seemingly coordinated effort to put before the Court a one-sided narrative about the effect of state court contempt proceedings on the ability of defendants to meet their constitutional obligations.  (*See*, *e.g.*, Dkts. 252 at 10-11; 253 at 3; 274 at 24-25.)  (A more complete accounting of that matter is intended as part of the fact-based discussion in the early 2023 round of *amicus* briefing.)

Even more troubling are the acknowledgements of defense counsel at the August 16, 2022, emergency hearing that "[g]iven the circumstances we find ourselves in now . . . the State is not in a position to oppose the relief that plaintiffs are requesting" and "we are no longer in a position to oppose the Court exercising its authority in this case"—which ultimately led to the September 1 Order.  (Dkt. 273 at 10, 11.)  It was then and remains now all the more important for the Court to receive input from the broadest range of those affected by the rulings in these cases—whose interests sometimes are, but often are not, divergent.

Page 9 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

intractable—involve fundamental, even existential, interests.  Protecting all those interests calls for the most careful of balancing, balancing made all the more difficult by the supposed inability of the Oregon Health Authority ("OHA") and OSH to further defend themselves in this litigation and that appears to be producing largely coordinated outcomes at the expense of the unheard.[3]

Judge *Amici*, in their motion for leave, meant what they said:  participation "to the fullest extent the Court deems helpful and appropriate."  Although they believe the law mandates an initial step back, to the state of legal affairs as they existed on August 16, they remain committed to offering whatever assistance the Court is willing to accept moving forward.

IV.     BRIEF FACTUAL CONSIDERATIONS

The history of this litigation reflects continued judicial efforts to ensure that, while seeking to enforce the due process rights of those who do or may lack the fitness to proceed by reason of incapacity ("A&A persons") and those who have been found guilty except for insanity ("GEI persons") (with *Bowman* having been consolidated)—and setting aside but only for now the others who are legally entitled to defendants' services—due consideration is given to Oregon's sovereign interests and the limits traditionally placed upon a federal court sitting in

---

[3]     To be clear, Judge *Amici* very much appreciate the considerable and genuine efforts Dr. Pinals has made to engage with the judges, administrators, and staff of the Oregon Judicial Department, and others as well, and look forward to that continued collaboration.  Their worry, instead, is that the parties either are unwilling or have become unable to put before the Court the breadth of evidence it needs to make the most informed decisions on issues that touch many of the state's most important social, political, and economic interests.

Page 10 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

equity.  For example, when OSH challenged Judge Panner's permanent injunction 20 years ago, it argued

> "that it is for the Oregon legislature, not the federal courts, to decide which entity within the Oregon state government must provide and pay for the treatment of mentally incapacitated criminal defendants.  Furthermore, OSH argues, the Oregon legislature has already decided that the county jails must provide for such treatment until OSH has a bed available.  On this basis, OSH concludes that the district court's injunction violates principles of federalism because it contravenes a decision within the exclusive province of the Oregon legislature."

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 2003 WL 751319 (9th Cir. 2003).  The problem with OSH's argument then was that it was "premised on an interpretation of ORS § 161.370 that [the court had] already rejected.  Under Oregon law it is OSH, not counties, that has the duty to accept incapacitated defendants once they have been certified as such by a circuit court."  *Id*.  More importantly for present purposes, the court went on to conclude that "[t]he injunction is **consistent with the legislative choice embodied in the statute, and thus with principles of federalism**."  *Id*. (emphasis added).[4]

And, two years ago, when the Ninth Circuit had before it this Court's May 2020 modification that "relaxe[d] the mandatory seven-day deadline in the *Mink* injunction, the court looked to traditional equitable principles to ensure that "meaningful parameters [had been

---

[4]     The court, as had Judge Panner (Dkt. 47 at 4), cited the immediately prior version of Oregon's aid and assist statute, which provided that "the defendant shall be transported to the hospital or treatment facility as soon as practicable.  Transport shall be completed within seven days after the court's determination unless doing so would jeopardize the health or safety of the defendant or others."  ORS 161.370(3) (1999), *amended by* Or Laws 1999, ch 931, § 2; *Oregon Advocacy Center*, 322 F.3d at 1132 n. 13.

