IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHT OREGON,[1] METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | Case No.: 3:02-cv-00339-AN (lead) |
| Plaintiffs, | |
| v. | OPINION AND ORDER |
| SEJAL HATHI, in her official capacity as Director of the Oregon Health Authority, and JAMES DIEGAL, in his official capacity as Interim Superintendent of the Oregon State Hospital, | |
| Defendants. | |

On June 6, 2025, this Court issued an Opinion and Order (hereinafter the "Contempt Order") in which the Court found that defendants Dr. Sejal Hathi ("Dr. Hathi"), in her official capacity as Director of the Oregon Health Authority ("OHA"),[2] and James Diegal, in his official capacity as Interim Superintendent of the Oregon State Hospital ("OSH"),[3] are in contempt; ordered daily monetary fines; and implemented remedial measures. On June 16, 2025, defendants filed their first report regarding calculation of fines. On June 17, 2025, defendants appealed the Contempt Order to the Ninth Circuit. On June 18, 2025, defendants filed a motion for stay. Plaintiff Disability Rights Oregon ("DRO") opposes defendants' motion in full, and plaintiff Metropolitan Public Defender Services, Inc. ("MPD") takes no position on a stay of the finding of contempt and imposition of fines but opposes a stay of any remedial measures. On June 20, 2025, DRO filed an objection to defendants' first report regarding calculation of fines. On July

---

[1] Plaintiff Disability Rights Oregon ("DRO") is named on the docket as "Oregon Advocacy Center" and has been referred to as both DRO and Oregon Advocacy Center since approximately January of 2023. The Court uses "DRO" in this Opinion and Order.

[2] The Court notes that Dr. Hathi is out on leave as of the date of this Opinion and Order, and that Kristine Kautz is currently serving as Interim Director of the Oregon Health Authority.

[3] At the time the Contempt Order was issued, the case caption named Dr. Sara Walker, in her official capacity as Interim Superintendent of the Oregon State Hospital ("OSH"), as party defendant, though the Court noted that Dr. Walker had resigned, and Dave Baden was then-serving as the Interim Superintendent of OSH.

15, 2025, defendants filed a second fine calculation report.

For the following reasons, defendants' Motion for Stay, ECF [610], is DENIED; DRO's Objection to Defendants' First Report Regarding Calculation of Fines, ECF [618], is SUSTAINED; and defendants are hereby ORDERED to resubmit, by August 15, 2025, the First Report Regarding Calculation of Fines, ECF [606], and Second Fine Calculation Report, ECF [634], both revised to include in the proposed fines all days beyond the allotted seven-day window, regardless of whether such delays were caused by circumstances purportedly out of defendants' control. All future fine calculation reports shall conform to the rulings set forth in this Opinion and Order.

## LEGAL STANDARD

Generally, "[o]nce a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam); *McClatchy Newspapers v. Cent. Valley Typographical Union No.*, 686 F.2d 731, 734 (9th Cir. 1982)). However, the court "retains jurisdiction during the pendency of an appeal to act to preserve the status quo." *Id.* (collecting cases). Thus, under Federal Rule of Civil Procedure ("FRCP") 62(d), a district court "may suspend, modify, restore, or grant an injunction" during the pendency of an appeal "on terms for bond or other terms that secure the opposing party's rights." Ultimately, FRCP 62(d) "grants the district court no broader power than it has always inherently possessed to preserve the status quo during the pendency of an appeal[.]" *Nat. Res. Def. Council*, 242 F.3d at 1166 (applying substantively similar previous version of rule) (citing *McClatchy Newspapers*, 686 F.2d at 734). Any action taken by the district court pursuant to this rule "may not materially alter the status of the case on appeal." *Id.* (internal quotation marks and citation omitted). A party seeking a stay of a district court's judgment or order must first seek the stay from the district court, unless doing so "would be impracticable[.]" Fed. R. App. P. 8(a)(1), (a)(2)(A).