Page 11 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

imposed] to ensure the interests of those patients are served to the greatest possible extent."

*Oregon Advocacy Center v. Allen*, No. 20-35540, 2021 WL 3615536 * 1 (9th Cir. Aug.16, 2021).

In other words, to ensure that OSH complied with, not be excused from, meeting its obligations.

The panel ultimately vacated and remanded:

> "To be sure, the district court faced a difficult task during an unprecedented time. But an open-ended modification order is inconsistent with the urgent need to transfer individuals with .370 orders out of jails. The order is thus not 'suitably tailored' to the factual circumstances."

*Id.* * 2 (citation omitted).

Finally, although Judge *Amici* believe the Court acted outside its equitable powers in granting plaintiffs' unopposed motion and entering the September 1 order, they also know that the Court did not make that decision lightly and recognized the potentially injurious effects of its decision on Oregon's self-governmental interests: "Federalism concerns are obviously implemented here[,]" and, absent necessity, "federalism principles require the reconciliation of the state law and federal injunctions" (internal quotations and citation omitted). (Dkt. 256 at 3, 4.) Now, nearly a month later, the reconciliation to which the Court referred is precisely what is needed.

## V. ARGUMENT

### A. The Question Properly Considered

In light of the now unusual circumstances of this litigation, there is some benefit to the parties suggesting (plaintiffs expressly, defendants tacitly and/or by concession) that it is OHA/OSH's compliance with state law (the statutes and court rulings made in lawful pursuance

Page 12 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

thereof mandating when they must accept someone who needs their services and, then, for how long) that is causing OHA/OSH to violate the United States Constitution.[5]  But, as PACER reflects, as to the separate but related question, defendants have been unable to comply with federal law for years.  And, as the need for repeated state court efforts to ensure compliance with their lawful orders demonstrates (efforts about which both sides complained mightily (Dkts. 252, 253, 263)), OHA/OSH regularly have been pushing the edges of the envelope as to their compliance with state law (regarding both intake to and discharge from the state hospital, but mostly the former).[6]

Still, the parties' attempt to shift the focus to "state laws" being the trigger of constitutional violations (which, to be clear, really trace back to the Oregon laws that permit criminal proceedings to be initiated in the first place, laws that go to the heart of this state's ability to exercise its police powers) serves to distract from the fact that defendants, particularly OSH here, have failed to discharge their responsibilities as required by both the Constitution and state law.  That is, rather than finding a way to satisfy these requirements, the parties have

---

[5]   *See* Plaintiffs' Unopposed Motion for Order to Implement Neutral Expert's Recommendations (Dkt. 252) at 9 ("there are two barriers under state law that are presently impeding OSH's ability to comply with the Mink Injunction – the types of patients who can be ordered to the state hospital and the length of time patients can be held there").

[6]   The systems in which all the relevant public and private actors must operate are difficult on a good day.  In referencing, repeatedly as they must, defendants' inability to meet their lawful obligations, Judge *Amici* are not suggesting that OSH and OHA are working anything less than mightily or that the challenges they face may be easily overcome.  Nor is it meant to ignore the sea changes of the last few years.

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

coordinated to seek the Court's assistance in evading them.  Moreover, if the inquiry were to be properly focused, defendants would run headlong into the repeated admonitions from this District, the Ninth Circuit, and federal courts across the nation that a lack of appropriations is not a constitutional defense.[7]

Consider, for example, prison litigation, either over generic overcrowding or in the specific context of a subset of the prison population for whom the institution is unable to provide adequate medical care.  Prisons receive convicted defendants—those who are sick and those who are well—not as a matter of administrative prerogative but by statutory command.  (In Oregon, *see generally* ORS 137.124 (commitment of defendant to Department of Corrections).)  Statutes and judicial actions then also dictate how long the prison must hold and care for its inmates (often with great complexity and variability:  minimum service of sentence requirements, work furloughs, parole, etc.)  Wardens and prison officials, of course, must follow those state laws.