When considering whether a stay pending appeal is appropriate, district courts analyze the following factors: (1) whether the party seeking the stay "is likely to succeed on the merits"; (2) whether the party seeking the stay "will be irreparably injured" if no stay is issued; (3) "whether issuance of the stay

will substantially injury the other parties interested in the proceeding"; and (4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776-77 (1987) (collecting cases). Under the four-factor test, "[t]he likelihood of success and irreparable injury 'are the most critical' factors." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th Cir. 2024) (per curiam) (quoting *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)). "These two factors fall on 'a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.'" *Id.* (quoting *Humane Soc'y of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008)). This "sliding scale" is analyzed by courts as a "continuum" that functions as follows:

> "On one end of the continuum, the proponent must show a 'strong likelihood of success on the merits' and at least 'the possibility of irreparable injury to the [proponent] if preliminary relief is not granted.' At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor."

*Id.* (alteration in original) (citations omitted). Ultimately, the party seeking the stay bears the burden of establishing that a stay is appropriate under the four-factor test. *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (quoting *Nken*, 556 U.S. at 433-34).

## BACKGROUND

The factual background of this case is well set out in prior opinions and orders, most recently being in the Court's Contempt Order. *See* Op. & Order of June 6, 2025 ("Contempt Order"), ECF [604], at 4-11. Additional pertinent facts are set forth below.

### A.    The Permanent Injunction

As noted in the Contempt Order, on May 10, 2002, then-District Judge Owen M. Panner ordered that defendants "'ensure that persons who are declared unable to proceed to trial pursuant to [Oregon Revised Statutes ("ORS")] § 161.370(2) be committed to the custody of the superintendent of a state hospital designated by the Department of Human Services as soon as practicable[,]'" and that such admissions "be done in a reasonably timely manner, and completed not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial[.]" *Id.* (second and third alterations in original) (quoting Findings of Fact & Concls. of L., ECF [47], at 1). Judge Panner's May 10, 2002, order is hereinafter referred to as the Court's "Permanent Injunction."

On May 14, 2002, defendants appealed the Permanent Injunction to the Ninth Circuit. *See* Notice of Appeal to U.S.C.A. from Findings of Fact & Concls. of L., ECF [48].

On May 15, 2002, Judge Panner entered judgment in favor of plaintiffs and found that the court retains continuing jurisdiction to enforce the Permanent Injunction. J. of May 15, 2002, ECF [51].

On May 16, 2002, defendants moved to clarify and modify the Permanent Injunction. Defs. Mot. for Clarification & Modify Inj., ECF [58]. In relevant part, defendants requested that Judge Panner clarify the Permanent Injunction to require that the seven-day period "be calculated from the date th[at] [OSH] receives a copy of the court order, rather than from the date the court issues the ruling." Order of May 28, 2002, ECF [65], at 3. Plaintiffs opposed defendants' "proposed interpretation, arguing [that] defendants' desire for administrative convenience should not trump the needs and rights of the persons requiring hospitalization." *Id.* at 4. Judge Panner agreed with plaintiffs and denied defendants' motion. *Id.*

On May 30, 2002, defendants appealed the judgment. Am. Notice of Appeal to U.S.C.A. from J., ECF [66]. On June 27, 2002, defendants appealed Judge Panner's denial of their motion for clarification and to modify the Permanent Injunction. 2d Am. Notice of Appeal to U.S.C.A. from Order of May 28, 2002, ECF [73].

On April 1, 2003, the Ninth Circuit affirmed the Permanent Injunction, resulting judgment, and Judge Panner's denial of defendants' motion for clarification and modification of the Permanent Injunction. Mandate from U.S. Ct. of Appeals, ECF [76], at 11 (referring to ECF pagination) (also located at *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003)). The Court does not describe the Ninth Circuit's opinion in full but highlights a few points. First, the Ninth Circuit rejected defendants' argument that Judge Panner erred in holding "that OSH, rather than Oregon's counties, must provide timely treatment to incapacitated criminal defendants." *Id.* at 31-32. Instead, the Ninth Circuit ruled that "it is OSH, not counties, that has the duty to accept incapacitated defendants once they have been certified as such by a circuit court." *Id.* at 32. The Ninth Circuit reiterated this point again, emphasizing "that by statute OSH is solely responsible for the timely treatment of incapacitated criminal defendants so that they may become competent to stand trial." *Id.* at 33. Second, in affirming the Permanent Injunction, the Ninth Circuit noted