---

[7]     *See, e.g.*, *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (aid and assist:  "Lack of funds, staff or facilities cannot justify the State's failure to provide such persons with the treatment necessary for rehabilitation."  (Cleaned up.)); *Bowman v. Matteucci*, No. 3:21-cv-01637-HZ, 2021 WL 5316440 * 2 (D. Or. Nov. 14, 2021) (guilty except for insanity; "When satisfying constitutional guarantees, Defendants cannot rob Peter to pay Paul."); *United States v. Donnelly*, 41 F.4th 1102, 1108-09 (9th Cir. 2022) (Watford, J., concurring:  "The BOP's bureaucratic failure to allocate adequate agency resources to meet the demand for competency evaluations is not, of course, a legitimate excuse for failing to comply with" federal time limits); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977) ("we have said that the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish").

Page 14 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

Then, because prisoners have essentially no political voice, the legislature more than rarely fails to fund existing prisons adequately or build new ones, or pay enough doctors or guards, or buy enough medicine.  Yet the influx continues, and even increases, and inmates are quadruple bunked, suffer greatly, are or become sick, and receive medical care that may be poor at best.  In the (unfortunately) prosaic litigation that follows, prison leadership always claims empty pockets, but properly to no avail.  *See*, *e.g.*, *Hoffer v. Secretary, Florida Dept. of Corrections*, 973 F.3d 1263, 1277 (11th Cir. 2020) ("if a particular course of treatment is indeed essential to 'minimally adequate care,' prison authorities can't plead poverty as an excuse for refusing to provide it"); *Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 201 (8th Cir. 1974) ("Lack of funds is not an acceptable excuse for unconstitutional conditions of confinement.").

In short, prisons should not able to escape responsibility by turning failed poverty or inability-to-comply arguments into a theory that it is actually compliance with state laws that somehow is causing the unconstitutional level of care and, therefore, those otherwise valid laws must be relaxed.  It is the prison's actions or lack of action that are the causal factors, and that remains the case even if the inputs are too many and the outputs too few.  The same analytical framework should apply as much for mental health as it does for physical health.

B.  The Appropriate Analytical Framework

All of the foregoing is consistent with the Court's legal analysis in its August 16 Opinion and Order.  And the Court further concluded, correctly in Judge *Amici's* view, that circumstances on the ground can be such that, when progressive efforts to induce compliance with a judge's equitable commands fail (allowing more time, pushing consent decrees, appointing special

Page 15 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

masters, issuing show cause orders, holding contempt hearings, imposing fines and penalties, appointing receives, etc.), the Constitution does not abide its violation: perfectly good state laws may have to yield. But the decision to do so—to take that drastic last step (and it truly must be drastic; otherwise, in addition to causing even worse structural harms, a state's refusal to fund or an executive agency's decision not to implement necessary services will become a legitimate defense against constitutional claims)—cannot be unhinged from the traditional moorings that steady federal courts sitting in equity.

To the contrary, the decision in that circumstance must hew to those considerations as tightly as possible, for multiple reasons. One is because the plaintiffs in such cases normally will have (understandably, and as they do here) particularized interests that certain state actors (in the *Ex Parte Young* injunctive context) either cannot or prefer not to meet. Even when those parties join on those specific issues—and much more so when they cease their adversity and coordinate efforts for a mutually convenient result—the potential for unintended (or intended) myopia in the advocacy is very real.

The otherwise valid state laws that hang in the balance, however, were the product of at least two branches of state government acting (federal courts must assume) with a broader understanding of all the collateral interests at stake. A court being asked to wield its extraordinary equitable powers in those kinds of situations, therefore, should have great concern that its decision altering one limited aspect of state government—like squeezing a balloon—can have a distorted effect on other parts. In other words, in such circumstances "'appropriate consideration must be given to principles of federalism in determining the availability and scope

Page 16 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

of equitable relief'." *Stone*, 968 F.2d at 860 (citations omitted); *see also id.* at 864 ("The state-law override provisions raise strong federalism concerns because the district court's action effectively reallocated legislative power to the executive.").[8]