that "'[l]ack of funds, staff or facilities cannot justify the State's failure to provide [incapacitated criminal defendants] with [the] treatment necessary for rehabilitation.'"  *Id.* at 36 (quoting *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980)).

Defendants eventually achieved compliance with the Permanent Injunction and maintained compliance for some time; however, defendants fell out of compliance in 2018 and, with little exception,[4] have remained out of compliance since that time.

**B.      The Contempt Order**

On January 7, 2025, DRO moved for an order to show cause why defendants should not be held in contempt, ultimately seeking civil contempt sanctions in the form of monetary fines and modification of the Court's remedial order[5] to include additional remedial measures aimed at effecting defendants' compliance with the Permanent Injunction.  Pl. DRO Mot. for Order to Show Cause, ECF [540]. MPD took no position on the requested contempt finding or monetary sanctions but joined in DRO's request for a remedial order.  Pl. MPD Partial Joinder to DRO Mot. for Contempt & Remedial Order, ECF [557]. On January 24, 2025, the Court held a status conference and heard testimony from then-Interim Superintendent of the OHA, Dr. Sara Walker; OSH staff members Kristine Kautz and Samantha Byers; and the then-Neutral Expert and now-Court Monitor in this case, Dr. Pinals.  *See* Mins. of Proceedings of January 24, 2025, ECF [560].  On March 12 and 13, 2025, the Court held a two-day hearing on the contempt motion and MPD's partial joinder to the same, during which the Court heard argument from the parties and *amici* health systems[6]; received evidence from the parties; and heard testimony from Dr. Pinals, Dr. Walker, Dr. Hathi, and OHA Behavioral Health Director Ebony Clarke.  *See* Mins. of Proceedings of March 12, 2025, ECF [584]; Mins. of Proceedings of March 13, 2025, ECF [586].

---

[4] As noted in the Contempt Order, defendants briefly achieved compliance with the Permanent Injunction in early 2024 but fell back out of compliance by the summer of that year.

[5] As noted in the Contempt Order, the remedial order currently in effect was issued on July 3, 2023, and is located at ECF [416].

[6] The health systems include Legacy Emanual Hospital & Health Center, Providence Health & Services – Oregon, Legacy Health Systems, PeaceHealth, and St. Charles Health System, Inc.

On May 5, 2025, Dr. Pinals issued her eleventh neutral expert report, which she provided to the Court *in camera*.  *See* Debra A. Pinals, M.D., *Neutral Expert Eleventh (11th) Report Regarding the Consolidated* Mink *and* Bowman *Cases*, 11 (May 5, 2025) (hereinafter the "Eleventh Report") (publicly accessible at https://www.oregon.gov/oha/OSH/reports/Oregon_Mink-Bowman_11th_Neutral_Expert_Pinals_Report.pdf); Contempt Order 11.  The next day, Dr. Pinals emailed a copy of the Eleventh Report to the parties.  Decl. of Thomas Stenson Supp. Pl. DRO Resp. Opp'n to Defs. Mot. for Stay ("Stenson Decl."), ECF [620], ¶ 8 & Exs. A, B.  Dr. Pinals informed the parties at that time that she had "already shared and discussed th[e] [Eleventh Report] with [the Court]."  Stenson Decl. Ex. B. On May 12, 2025, the Eleventh Report was posted on OHA's website, where it remains publicly accessible.