Here, the parties' cooperation in limiting the issues and evidence they put forward left the Court with a presentation that merely assumed that which they were required to prove:  the only way OSH can satisfy its mandate under *Mink* to timely admit A&A persons is by, in the words of Judge Hernandez in the member case, "rob[bing] Peter to pay Paul" (*Bowman v. Matteucci*, No. 3:21-cv-01637-HZ, 2021 WL 5316440 * 2 (D. Or. Nov. 14, 2021)).  Put differently, they essentially presented the Court with the only scenario in which it was necessary to sacrifice all of the following:  (1) the care needs of A&A persons who have not been restored by the end of the time periods set out in the Court's September 1 order; (2) the public safety needs when these patients end up on the streets (many times for only as long as it takes for them to return to the criminal justice system and hopefully with little personal and third-party harm along the way);

---

[8]      It is noteworthy that most of the decisions upon which the Court placed primary reliance in its August 16 opinion and order—*Stone* included and many of which plaintiffs themselves cited—resulted in the Ninth Circuit reversing lower court determinations to override state law. *See Stone*, 968 F.2d at 865 ("[t]hat portion of its order allowing the Sheriff to override applicable state law . . . is VACATED"); *Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010) (district court failed to make express determination that state ballot proposition violated constitutional rights or injunction was necessary to remedy constitutional violation, order vacated and remanded to so determine and reconcile state and federal law); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997) ("The district court, in the case at hand, simply lost sight of its limitations."); *Clark v. Coye*, 60 F.3d 600, 603 (9th Cir. 1995) ("The problem here, however, is that there has never been a judicial determination that [a California law] conflicts with applicable federal law."); *contrast Hook v. Arizona Dept. of Corrections*, 107 F.3d 1397, 1402-03 (9th Cir. 1997) (Arizona statute enacted to thwart efforts of special masters).

Page 17 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

and (3) the needs of individuals in the civil commitment process who require OSH-level of care. What they did not explore to any meaningful extent were other potential solutions with fewer or less deleterious side effects. While that resolution was no doubt convenient to the parties, as discussed below, it is by no means necessary to satisfy the Fourteenth Amendment.

All those things said, it is not the case that courts always apply, or are perceived as applying, equitable principles correctly. Prison litigation, again, provides a useful reference point:

> "To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates 'may actually produce physical "torture or a lingering death."'"

*Brown v. Plata*, 563 U.S. 493, 510, 131 S. Ct. 1910, 179 L. Ed 2d 969 (2011) (citations omitted). At the same time, it is "[a]s a consequence of their own actions [that] prisoners may be deprived of rights that are fundamental to liberty." *Id*. Accordingly, prisoners do not usually find themselves high on a legislator's list of priorities, and public disregard over time often leads to dire circumstances and judges who unsurprisingly see a need to exercise the more formidable of their equitable powers.

Not meaning to oversimplify the history, but the discord such dynamics produced ultimately led Congress to enact the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626. *See, e.g., Benjamin v. Jacobson*, 935 F. Supp. 332, 340 (S.D.N.Y. 1996) (discussing legislative history: "Senator Hatch told us that as of January 1994, 244 institutions in 34 jurisdictions were operating under court orders . . . . The thrust of the criticism which prompted

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

the legislation was that the federal courts had overstepped their authority and were mollycoddling prisoners in state and local jails."), *aff'd in part and rev'd in part*, 124 F.3d 162 (2d Cir.1997).

The PLRA is relevant to the legal question the Court has posited for two reasons. First, the statute, among other things, specifically addresses—and restricts—the circumstances in which a court may enter an order that affects prison conditions: (1) prospectively, (2) by preliminary injunction, or (3) by reducing or limiting a prison's population. 18 U.S.C. § 3626(a)(1)-(3). The most restricted type of order under the PLRA is the third category—a prisoner release order—which essentially is what this Court's September 1 order does, at least as a matter of analogy (Judge *Amici* are <u>not</u> arguing the PLRA applies here). For that most restricted category of court prison order, the Supreme Court described the limitations Congress imposed on the federal judiciary as follows:

> ". . . Only a three-judge court may enter an order limiting a prison population. Before a three-judge court may be convened, a district court first must have entered an order for less intrusive relief that failed to remedy the constitutional violation and must have given the defendant a reasonable time to comply with its prior orders. . . .
>
> "The three-judge court must then find by clear and convincing evidence that crowding is the primary cause of the violation of a Federal right and that **no other relief will remedy the violation** of the Federal right. As with any award of prospective relief under the PLRA, the relief shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The three-judge court must therefore find that **the relief is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary** to correct the violation of the Federal right. In making this determination, the three-judge court must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR 97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

*Brown*, 563 U.S. at 512 (cleaned up; emphasis added). Those restrictions not only seem to mirror the legal considerations upon which this Court relied when initially refusing to adopt the second and third paragraphs in plaintiffs' proposed form of order (Dkt. 252-1), but the Ninth Circuit has concluded that they "merely codify existing law governing injunctive relief and do not change the standards for determining whether to grant an injunction." *Porretti v. Dzurenda*, 11 F.4th 1037, 1051 (9th Cir. 2021) (cleaned up); *cf. Atwood v. Shinn*, 36 F.4th 901, 903 (preliminary injunction must, among other things, be in the "public interest").

Consequently, the answer to the Court's doctrinal question is layered: it does have the authority to override valid state laws (even if it is adherence to those laws that is causing the constitutional violation) but only if (1) it is necessary to remedy the violation and, if so, (2) the relief is narrowly drawn, (3) extends no further than necessary, (4) uses the least intrusive means necessary, (5) balances the potential for harm to third parties (to public safety, other governmental systems, etc. as the case may be), and (6) gives appropriate consideration to principles of federalism.

Judge *Amici* address those issues briefly below, combining the elements, but their main concern is that neither the record the parties put before the Court nor the findings the Court made appear to meet the requirements for allowing defendants to ignore the legal obligations that Oregonians, through their elected representatives, have placed upon them. (Judge *Amici* have not lost sight that the Court wants briefing about factual effects later, once "this has played out for a while." (Dkt. At 10:23.) Although the matters discussed below necessarily involve some

Page 20 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

broader factual considerations, that discussion is not about whether this Court *should* have issued the September 1 order—was it a good idea or a permissible exercise of discretion?—but instead whether, given the relief awarded, the Court lawfully *could* issue the order.)[9]

C. Application

As noted, the Court did not issue a written decision for the September 1 order, but it did make findings on the record at the August 29 hearing:

> "So then we come to the factual question, and that is did the parties in this case adequately demonstrate that that's the lay of the land in front of me, that in fact it is defendants' required obedience to certain state laws that results in its inability to obey the U.S. Constitution? . . . .
>
> ". . . . .
>
> "And my tentative view -- again, I'm willing to hear from amicus on this -- is that the answer to that is yes, that diligent work, really remarkable efforts by all the parties involved to sort through this complex hydraulic system of inputs and outputs has for at least present purposes identified certain state laws that affect both input and output at OSH as the causal factors for current noncompliance with the U.S. Constitution. So I think -- again, I'll hear from parties and amicus, but I think the answer to the factual question is yes."

(Dkt. 272 at 8:6-10, 8:22-25, 9:1-4.)

---

[9] There is another element noted in the block quote from the Supreme Court about the PLRA above that, in light of the history of this case and subject matter of the litigation, should apply to the general injunctive context here as well: the existence of a prior order mandating less intrusive means and the failure of that order to cure the constitutional defect after a reasonable time for compliance. Here, Judge *Amici* would agree that the Court's initial and less intrusive efforts have failed to produce compliance within a reasonable time, so they also would agree that the equitable threshold for the Court to act has been met. However, that does not mean the high bar of necessity to override state law has been crossed. And, it remains that the injunctive product of the Court's action must be narrowly drawn, be no more intrusive than necessary, use the least restrictive means, balance third-party harms, and respect principles of federalism.