On June 6, 2025, the Court issued the Contempt Order.  The Court found that defendants are in contempt; ordered monetary sanctions in the amount of $500.00 per *Mink-Bowman* class member[7] per day, to begin accruing on June 7, 2025, and to continue to accrue each calendar day unless and until defendants achieve substantial compliance with the Permanent Injunction; and granted plaintiffs' request for a remedial order, as outlined in the Contempt Order.  Contempt Order 21.  The Court ordered that the fines be reduced to judgment once per month, and that to facilitate payment of the fines, defendants shall, on the fifteenth day of each month, submit to the Court the relevant dashboard data pertaining to the average active waiting period for *Mink-Bowman* class members, together with a proposed calculation of that month's accrued contempt fines.  *Id.* at 17-18.  The Court noted that the proposed calculation shall specify the amount of the fine to be imposed and contain all calculations performed by defendants to reach the proposed number.  *Id.*

Pursuant to the Contempt Order, defendants have filed two reports regarding proposed calculations of fines.  The first proposed fine calculation report is dated June 16, 2025; covers the period of

---

[7] Defendants repeatedly assert that "there are no 'class members' in the *Mink* or *Bowman* cases" but that, "[a]lthough there are no class members," their fine calculations "include all persons ordered committed to [OSH] pursuant to ORS § 161.370[.]"  Defs. First Report Regarding Calculation of Fines, ECF [606], at 2-3; Defs. 2d Fine Calculation Report, ECF [634], at 2.  Defendants' assertions about class members are irrelevant to the issues addressed in this Opinion and Order.  However, the Court notes that defendants' understanding of the term "*Mink-Bowman* class members" is consistent with that term's definition as set forth in the Contempt Order.  *See* Contempt Order 7.

June 7, 2025, through June 15, 2025; and proposes a total fine amount of $38,000.00.  The report excludes "in the[] proposed fines days where the delay was caused by circumstances outside [d]efendants' control (*e.g.*, where OSH offered a bed to the jail, but the jail declined to transport)."  Defs. 1st Rep. Regarding Calculation of Fines, ECF [606], at 3.  On June 17, 2025, the Court directed defendants "to provide a supplemental report to the Court that details the process related to" individuals affected by delays "outside [d]efendants' control[.]"  Order of June 16, 2025, ECF [608].  Also on June 17, defendants appealed the Court's Contempt Order to the Ninth Circuit.  *See* Notice of Appeal to the 9th Cir., ECF [607].  On June 18, 2025, defendants filed a supplemental report, indicating that "when jails are unwilling to transport an aid and assist defendant the day a bed becomes available, OSH admits the next person on the admissions list" and "[t]he defendant who is not transported[] stays on the waitlist for admission when the next bed becomes available[,]" *i.e.*, "that defendant is offered the next available bed (they do not go to the end of the list)."  Defs. Suppl. Rep. Regarding Fines Calculation ("Defs. Suppl. Rep."), ECF [609], at 2-3.  Also on June 18, defendants filed a motion to stay the Contempt Order pending defendants' appeal to the Ninth Circuit.  Defs. Mot. for Stay, ECF [610].

On June 20, 2025, DRO filed a "brief on calculation of contempt fines," which the Court construed as an objection to defendants' first proposed fine calculation report.  *See* Pl. DRO Br. on Calculation of Contempt Fines, ECF [618]; Order of June 24, 2025, ECF [622].  DRO objects to defendants excluding from the proposed fines days where the delay in admission was caused by circumstances purportedly beyond defendants' control.  Defendants responded in opposition to DRO's objection on June 27, 2025.  Defs. Resp. to Br. on Calculation of Contempt Fines, ECF [623].

Defendants' second proposed fine calculation report is dated July 15, 2025; covers the period of June 16, 2025, through July 14, 2025; and proposes a total fine amount of $107,000.00.  The second proposed fine calculation report again excludes from the "proposed fines days where the delay in admission was caused by circumstances outside [d]efendants' control."  Defs. 2d Fine Calculation Rep., ECF [634], at 3.