Page 21 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

"... For today's purposes, I am going to adopt the suggested rulings as my own. I believe that the doctrinal answer is yes, and I believe a compelling case has been made for a factual crisis requiring immediate action in these things, that even as this has played out while diligent people have worked hard to get to this point, you know, lives have been lost. And so I view it as of the utmost importance to undertake this drastic step, one that for someone of my judicial philosophy is a very drastic step, but it has been compelled by facts on the ground."

(*Id.* at 11:10-20.) And, the September 1 order itself states that "the Court finds that Defendants are not in compliance with the Court's permanent injunction in *Mink* and ORDERS the following which are necessary to move Defendants towards compliance with that injunction[.]" (Dkt. 271 at 1-2.)

Again, Judge *Amici* agree that the factual threshold to justify further equitable action has been met but, respectfully, neither the Court's findings above nor the record upon which they were based is sufficient to permit the Court to allow defendants to ignore Oregon's unquestionably otherwise valid laws regarding who goes into and at what point those persons must come out of the state hospital. But, even if the circumstances were such that the Court could require Oregon law to yield, as set out briefly below, it would remain that the September 1 order is, among other things, insufficiently narrowly drawn and fails to properly take into account the serious questions about federalism that its hugely impactful terms implicate.

1. *The September 1 Order Is Not Demonstrably Necessary or Narrowly Drawn and Will Adversely Affect Public Safety, the Oregon Criminal Justice System, and Others.*

Consistently with their concern about the harmful impact of the parties' converging interests on the Court's ability to correctly perceive the underlying factual

Page 22 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

situation, Judge *Amici* note the tepid efforts plaintiffs made to identify for the Court potential alternatives when fashioning relief that both (1) is the most narrow and least intrusive and yet also (2) offers a reasonable possibility of bringing defendants into compliance. When adding, as the higher courts have said lower courts must consider, overlays of federalism and the weight of public safety concerns to the calculus, one inescapable conclusion is that the Court's efforts here must have as a byproduct the fewest number of people kept from and forced out of defendants' care: individuals who have been found in need of restorative treatment or OSH-level of care who, when ejected in the midst of restoration, most likely will end up in the community (that is, often on the streets without shelter, food, or medication but with access to illegal and addictive substances) resulting in nearly unlimited potential untoward effects.

That, however, is not what plaintiffs emphasized (again, defendants stood mute). Plaintiffs chose to focus on the failure of recent legislative efforts to bear fruit (at least yet). (*E.g.*, Dkt. 265 at 6-11.) To be fair, plaintiffs at least acknowledged there were "other available options"—*e.g.*, have the Court place moratoria only on those charged with misdemeanors (and/or maybe lesser felonies), or place the upper limit for Ballot Measure 11 offenses at 24 rather than 12 months, or compel the discharge of those deemed no longer to need a hospital level of care (even if based atomistically on acuity of symptoms alone)—the kind of options that would have put fewer, potentially restorable patients back into Oregon's communities where there are limited at best opportunities to receive services. (*See*, *e.g.*, *id.* at 12.)

Page 23 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

Plaintiffs, however, gave those alternatives short shrift, dismissing them summarily as "more disruptive to the system and present[ing] a greater challenge with regards to comity towards state law." (*Id.*) But why is that the case as to comity? Plaintiffs' explanation (setting aside the conclusory, subjective statement that they viewed "their proposed order as the least disruptive, most respectful of state sovereignty and is recommended by the Court's neutral expert[10]" (*id.*): "granting the proposed order would not affect any of the other processes and procedures **outside of this single statutory subsection** [ORS 161.371(1)]." (*Id.* at 14. (emphasis added).) [11]

---

[10]    While it is neither fair nor logically consistent to mix the policy recommendations of Dr. Pinals with summary constitutional considerations, she actually was careful to separate which of her recommendations could be carried out consensually and which would require, among other things, **legislative** action. (*See*, *e.g.* Dkt. 262-1 at 12; 262-2 at 27-33.)

[11]    Indeed, the only difference plaintiffs offered between their first and amended proposed orders (Dkts. 252-1 and 272) was to swap Ballot Measure 11 offenses for the violent felonies referenced in ORS 135.240(6) for purposes of who qualifies for the maximum one-year restorative period. Although the amendment had the benefit of added clarity, it also has the effect of <u>actually reducing</u> the number of individuals who will be eligible for the maximum one-year period restorative period.