# DISCUSSION

## A.     Motion for Stay

Defendants assert that a stay of the Contempt Order is appropriate because defendants "have a substantial case for relief on the merits on appeal" and because defendants and other parties "are likely to suffer irreparable harm if required to pay fines[.]"  Defs. Mot. for Stay 3-4, 8.  Defendants also argue that a stay will not substantially injure other interested parties and is in the public interest.

### 1.     *Likelihood of Success on the Merits*

A party seeking a stay pending appeal need not show that "success is more likely than not[.]"  *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).  Instead, the party need only show that it "has a substantial case for relief on the merits."  *Id.*; *see Nken*, 556 U.S. at 434 (noting that party seeking a stay must show more than a "mere possibility" of success—*i.e.*, they must make a "strong showing").

Defendants argue they have satisfied this standard on two grounds.  First, defendants assert that the Court committed "legal error" by relying on the Eleventh Report to reject defendants' "all reasonable steps" defense.  Defs. Mot. for Stay 4.  Defendants argue that by relying on facts not in the record and provided after the two-day contempt hearing, the Court "deprived [d]efendants of an opportunity to litigate their reasonable steps defense." *Id.* at 4.  Second, defendants assert that the Contempt Order's requirement that defendants "use 'all reasonable steps' or 'all reasonable efforts'" to achieve compliance with the Permanent Injunction is "insufficiently specific to give [d]efendants appropriate notice for what is required of them to be in compliance with the [Contempt] Order." *Id.* at 5-6.  Defendants assert that the remedial relief ordered by the Court "does not require [d]efendants to take any specific actions, nor does it explain what steps defendants must take, in addition to the work in this area they already provided evidence of at the contempt hearing, to comply[.]" *Id.* at 6.  The Court addresses defendants' arguments in turn.

Defendants' first assertion of legal error is not well-taken for several reasons.  First, defendants cannot reasonably take issue with the Court's reliance on the Eleventh Report.  As an initial matter, defendants received the Eleventh Report nearly a month before the Contempt Order was issued,

knew the Eleventh Report had already been provided to the Court, and at no point objected to or asked to be heard by the Court regarding the Eleventh Report's potential use by the Court in ruling on contempt. An argument raised for the first time in a motion to stay pending appeal is generally waived. *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024); *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010). It is noteworthy that defendants generally do not contest the accuracy of the Eleventh Report's recitation of the factual background of this case, or the numbers contained within it.[8] It is also noteworthy that in this case, defendants have requested Dr. Pinals' involvement, paid for her expertise, and supported her provision of ongoing quarterly reports to this Court. Indeed, the Eleventh Report was made available on OHA's website before the Contempt Order was issued. For all these reasons, defendants' arguments regarding the Court's reliance on the Eleventh Report fall short of the "substantial" showing they must make that they are likely to succeed on the merits of their appeal.

Second, defendants provide only a single citation in support their argument regarding the Court's reliance on the Eleventh Report, to *International Union, United Mine Workers of America v. Bagwell* ("*Bagwell*"), 512 U.S. 821 (1994). Defendants are correct that *Bagwell* supports the general proposition that a party must receive notice and an opportunity to be heard before civil sanctions are imposed upon them. *See* 512 U.S. at 827. However, *Bagwell*'s notice requirement plainly applies to the imposition of a contempt finding—*i.e.*, a party must be provided notice of the possibility of contempt and an opportunity to be heard regarding contempt before contempt is imposed. Defendants did receive notice and an opportunity to be heard in this case; indeed, the Court heard extensive argument and testimony proffered by defendants over the course of a two-day contempt hearing. Defendants do not cite to any authority in support of the proposition that a court commits reversible error by relying on a report released following the contempt hearing that is held. Regardless, the Court notes that defendants did receive notice

---

[8] The closest defendants come on this point is their argument that "the purported effect of personnel changes at OSH and some delays or less than perfect performance on some of Dr. Pinals' recommendations . . . did not have any causal effect on meeting the seven-day admissions timeframe." Defs. Mot. for Stay 5. For various reasons, the Court disagrees that this is sufficient to demonstrate that defendants have a substantial case for or strong showing of likelihood of success on the merits of their appeal.