Also respecting their proposed form of order, plaintiffs suggested at the August 16 emergency hearing that "we believe [it] is necessary in order to avoid a **potential problem down the road** of state court judges sending or attempting to send patients back to the hospital after the hospital discharges them if they were to simply try and implement a policy that looks like the or[der] that we submitted." (Dkt. 273 at 8:3-8. (emphasis added).) Again, this Court's extraordinary equitable power to override a state's lawful enactments may be invoked only when necessary—not speculatively—and employed only in the narrowest and least intrusive ways.

Page 24 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

It cannot be (and, of course, is not) the case that the number of lines in the Oregon Revised Statutes that will be re-written or ignored is the test for evaluating whether a federal court might be overreaching in the exercise of its equity jurisdiction. (Instead, it is the elements Judge *Amici* identified above.) Here, it could not be more clear that foisting upon the Court the single option (even if the others plaintiffs dismissed were the only others, and they were not) that would result in OHA sending <u>the greatest number of persons in need of restorative care</u> back into the community unsupervised and with a significant likelihood of re-offense (contrary to the policy choices in ORS Chapter 161) presented almost no opportunity to craft equitable relief that—even if somehow necessary— was narrowly drawn, least intrusive, and founded on due considerations of public safety.

As for other, narrower options, one could begin with the $1.35 billion the legislature has injected (https://www.oregon.gov/oha/HSD/AMH/docs/le4247.pdf  (last accessed 9/27/22) into the public health system over the last several years, much of it going to OHA to be distributed to localities to build resources in the community. Unfortunately, neither OHA nor the counties that received funds have reported <u>sufficient</u> new resources to date, or even specific plans to develop the particular resources needed to serve the A&A and GEI populations. And, even if the funds are being spent responsibly and productively, such resources take time to build. While acknowledging those facts, it remains that there still were many potential options to consider, just a few of which are listed below. The Court could have:

Page 25 – BRIEF OF JUDGE *AMICI* AUDREY BROYLES, MATTHEW DONOHUE, JONATHAN HILL, KATHLEEN PROCTOR, AND NAN WALLER

- ordered OHA to coordinate earlier discharges from OSH with the availability of these community resources rather than immediately discharging individuals to jail and, thereafter, the streets;[12]

- mandated that OHA acquire or contract with an existing facility with sufficient capacity to provide restoration services to A&A persons from across the state or, at a minimum, provide humane stabilization conditions pending transport to OSH; and/or

- ordered OHA to maximize existing bed capacity at OSH—Judge *Amici* understand space exists for many more—and rejected (again, as courts routinely do) claims of insufficient staffing ability.

That is not to say the above are necessarily the final answers, or even a good representation of all the other potential answers, but those or alternatives like them should have been given due consideration in deciding whether the factors for equitable relief had been satisfied—whether the resulting  injunction was "necessary" and, if so, sufficiently narrow—because federally-imposed time limits such as those in the September 1 order directly interfere with a state's legislative prerogatives (its police power) to decide how much time to invest in a

---

[12]  For example, the executive director of the Oregon Mental Health Consumers Association was quoted as calling the situation a "fiasco" because at present only 20 to 30 percent of the community resources needed to avoid people being discharged to the streets are available.  *See https://www.wweek.com/news/2022/09/21/a-federal-judge-has-ordered-the-release-of-more-than-100-patients-from-the-states-locked-psychiatric-hospital-no-one-is-sure-what-happens-next/* (accessed 9/26/2022).