9

of the Eleventh Report, nearly a month before the Court issued the Contempt Order. All of these facts are particularly noteworthy in the context of this case, which involves an injunction that has been in place since 2002; a lack of compliance since 2018; and Dr. Pinals' multi-year extensive involvement in the parties' efforts toward defendants achieving compliance.

Defendants' second assertion of legal error likewise fails. As an initial matter, it is curious to the Court that defendants claim the phrase "all reasonable steps [or efforts]" is an unintelligible standard, considering that defendants' primary defense set forth in the contempt hearing was the "all reasonable steps" defense. Further, it is noteworthy that defendants are already obligated to take "all reasonable steps" to achieve compliance with the Permanent Injunction. *See* Contempt Order 2-3, 12; *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016). As DRO points out, the logical conclusion to draw from defendants' argument is that "[i]f the term 'reasonable steps' is too vague to be understood, then so is Ninth Circuit law on contempt generally." Pl. DRO Resp. Opp'n to Defs. Mot. for Stay, ECF [619], at 11-12. Finally, the long-term nature of this case and the Court's ongoing role in providing oversight of defendants' efforts toward compliance are again important context informing the language used by the Court. *See Melendres v. Skinner*, 113 F.4th 1126, 1139-40 (9th Cir. 2024); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086-87 (9th Cir. 2004).

For all these reasons, the Court finds that defendants have not made the requisite showing of likelihood of success on the merits.

2.  *Irreparable Injury*

A party seeking a stay must show that "there is a probability of irreparable injury if the stay is not granted." *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (emphasis omitted) (citing *Leiva-Perez*, 640 F.3d at 968); *see Index Newspapers LLC v. U.S. Marshal Serv.*, 977 F.3d 817, 824 (9th Cir. 2020) (internal quotation marks and citation omitted) (noting that party seeking stay must "show that irreparable injury is likely to occur during the period before the appeal is decided"). Courts analyze this factor by "focus[ing] on the individualized nature of irreparable harm and not whether it is 'categorically irreparable,'" *Lair*, 697 F.3d at 1214 (quoting *Leiva-Perez*, 640 F.3d at 969), and generally seek to

"anticipate what would happen as a practical matter following the denial of a stay[,]" *Leiva-Perez*, 640 F.3d at 968. The harm identified must be "probable, not merely possible[,]" and assertions of irreparable injury must be supported by more than "conclusory factual assertions and speculative arguments." *Doe #1*, 957 F.3d at 1059 (citing *Nken*, 556 U.S. at 434; *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). Defendants argue that irreparable harm will result if no stay is issued because they will need to reduce budget allocations to key areas to pay the contempt fines, which will result in harm to their employees, persons with behavioral health needs, and the Oregon community at large.

First, as DRO points out in its opposition to defendants' motion, defendants' arguments regarding irreparable injury relate only to the Court's imposition of contempt fines. Defendants make no argument as to whether "there is a probability of irreparable injury if" the challenged remedial measures are not stayed. This alone is sufficient reason to deny defendants' motion as to the challenged remedial measures.

Second, regarding the imposition of contempt fines, "monetary injury is not normally considered irreparable." *Doe #1*, 957 F.3d at 1060 (internal quotation marks and citation omitted). The Ninth Circuit has stated that "'[m]ere injuries, however substantial, in terms of money, time[,] and energy expended . . . are not enough.'" *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) (declining to make finding of irreparable harm where the "harm suffered is largely the result of the government's own failure[s]"). The Court is cognizant of the practical considerations defendants face; it is true that budgets are finite, and needs are many. However, the fines scheme set forth in the Contempt Order is specifically intended to ensure that funds are set aside to aid defendants' efforts toward compliance—those funds will be held and not distributed until, following discussions with the parties, Dr. Pinals provides formal recommendations regarding their expenditure. Put simply, defendants' broad-brush assertions regarding the budget cuts and cuts to services that they "anticipate" and find "likely" to occur if no stay is issued are simply insufficient to establish irreparable injury. Defs. Mot. for Stay 3.