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

criminal adjudication before dismissal when the adjudication happens to require time to restore a defendant's fitness—a policy decision reflecting the consideration of many important interests, including those of the criminal defendants, state agencies and, significantly, victims and the public's safety as well.[13]

    2.   *Principles of Federalism Dictate that the Parties Should not be Permitted to Preempt Ongoing Legislative and Community Discussions with a Federal Fait Accompli.*

This Court is not the only forum in which discussions about the shortcomings of OSH, OHA, and the overall mental health system in Oregon are being had. Plaintiffs and defendants are subset of a broader group of interested parties, including the judiciary, the legislature, prosecutors and other law enforcement officials, counties, mental health advocacy groups, private hospitals and others that are engaged in multiple and delicate negotiations to reach a more equitable solution—including a solution for those individuals left by the wayside in the relief to which plaintiffs and defendants have stipulated, such as those in the civil commitment process. The Court should not allow the weight of the federal judiciary to be brought to bear in favor of plaintiffs' and defendants' limited set of interests in this process, particularly when the

---

[13]    Conspicuously absent from the materials the parties presented to the court is any discussion of that last consideration: the public safety ramifications of these discharges. Of course, reasons of public safety are why A&A and GEI persons are involved in the justice system to begin with. Ignoring the problem will not make it go away—as has been demonstrated so clearly of late on the streets of our major cities. More consideration could have, should have been given—which could have narrowed the effect from a public safety perspective—to include the potential for harm as an express part of the decision-making on discharge, including input from district attorneys and the courts.

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR 97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

record does not reflect specific, fact-referenced findings regarding necessity, narrowness, etc. or evidence that the potential for harm to the public was presented or expressly taken into account.

To add to the legislative efforts that the county *amici* discussed earlier (Dkt. 266), the following is a brief outline of only some of the consensus-based policy processes that plaintiffs and defendants are seeking to (and very well may) upend, a number of which involve one or both of parties themselves:

    a. Legislative Behavioral Health Transformation Workgroup—and its four subcommittees that are continuing to meet (2021-22);

    b. multiple 988 Implementation Workgroups (2021-2022);

    c. Oregon Behavioral Health Quality and Performance Improvement Plan (2020-21);

    d. Oregon Aid & Assist Workgroup—which hopefully will remain very active (2019 – present);

    e. Improving People's Access to Community-Based Treatment, Supports and Services Program (IMPACTS) (2019-present);

    f. GAINS Community of Practice on Competence to Stand Trial/Competence Restoration (Oregon GAINS Workgroup) (2020-present);

    g. Oregon Judicial Department Commitment to Change Civil Commitment Workgroup (starting October 2022); and

    h. various local judicially led stakeholder convenings to discuss system improvements (including the Chief Justice's Behavioral Health Advisory Committee);

Respectfully, the Court should allow these processes to play out and thus ensure that the interests of all the groups and individuals seeking to alleviate the problems at OSH and with the

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

mental health system more broadly can be heard in the proper forum. Not only is this a matter of proper judicial restraint, as shown above it is required by law. The collective wisdom of legislators, community leaders and organizations, counties, law enforcement and the courts, is more likely to come up with a solution that protects all of their interests—including those of public safety—than a coordinated effort by two interested parties to preempt these discussions in the federal courts.

## VI.     CONCLUSION

A brief reset is in order here. Respectfully, at least presently and with more of the interested voices now finally beginning to be heard, the restrained inclinations this Court expressed in its August 16, Opinion and Order were correct. Equitable action in the form of adopting almost all of Dr. Pinals' recommendations appear well within this Court's equitable authority on this record. But not yet so far as to contravene otherwise valid Oregon laws. And, even if that threshold had been crossed, the relief the Court ordered on September 1, again respectfully, goes further than it needs to—at least for now.

Judge *Amici* (1) ask this Court to vacate its September 1, 2022, Order to Implement Neutral Expert's Recommendations (Dkt. 271) and reenter—without the injunction against state court contempt actions—the August 16, 2022 Opinion and Order (Dkt. 256); and (2) offer whatever support or assistance this Court deems helpful.

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR 97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

Respectfully submitted this 28th day of September 2022.

                                         */s/ Keith M. Garza*

Keith M. Garza, OSB No. 940773
Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon  97268
Phone:  (503) 344-4766
Facsimile:  (503) 344-4767
E-mail:  keithgarza@comcast.net

Attorney for Oregon Circuit Court
Judges Audrey Broyles, Matthew
Donohue, Jonathan Hill, Kathleen
Proctor, and Nan Waller