Third, in contrast to monetary injuries, constitutional injuries *are* generally considered

11

irreparable. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019); *see Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011). To this point, the Court must also consider the potential for irreparable injury if a stay *is* issued—*i.e.*, the irreparable injury that individuals unable to aid and assist in their defense face when held in jail beyond the seven-day period. These competing interests lead the Court to conclude that defendants have not set forth the requisite showing that the irreparable injury factor should tip in favor of a stay.

Because the Court finds that defendants have not satisfied their burden as to either of the first two factors, which are afforded the greatest weight, the Court does not reach the remaining factors.

## B.    Objection to Proposed Fine Calculations

Defendants generally argue that they should not be fined for days beyond the seven-day window that are out of their control, such as "when a jail declines to transport a defendant" because "[the jail] will not transport except on certain days of the week[.]" Defs. Suppl. Rep. 3. Defendants argue that they should not be penalized for these days because it is "longstanding practice" that jails conduct such transports; "OSH does not believe that it has authority to transport [criminal] defendants from or to county jails"; and "OSH does not have staff to transport defendants from and to county jails across the state." *Id.* Defendants assert that OSH representatives "have worked hard to develop strong relationships with the jails" and that those representatives "are now regularly invited to the jails conferences to discuss and collaborate, address barriers, and resolve issues." *Id.*

DRO objects to defendants' proposed fine calculations, which exclude days where the delay in admission was purportedly caused by circumstances beyond defendants' control.

DRO's objection is well-taken. The law of this case and the Ninth Circuit makes clear that the onus falls on defendants to comply with the Permanent Injunction. In addressing defendants' motion to stay the Permanent Injunction, Judge Panner made clear that the seven-day period must be calculated from the date the court order is issued—not the date that OSH receives a copy of the court order—in part because

"defendants' desire for administrative convenience should not trump the needs and rights of the persons requiring hospitalization." Order of May 28, 2002, at 3. Likewise, in affirming the Permanent Injunction, the Ninth Circuit conclusively held that "it is OSH, not counties, that has the duty to accept incapacitated defendants once they have been certified as such by a circuit court." Mandate from U.S. Ct. of Appeals 32. The Ninth Circuit called OSH "solely responsible" for satisfying the Permanent Injunction and noted that "'[l]ack of funds, staff or facilities cannot justify the State's failure to provide [incapacitated criminal defendants] with [the] treatment necessary for rehabilitation.'" *Id.* at 36 (quoting *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980)).

It is true that defendants' assertions regarding the limited nature of some counties' transport efforts raise practical considerations that defendants must work around. However, the Court is not convinced that defendants have taken all reasonable steps to ensure that, despite these transport limitations, they are complying with the Permanent Injunction. If defendants are aware of particular limitations, they must seek to work within or around those limitations to reach compliance—by, for example, revising their own processes and protocols to account for the limitations on transport offered by counties, or establishing some other adequate means of transport. Indeed, defendants assert that they "do[] not believe that [OSH] has authority to transport defendants from or to county jails[,]" but do not identify any law or regulation forbidding such transport. The harm that criminal defendants face by being jailed longer than allowed by the Permanent Injunction is not mitigated by the fact that their continued jailing is a result of lack of transport, as opposed to some other reason. The Court must account for this harm.

**CONCLUSION**

For the reasons stated above, defendants' Motion for Stay, ECF [610], is DENIED. Additionally, plaintiff Disability Rights Oregon's Objection to Defendants' First Report Regarding Calculation of Fines, ECF [618], is SUSTAINED. Defendants shall re-submit their First Report Regarding Calculation of Fines, ECF [606], and Second Fine Calculation Report, ECF [634], in accordance with this Opinion and Order, by August 15, 2025. All future fine calculation reports shall conform to the rulings set forth in this Opinion and Order.

IT IS SO ORDERED.

DATED this 6th day of August, 2025.

Adrienne Nelson
United States District Judge